# EXHIBIT A

SERVER INITIALS: _____ RS _____

BATTLEFIELD PROCESS SERVING

DATE SERVED: 7 /10 / 26.

TIME SERVED: 11:01 (AM / PM)

# SUMMONS
### IN THE STATE OF ILLINOIS, CIRCUIT COURT

☐ Alias Summons

*Check if this is not the 1ⁿ Summons issued for this Defendant/Respondent.*

FILED-CH
CLERK OF THE CIRCUIT COURT
CHANCERY DIVISION
MARIYANA T SPYROPOULOS
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY
2025 JUL 15 PM 12:12

**COUNTY:** Cook

*County Where You Are Filing the Case*

*Enter the case information as it appears on your other court documents.*

**PLAINTIFF/PETITIONER OR IN RE:** Fox River Resort Club and Silverleaf R

*Who started the case.*          *First, Middle, and Last Name, or Business Name*

**DEFENDANTS/RESPONDENTS:** Vairt Inc.

*Who the case was filed against.*

*First, Middle, and Last Name, or Business Name*

2026CH08461
Judge: Calendar, 2
Case Number

## The Defendant/Respondent named above has been sued. Read this form for information about how to respond to this lawsuit. Also see page 4 for next steps.

**For the person filling out this form: Read all instructions in this box.**

This *Summons* can only be used for certain types of cases. See the *How To Serve a Summons* instructions for more information: ilcourts.info/how-to-summons.

Check 1 if this is a 30-day summons or check 2 if this is a date certain summons. Fill in all the information in 1 or 2.

- Use a **date certain summons** if you are asking for money of $50,000 or less or recovery of your personal property that you think the Defendant has, and for some mandatory arbitration cases. In 2, fill in your court date and how to go to court. You may get the court date when you e-file or you may need to ask the Circuit Clerk's office.

- Use a **30-day summons** for most other case types.

Complete the rest of the form with the Defendant/Respondent's information and information about the lawsuit.

**If you are suing more than 1 Defendant/Respondent,** attach an *Additional Defendant/Respondent Address and Service Information* form for each additional Defendant/Respondent.

### ☑ 1. 30-DAY SUMMONS

To participate in this case, you must file your *Appearance* and *Answer/Response* forms with the court within 30 days after you are served with this *Summons* (not counting the day of service) by e-filing or at:

Court Address: Richard J. Daley Center 50 W. Washington St., Chicago, Illinois 60602

*Courthouse Street Address*

- or -

### ☐ 2. DATE CERTAIN SUMMONS

*Your court date is listed below. Information about getting a court date and how to attend is available from the Circuit Clerk. You can find their contact information at ilcourts.info/clerks.*

To respond to this *Summons*, you must **attend court** in one of the ways checked below on:

_____ at _____ ☐ a.m. ☐ p.m. in _____

*Month, Day, Year*          *Time*                          *Courtroom Number*

*This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Circuit Courts. Forms are free at ilcourts.info/forms.*

Case Number _____

## Going to Court for a Date Certain Summons

Court dates may be in-person, remote, or a combination of in-person and remote.

☐ **In person at:** _____
        *Courtroom Address*                 *Courtroom Number*

☐ **Remotely** (video or telephone)

    **By video conference at:** _____
                *Video Conference Website*

    **Log-In Information:** _____
                *Video Conference Log-in Information, Meeting ID, Password, etc.*

    **By telephone at:** _____
                *Call-in Number for Telephone Remote Appearance*

To find out more about remote court options:

**Phone:** _____ or **Website:** _____
      *Circuit Clerk's Phone Number*               *Website URL*

## 3. ADDITIONAL INFORMATION ABOUT THE LAWSUIT

a. I am asking for the following amount of money in my *Complaint/Petition:* $ _____.
                                         *(Enter 0 if you are not asking for money)*

b. I am asking for the return of tangible personal property (items in the Defendant/Respondent's possession) in my *Complaint/Petition.*

    ☐ Yes    ☑ No

## 4. DEFENDANT/RESPONDENT'S INFORMATION

a. Number of Defendants/Respondents being served:

    ☑ I am having 1 Defendant/Respondent served and their information is on this form below.

    ☐ I am having more than 1 Defendant/Respondent served. The first is listed below. I have attached *Additional Defendant/Respondent Address and Service Information* forms for the following number of additional Defendants/Respondents: _____.
                               *Number*

b. First Defendant/Respondent's **primary address/information** for service:

**Name:** Vairt Inc. _____
    *First, Middle, and Last Name, or Business Name*

Registered Agent's Name *(if you are serving the Registered Agent of a business):*

_____
    *First, Middle, and Last Name*

**Street Address:** 13308 Bueno Vista Road _____
        *Street, Apt #*

**City, State, ZIP:** Waynesboro, Pennsylvania 17268 _____
          *City*                  *State*      *Zip*

**Telephone:** _____ **Email:** _____

Case Number _____

c. **Second address** for this Defendant/Respondent:

☑ I do **not** have another address where the Defendant/Respondent might be found.

☐ I have another address where this Defendant/Respondent might be found. It is:

Street Address: _____
             *Street, Apt #*

City, State, ZIP: _____
             *City*                               *State*        *Zip*

Telephone: _____ Email: _____

d. **Person who will serve your documents on this Defendant/Respondent:**

☐ Sheriff in Illinois ☑ Special process server ☐ Licensed private detective

☐ Sheriff outside Illinois: _____
                          *County & State*

---

## PLAINTIFF/PETITIONER INFORMATION:

*Enter your information below.*

Name **Fox River Resort Club, a Not-For-Profit Illinois Corp. and Silverleaf Resorts, LLC**
      *First, Middle and Last Name*

Registered Agent's name, if any _____
                       *First, Middle and Last Name*

Street Address **360 N. Green Street, Suite 1300 (Greenberg Traurig, LLP)**
        *Street, Apt #*

City, State, ZIP: **Chicago, Illinois**
             *City*                           *State*       *Zip*

Telephone: **(312) 236-4386**      Email: **kedzioram@gtlaw.com**

Be sure to check your email every day so you do not miss important information, court dates, or documents from other parties.

---

**STOP** The Circuit Clerk and officer or process server will fill in this section.

MARIYANA T. SPYROPOULOS
CLERK OF CIRCUIT COURT.

**To be filled in by the Circuit Clerk:**

Witness this Date: _____

Clerk of the Court: **Mariyana T. Spyropoulos JUL 0 6 2026**

**To be filled in by an officer or process server:**

Date of Service: _____

*Fill in the date above and give this copy of the Summons to the person served.*

---

**Note to officer or process server:**

○ If 1 is checked, this is a 30-day *Summons* and must be served within 30 days of the witness date.

○ If 2 is checked, this is a date certain *Summons* and must be served at least 21 days before the court date, unless 3b is checked yes.

  ▪ If 2 is checked **and 3b** is checked yes, the *Summons* must be served at least 3 days before the court date.

○ Fill in the date above and give this copy of the *Summons* to the person served.

○ You must also complete the attached *Proof of Service* form and file it with the court or return it to the Plaintiff.

---

ATJ 1503.8                                 **Page 3 of 6**                                  **(08/25)**



Case Number _____

# WHAT'S NEXT

## NEXT STEPS FOR PERSON FILLING OUT THIS FORM:

When you file a lawsuit, you must notify the person or business you are suing of the court case by having the *Summons* and Complaint or Petition delivered to them. This is called "serving" them.

File your *Summons* and Complaint or Petition with the Circuit Clerk in the county where your court case should be filed. The Circuit Clerk will "issue" the *Summons* by putting a court seal on the form.

Have the sheriff or a private process server serve the *Summons* and a copy of the Complaint or Petition on the Defendant/Respondent. You cannot serve the *Summons* yourself.



> Learn more about each step in the process and how to file in the instructions:
> ilcourts.info/how-to-summons.



## NEXT STEPS FOR PERSON RECEIVING THIS DOCUMENT:

### You have been sued:

- Read all documents attached to this *Summons*.
- All documents referred to in this *Summons* can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.
- You may be charged filing fees, but if you cannot pay them, you can file an *Application for Waiver of Court Fees (Civil)*.
- When you go to court, it is possible that the court will allow you to attend the first court date in this case in-person or remotely by video or phone. Contact the Circuit Court Clerk's office or visit the Court's website to find out whether this is possible and, if so, how to do this.

### If Section 1 on page 1 of this *Summons* is checked (30-day summons):

- You must file official documents called an *Appearance* and an *Answer/Response* with the court within 30 days of the date you were served with this *Summons*.
- If you do not file an *Appearance* and *Answer/Response* on time, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.
- After you fill out the necessary documents, you need to electronically file (e-file) them with the court. To e-file, you must create an account with an e-filing service provider. For more information, go to ilcourts.info/efile. If you cannot e-file, you can get an exemption that allows you to file in-person or by mail.
- You should be notified of any future court dates.

### If Section 2 on page 1 of this *Summons* is checked (date certain summons):

- You must attend court on the date listed in Section 2 of this *Summons*.
- If you do not attend that court date, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.

### Need Help? ¿Necesita ayuda?

- Call or text Illinois Court Help at 833-411-1121 or go to ilcourthelp.gov for information about going to court, including how to fill out and file documents.
- Llame o envíe un mensaje de texto a Illinois Court Help al 833-411-1121, o visite ilcourthelp.gov para obtener información sobre los casos de la corte y cómo completar y presentar formularios.
- You can also get free legal information and legal referrals at illinoislegalaid.org.
- If there are any words or terms that you do not understand, please **visit Illinois Legal Aid Online** at ilao.info/glossary. You may also find more information, resources, and the location of your local legal self-help center at: ilao.info/lshc-directory.

Case Number _____

# PROOF OF SERVICE OF SUMMONS AND COMPLAINT/PETITION

### IN THE STATE OF ILLINOIS, CIRCUIT COURT

☐ **Alias Summons**
Check if this is not the 1ᵗ Summons issued for this Defendant/Respondent.

**COUNTY:** Cook _____
*County Where You Are Filing the Case*

*Enter the case information as it appears on your other court documents.*

**PLAINTIFF/PETITIONER OR IN RE:** Fox River Resort Club and Silverleaf R
*Who started the case.*                    *First, Middle, and Last Name, or Business Name*

**DEFENDANTS/RESPONDENTS:** Vairt Inc.
*Who the case was filed against.*

_____

*First, Middle, and Last Name, or Business Name*

**Case Number** _____

**STOP** Do not complete the rest of the form. **The sheriff or special process server will fill in the form.** Give them one copy of this blank *Proof of Service* form for each Defendant/Respondent who will be served.

My name is _____ and I state:
*Officer/Process Server First, Middle, Last Name*

## SERVICE INFORMATION

Defendant/Respondent: _____
*First, Middle, Last Name, or Business Name*

☐ I was not able to serve the *Summons* and Complaint/Petition on the Defendant/Respondent named above.

- or -

☐ I served the *Summons* and Complaint/Petition on the Defendant/Respondent named above as follows:

☐ **Personally on the Defendant/Respondent:**
☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____ Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

☐ **On someone else at the Defendant/Respondent's home** who is at least 13 years old and is a family member or lives there:
Name of person served: _____
*First, Middle, Last Name*
☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____ Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
and by sending a copy to this Defendant/Respondent in a postage-paid, sealed envelope to the above

address on this date: _____.

ATJ 1503.8                        Page 5 of 6                        (08/25)

Case Number _____

☐ **On the Business's agent:** _____
First, Middle, Last Name

☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____  Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

## SERVICE ATTEMPTS

I made the following attempts to serve the *Summons* and Complaint/Petition on the Defendant/Respondent:

**First Attempt:** On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
Other information about service attempt:

_____
_____
_____

**Second Attempt:** On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
Other information about service attempt:

_____
_____
_____

**Third Attempt:** On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
Other information about service attempt:

_____
_____
_____

---

**SIGN**

I certify under <u>735 ILCS 5/1-109</u> that:

1) everything in this document is true and correct, or I have been informed or I believe it to be true and correct, and
2) I understand that making a false statement on this form is perjury and has penalties provided by law.

Your Signature /s/ _____  Print Your Name _____

You are: ☐ Sheriff in Illinois                      ☐ Special process server
         ☐ Sheriff outside Illinois: _____  ☐ Licensed private detective, license number: _____
                        County and State                                                          License number

**FEES:**
    Service and Return: $_____  Miles: $_____  Total: $_____

**Chancery Division Civil Cover Sheet**
**General Chancery Section**

(12/01/24) CCG 0061

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

Fox River Resort Club and Silverleaf Resorts, LLC
                                                    Plaintiff

v.                                      Case No: **2026CH06461**
                                                 **Judge: Calendar, 2**
Vairt Inc.

                                                    Defendant

### CHANCERY DIVISION CIVIL COVER SHEET
### GENERAL CHANCERY SECTION

A Chancery Division Civil Cover Sheet - General Chancery Section shall be filed with the initial complaint in all actions filed in the General Chancery Section of Chancery Division. The information contained herein is for administrative purposes only. Please check the box in front of the appropriate category which best characterizes your action being filed.

**Only one (1) case type may be checked with this cover sheet.**

| | | |
|---|---|---|
| 0005 ☐ Administrative Review | 0017 | ☐ Mandamus |
| 0001 ☐ Class Action | 0018 | ☐ Ne Exeat |
| 0002 ☑ Declaratory Judgment | 0019 | ☐ Partition |
| 0004 ☐ Injunction | 0020 | ☐ Quiet Title |
| | 0021 | ☐ Quo Warranto |
| 0007 ☐ General Chancery | 0022 | ☐ Redemption Rights |
| 0010 ☐ Accounting | 0023 | ☐ Reformation of a Contract |
| 0011 ☐ Arbitration | 0024 | ☐ Rescission of a Contract |
| 0012 ☐ Certiorari | 0025 | ☐ Specific Performance |
| 0013 ☐ Dissolution of Corporation | 0026 | ☐ Trust Construction |
| 0014 ☐ Dissolution of Partnership | 0050 | ☐ Internet Take Down Action (Compromising Images) |
| 0015 ☐ Equitable Lien | | |
| 0016 ☐ Interpleader | | ☐ Other (specify) _____ |

◉ Atty. No.: 36511      ○ Pro Se 99500

Atty Name: Greenberg Traurig, LLP

Atty. for: Plaintiffs

Address: 360 N. Green Street, Suite 1300

City: Chicago          State: IL

Zip: 60607

Telephone: (312) 236-4929

Primary Email: grace.filer@gtlaw.com

Pro Se Only: ☐ I have read and agree to the terms of the Clerk's Clerk's Office Electronic Notice Policy and choose to opt in to electronic notice from the Clerk's office for this case at this email address:

Email: _____

Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois
cookcountyclerkofcourt.org
Page 1 of 1

7/15/2026 10:15 AM - 10:20 AM
CourtRoomNumber>>
Calendar, 2

FILED
7/8/2026 8:27 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026CH06461
Calendar, 2
38925534

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

FOX RIVER RESORT CLUB, a Not-For-Profit Illinois Corporation, and SILVERLEAF RESORTS, LLC, a Texas Limited Liability Company,

    Plaintiffs,

  v.

VAIRT INC., a Pennsylvania Corporation,

    Defendant.

Case No. 2026 CH 06461

Calendar 2

### PLAINTIFFS FOX RIVER RESORT CLUB AND SILVERLEAF RESORTS, LLC'S MOTION FOR EARLY HEARING ON THE VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs Fox River Resort Club, a not-for-profit Illinois corporation, and Silverleaf Resorts, LLC, a Texas limited liability company (collectively "Plaintiffs"), by and through their attorneys, Greenberg Traurig, LLP, and pursuant to 735 ILCS 5/2-701(b), hereby move this Court to set an expedited schedule and early hearing on their Verified Complaint for Declaratory Judgment ("Verified Complaint"). In support of their Motion, Plaintiffs state as follows:

### INTRODUCTION

1. Plaintiffs, as seller ("Seller"), and Defendant Vairt Inc. ("Defendant" or "Purchaser"), as purchaser, entered into a Purchase and Sale Agreement and Joint Escrow Instructions (the "PSA") concerning the sale of certain commercial real property located at 2558 N. 3653 Road, Sheridan, Illinois, known as Fox River Resort (the "Property"). Thereafter, Seller and Purchaser executed a Mutual Termination and Release Agreement (the "Termination Agreement"), pursuant to which they mutually agreed to terminate the PSA and release any claims arising from the contemplated transaction. Despite executing the Termination Agreement, and requesting and receiving the return of the Earnest Money Deposit, Purchaser now contends that

FILED DATE: 7/8/2026 8:27 PM 2026CH06461

FILED DATE: 7/8/2026 8:27 PM   2026CH06461

the Termination Agreement is unenforceable and continues to assert purported rights relating to the Property and the terminated transaction. By doing so, Purchaser threatens to cloud Seller's title and impair Seller's ability to market, transfer, or otherwise dispose of the Property.

2. Accordingly, Plaintiffs initiated this single-count action seeking declaration that the Termination Agreement is a valid and enforceable, the PSA was terminated pursuant to the Termination Agreement, and therefore Defendant has no right to purchase the Property. Because Purchaser's continued assertions regarding the Property create ongoing uncertainty regarding title, prompt resolution is necessary to avoid further prejudice and loss of alienability to Seller. Accordingly, by this Motion, Plaintiffs seek entry of an order establishing an expedited briefing schedule and early hearing on their Verified Complaint pursuant to 735 ILCS 5/2-701(b), as the sole relief sought is a judicial declaration of the parties' rights under the Termination Agreement.

## RELEVANT FACTUAL BACKGROUND

*Purchase and Sale Agreement and Joint Escrow Instructions*

3. On April 22, 2026, Plaintiffs, as Seller, and Defendant, as Purchaser, entered into the Purchase and Sale Agreement and Joint Escrow Instructions (together with any amendments or modifications, the "PSA"), for the sale of the Property. (**Ex. A**, Verified Compl. ¶ 8). On June 1, 2026, Defendant exercised its option under the PSA to extend the closing deadline to June 24, 2026, requiring an additional Earnest Money Deposit ("EMD"). (*Id.* ¶ 9).

*Agreement to Terminate the PSA*

4. On June 4, 2026, Plaintiffs sent Defendant written notice outlining multiple breaches of the PSA by Defendant—including failure to fund the required additional EMD, unauthorized advertising and promotional activities, and misuse of access rights—and demanded that Defendant immediately cure such defaults. (*Id.* ¶ 10). In the days that followed, additional

2

FILED DATE: 7/8/2026 8:27 PM    2026CH06461

issues arose between the Parties concerning the transaction, culminating in Defendant indicating that it would not proceed. (*Id.* ¶ 11). The Parties thereafter began negotiating a mutual termination of the PSA and exchanged drafts of a Termination Agreement. (*Id.*).

5.      At the same time, and in parallel with those negotiations, the Parties communicated with Wheatland Title (the "Escrow Agent") to facilitate the release of the EMD from escrow in anticipation of termination. (*Id.* ¶ 12).

*Execution of the Termination Agreement*

6.      On June 18, 2026, Plaintiffs' counsel transmitted a redline and clean version of the negotiated Termination Agreement to Defendant's counsel. (*Id.* ¶ 13). Seller executed the Termination Agreement on June 18, 2026. (*Id.* ¶ 14).

*Defendants' Acknowledgment of and Demands under the Executed Termination Agreement*

7.      Defendant repeatedly represented and acknowledged that it also executed the Termination Agreement. (*Id.* ¶ 15). For example:

   a. On June 19, 2026, Defendant's counsel sent an email to Plaintiffs' counsel stating "My client signed everything. I can release it once there is confirmation from the title company that the form will work."[1]

   b. On June 22, 2026, the Escrow Agent sent an email to Defendant's counsel stating: "We cannot release funds based on a written direction by someone on behalf of an entity whose authority we cannot verify. We have escrow standards that have to be met." A copy of the June 22, 2026 email is enclosed hereto as **Exhibit C**. In response, Defendant's counsel stated: "This is why I would not release the signed documents in case something like this occurred." *Id.*

   c. On June 24, 2026, Defendant sent correspondence titled "SUPPLEMENTAL NOTICE OF DAMAGES, DEMAND FOR IMMEDIATE ACTION, AND ELECTION OF REMEDY" ("June 24 Notice") under the PSA and the "Mutual Termination and Release Agreement dated June 18, 2026."

   d. In the June 24 Notice Defendant stated: "[t]his correspondence constitutes formal notice from Vairt Inc. regarding the above-referenced transaction, **the**

_____

[1] That same day, June 19, 2026, the Escrow Agent confirmed that "The document is acceptable…" A copy of the June 19, 2026 email is enclosed hereto as **Exhibit B**.

**Mutual Termination and Release Agreement executed on June 18, 2026,** and the related Payout and Return of Earnest Money Authorization executed by the parties."

e. In the June 24 Notice Defendant stated: **"[a]s reflected in the executed termination and escrow disbursement documents, the parties agreed to terminate the Purchase and Sale Agreement** and authorized the disbursement of the Earnest Money Deposit held by Escrow Agent."

f. In the June 24 Notice, the Defendant requested a "written confirmation no later than 3:00 PM Central Time on June 24, 2026, confirming whether the earnest money funds in the amount of $[] will be released and wired in accordance with **the executed authorization documents** today."

g. On June 25, 2026, Defendant sent an email stating "[s]ince execution of the **Mutual Termination and Release Agreement and Escrow Authorization,** Purchaser has acted promptly and in good faith to provide all information, documentation, banking records, source-of-funds materials, investor information, wire instructions, and other items requested by Seller, Seller's representatives, and Wheatland Title." A copy of the June 25, 2026 email is enclosed hereto as **Exhibit D.**

(*Id.* ¶¶ 16-22, Exs. E, F; Ex. C) (emphases added).

*Defendant Reverses Course and Threatens to Cloud Plaintiffs' Title to The Property*

8. Over the course of several days, the parties communicated with the Escrow Agent to facilitate the release of the EMD. (*Id.*). On June 24, 2026, the Escrow Agent refunded a portion of the EMD. (*Id.* ¶ 24). Because a portion of the remaining EMD had originally been deposited by third parties, the Escrow Agent required additional documentation confirming Defendant's authority to direct the disbursement of those funds and/or the third-party depositors' consent to the disbursement of these funds to the account designated by Defendant. (*Id.* ¶ 25).

9. Rather than cooperating with the Escrow Agent to complete the disbursement process—notwithstanding Defendant's repeated acknowledgment of the execution of the Termination Agreement—Defendant reversed course and began demanding either an extension of the closing date to pursue the transaction and/or payment not contemplated by the PSA or the Termination Agreement. (*Id.* ¶ 26). Defendant further threatened to cloud Plaintiffs' title to the

4

FILED DATE: 7/8/2026 8:27 PM   2026CH06461

Property through litigation and impair their ability to transfer or otherwise dispose of it, thereby necessitating this declaratory judgment action. (*Id.* ¶ 27). Accordingly, on July 6, 2026, Plaintiffs filed their single-count Verified Complaint seeking declaration that the Termination Agreement is a valid and enforceable contract, the PSA has been terminated by the Termination Agreement, and that Defendant has no right to purchase the Property. (Ex. A).

## ARGUMENT

10.    The Property, formerly operated as and known as Fox River Resort, is a former timeshare development located in Sheridan, Illinois. Following a vote by super majority of the timeshare interest owners to terminate the timeshare regime and sell the Property, Seller entered into the PSA with Purchaser. Thereafter, Purchaser elected not to proceed with the acquisition and executed the Termination Agreement. Despite having agreed to terminate the transaction, Purchaser now improperly contends that the Termination Agreement is unenforceable in an effort to revive the terminated transaction or extract additional remuneration not contemplated by the PSA or the Termination Agreement, and thereby clouding Seller's title and impairing Seller's ability to market, transfer, or otherwise dispose of the Property.

11.    Time is of the essence. Every day that passes, operating, maintenance, and carrying costs continue to accrue, imposing an unnecessary financial burden on the Seller, and Plaintiffs ability to sell the Property remains impaired. Prompt resolution is therefore necessary to prevent further prejudice, ongoing damages, and impairment of Plaintiffs' right of alienability. Accordingly, Plaintiffs seek entry of an order establishing an expedited briefing schedule and early hearing on their Verified Complaint pursuant to 735 ILCS 5/2-701(b).

12.    Section 2-701 of the Illinois Code of Civil Procedure allows this Court to set this matter on an expedited track:

5

(a)     The court may, in cases of actual controversy, make binding declarations of rights, having the force of final judgments, whether or not any consequential relief is or could be claimed, including the determination, at the instance of anyone interested in the controversy, of the construction of any . . . *contract* . . . , and a declaration of the rights of the parties interested.

(b)     Declarations of rights as herein provided for, may be obtained by means of a pleading seeking that relief alone, or as incident to or part of a complaint, counterclaim or other pleading seeking other relief as well, *and if a declaration of rights is the only relief asked, the case may be set for early hearing* as in the case of a motion.

735 ILCS 5/2-701 (a), (b) (emphasis added).

13.     The determination of the validity of a contract is a proper subject of inquiry in a declaratory judgment action. *Mid-Town Petroleum, Inc. v. Dine*, 72 Ill. App. 3d 296, 299 (1st Dist. 1979). "[W]here an actual controversy regarding the validity of the contracts and the parties' rights and obligations under them existed, a declaratory judgment action could best serve to fix the rights of the parties and avoid future litigation." *Albright v. Phelan*, 2 Ill. App. 3d 142, 148 (1st Dist. 1971). "The declaratory judgment procedure allows the court to take hold of a controversy one step sooner than normally – that is, after the dispute has arisen, but before steps are taken which give rise to claims for damages or other relief." *Beahringer v. Paige*, 204 Ill. 2d 363, 372-73 (2003) (internal quotations omitted). "The parties to the dispute can then learn the consequence of their action before acting." *Id.* at 373. "The purpose of a declaratory judgment action is to obtain judicial resolution of an actual dispute before the parties irrevocably jeopardize their rights." *Miller v. Lake Cnty.*, 71 Ill. App. 3d 478, 481 (2nd Dist. 1979), *aff'd in part, rev'd in part on other grounds*, 79 Ill. 2d 481 (1980).

14.     As stated in Section 2-701(b), "if a declaration of rights is the only relief asked, the case may be set for early hearing as in the case of a motion." *Universal Underwriters Ins. Co. v.*

6

FILED DATE: 7/8/2026 8:27 PM    2026CH06461

*Judge & James, Ltd.*, 372 Ill. App. 3d 372, 379 (1st Dist. 2007) (quoting 735 ILCS 5/2-701(b));
*see also Ocampo De Kalb, LLC v. GMAC Commercial Mortg. Corp.*, 169 F. Supp. 2d 810, 814
(N.D. Ill. 2001) (noting that the statue clearly "contemplates an 'early hearing'" and stating that
the court in the case could "expedite matters to try to resolve this dispute"); *St. Joseph Hosp. v.
Corbetta Constr. Co.*, 21 Ill. App. 3d 925, 931 (1st Dist. 1974) (finding that hospital's "filing [of]
its declaratory action when it did, without waiting for an even more complete disaster, certainly
was proper"). Here, a judicial declaration of validity of the Termination Agreement is the sole
relief sought. Hence, the statute allows the Court to set this matter for an early hearing.

15.     In addition, the Court has discretion to control its own docket and set an expedited
schedule. *See Kula v. Sitkowski*, 395 Ill. 167, 171 (1946) ("A trial court is vested with judicial
discretion in the arrangement of cases on the trial calendar, and in determining their priority, and
so long as there is no abuse of that discretion its action will not be changed by a court of review.");
*Bank of Am. v. Land*, 2013 IL App (5th) 120283 ¶ 24 ("The circuit court has the discretion to
manage its docket to ensure that there is no undue delay in the resolution of the proceedings before
it.").

16.     Here, the Court should exercise its discretion to hear this case in an expedited
manner because Defendant's refusal to acknowledge the enforceability of the Termination
Agreement is acting as a restraint on the alienability of the Property and interferes with Plaintiffs'
ability to sell the Property. *See Drayson v. Wolff*, 277 Ill. App. 3d 975, 981 (1st Dist. 1996) ("The
rule against restraints on alienation has developed from the early idea that the power of alienation
of real property is socially and economically desirable. This power is now regarded as an attribute
of ownership and may not be restrained unreasonably.").

7

FILED DATE: 7/8/2026 8:27 PM   2026CH06461

17.     Moreover, Seller incurs approximately $300,000 per month in carrying, operating, and maintenance expenses while the Property remains unsold. Accordingly, any delay in resolving this dispute subjects Seller to substantial and continuing damages, further warranting expedited consideration of the Verified Complaint.

18.     Despite executing the Termination Agreement and acting pursuant to its terms by requesting and receiving the return of the EMD, Defendant now contends that the Termination Agreement is unenforceable because Defendant did not deliver its executed signature page to Plaintiffs. Defendant's position is contrary to both the undisputed facts and settled Illinois law.

19.     Illinois law is clear that delivery is not an essential element of contract formation unless expressly required by the contract. *Soderstrom v. Rock River Valley Pigeon Club, Inc.*, 122 Ill. App. 3d 819, 820 (3d Dist. 1984) ("Clearly delivery is not an essential element to the formation of a contract unless the offer specifies actual delivery as an essential part of acceptance of the offer."); *Stuart Park Assocs. Ltd. P'ship v. Ameritech Pension Tr.*, 846 F. Supp. 701, 710 (N.D. Ill. 1994) (applying Illinois law) ("Delivery, however, is not a precondition to contract formation unless the contract indicates otherwise."). "[W]here one party signs a contract and informs the other party he has done so, a binding written contract may be formed regardless of whether or not the contract is actually delivered. Delivery is not an essential element to the formation of a contract unless the offer specifies actual delivery as a requirement of acceptance." *M.J. Oldenstedt Plumbing Co., Inc. v. K Mart Corp*, 257 Ill. App. 3d 765-66 (3d Dist. 1994) (internal citation and quotation marks omitted).

20.     Here, the Termination Agreement contains no requirement that an executed signature page be delivered as a condition precedent to contract formation or enforceability. To the contrary, each party expressly represented and warranted that, upon execution, the Termination

Agreement "constitutes a valid and binding obligation of such party, enforceable in accordance with its terms." (Ex. A, ¶ 37). Accordingly, Defendant's refusal to deliver a signature page does not negate the existence of a binding agreement, especially where Defendant repeatedly represented that it had executed the Termination Agreement, induced Plaintiffs and Escrow Agent to rely on those representations and thereafter performed in accordance with the agreement's terms.

21.     Indeed, Defendant repeatedly acknowledged that it had executed the Termination Agreement. In its June 24, 2026 notice, Defendant expressly referred to the "Mutual Termination and Release Agreement **executed on June 18, 2026**" and further represented that "**[a]s reflected in the executed termination and escrow disbursement documents, the parties agreed to terminate the Purchase and Sale Agreement** and authorized the disbursement of the Earnest Money Deposit held by Escrow Agent." (Ex. A ¶ 20). The following day, Defendant again represented that "[s]ince execution of the Mutual Termination and Release Agreement and Escrow Authorization, Purchaser has acted promptly and in good faith ..." (*Id.* ¶ 22). Defendant's counsel likewise confirmed that Defendant had "signed everything." (*Id.* ¶ 16). These statements leave no doubt that Defendant affirmatively represented to Plaintiffs and third parties that it had executed and agreed to be bound by the Termination Agreement.

22.     Defendant's conduct likewise confirms its assent. Following execution of the Termination Agreement, Defendant repeatedly demanded the return of the EMD and accepted the return of the majority of those funds. Only a portion of the EMD remains in escrow because the Escrow Agent required additional documentation concerning funds originally deposited by third parties and Defendant's authority to direct their disbursement. (*Id.* ¶ 25). By seeking and accepting

FILED DATE: 7/8/2026 8:27 PM   2026CH06461

the benefits afforded by the Termination Agreement, Defendant objectively manifested its intent to be bound by that agreement.

23. Having repeatedly acknowledged that it executed the Termination Agreement, invoked its provisions, and sought performance thereunder, Defendant cannot now plausibly contend that the agreement was never formed or is otherwise unenforceable. Illinois law evaluates contract formation based on the parties' objective manifestations of assent, not their unexpressed subjective intentions. *See Vill. of S. Elgin v. Waste Mgmt. of Illinois, Inc.*, 348 Ill. App. 3d 929, 941 (2d Dist. 2004) ("'Intent'" refers to objective manifestations of intent in the words of the contract and the actions of the parties; it does not encompass one party's secret, undisclosed intentions or purely subjective understandings of which the other party is unaware."); *Bank Computer Network Corp. v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 110 Ill. App. 3d 492, 497 (1st Dist. 1982) ("a person's intention can be ascertained by another only by means of outward expressions such as words and acts.") (citation omitted); *see also Landmark Properties, Inc. v. Architects International-Chicago*, 172 Ill. App. 3d 379, 383-84 (1st Dist. 1988) (acknowledging that even an unsigned contract may become binding if a party, by acts and conduct, indicates assent to its terms).

24. By repeatedly representing that the Termination Agreement had been executed, demanding performance pursuant to its terms, and accepting the benefits flowing therefrom, Defendant objectively manifested its intent to be bound. Its belated attempt to disavow the agreement based on the nondelivery of a signature page is contrary to both the facts and governing Illinois law. *See e.g. Stuart Park Assocs. Ltd. P'ship*, 846 F. Supp. at 710 (rejecting argument that a contract never became binding because it was never delivered). In addition, the doctrine of estoppel bars Defendant from denying the validity and enforceability of the Termination

Agreement. *See M.J. Oldenstedt Plumbing Co.*, 257 Ill. App. 3d at 765 (affirming that a party was estopped from denying he was bound by the agreement where a party signed but did not deliver the written contract yet proceeded with performance and repeatedly stated it had signed and would return the contract).

25.    For the foregoing reasons, Plaintiffs respectfully request that the Court exercise its discretion to hear this matter on an expedited basis, enter an accelerated briefing schedule, and set it for the earliest available hearing date. Because the sole relief sought is a declaration of the parties' rights under the Termination Agreement, and because Defendant's conduct continues to cloud title and interfere with Plaintiffs' ability to sell the Property while damages accrue, expedited consideration is both appropriate and necessary.

WHEREFORE, Plaintiffs Fox River Resort Club and Silverleaf Resorts, LLC respectfully request that this Court enter an Order:

(a)    Setting an early hearing on the Verified Complaint on the earliest date convenient for the Court;

(b)    Setting an expedited deadline for Defendant to answer or otherwise plead to the Complaint, within 7 days of service of same;

(c)    Setting an expedited briefing schedule on any dispositive or other motions to be completed prior to the early hearing, if appropriate; and

(d)    Granting any other relief that this court deems just and proper.

FILED DATE: 7/8/2026 8:27 PM    2026CH06461

FILED DATE: 7/8/2026 8:27 PM    2026CH06461

Dated: July 8, 2025

Respectfully submitted,

**PLAINTIFFS FOX RIVER RESORT CLUB AND SILVERLEAF RESORTS, LLC**

By: /s/ *Rita M. Alliss Powers*
Rita M. Alliss Powers
Martin Kedziora
C. Grace Filer
Greenberg Traurig, LLP
360 N. Green Street, Suite 1300
Chicago, Illinois 60607
Tel. 312.456.8400
Fax 312.456.8435
powersr@gtlaw.com
kedzioram@gtlaw.com
grace.filer@gtlaw.com
Firm Id. 36511

*Attorneys for Fox River Resort Club and Silverleaf Resorts, LLC*

12

## CERTIFICATE OF SERVICE

The undersigned, an attorney, pursuant to Illinois Supreme Court Rules 12(b)(1) and 12(b)(2) and Section 1-109 of the Code of Civil Procedure, certifies that copy of the foregoing was filed via the Court's e-filing system and that the undersigned will cause a copy thereof to be served upon Defendant via a private process server and/or overnight Mail and to Defendants counsel via email at the following addresses:

Vairt, Inc.
13308 Bueno Vista Road
Waynesboro, Pennsylvania 17268

Ray Melton
Amundsen Davis, LLC
308 W. State Street, Suite 320
Rockford, Illinois 61101
rmelton@amundsendavislaw.com

/s/ C. Grace Filer

13

FILED DATE: 7/8/2026 8:30 PM   2026CH06461

# Exhibit A

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

FOX RIVER RESORT CLUB, a Not-For-
Profit Illinois Corporation, and SILVERLEAF
RESORTS, LLC, a Texas Limited Liability
Company,

        Plaintiffs,

    v.

VAIRT INC., Pennsylvania Corporation,

        Defendant.

Case No. 2026CH06461
Judge: Calendar, 2

## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs Fox River Resort Club, a Not-For-Profit Illinois Corporation, and Silverleaf

Resorts, LLC, a Texas Limited Liability Company (together "Plaintiffs" or "Seller"), by and

through their attorneys, Greenberg Traurig, LLP, bring this Verified Complaint for Declaratory

Judgment ("Complaint") against Vairt Inc., a Pennsylvania Corporation ("Defendant" or

"Purchaser", and collectively with the Plaintiffs, the "Parties"), and allege as follows:

## NATURE OF THE CASE

1.     This is a single-count action seeking declaration of the Parties' rights under that

certain Mutual Termination and Release Agreement (the "Termination Agreement"), pursuant to

which the Parties terminated a Purchase and Sale Agreement and Joint Escrow Instructions

("PSA") relating to a commercial property located at 2558 N. 3653 Road, Sheridan, Illinois 60551

("Property"). Specifically, Plaintiffs seek declaration that the Termination Agreement is a valid

and enforceable contract, the PSA has been terminated by the Parties by the Termination

Agreement, and that Defendant has no right to purchase the Property.

2.     Notwithstanding the Parties' execution of the Termination Agreement, Defendant

continues to assert that the Termination Agreement is unenforceable and that it has a right to buy

the Property, thereby clouding Plaintiffs' title to the Property and imperiling Plaintiffs' ability to transfer or otherwise dispose of the Property, thus necessitating this declaratory judgment action.

## PARTIES

3.      Plaintiff Fox River Resort Club is an Illinois non-profit corporation.

4.      Plaintiff Silverleaf Resorts is a Texas limited liability company.

5.      Defendant Vairt Inc. is a Pennsylvania corporation.

## JURISDICTION AND VENUE

6.      Jurisdiction is proper in this Court because this cause of action arises out of "the ownership, use, or possession of any real estate situated in this State;" and "the performance of a[] contract or promise substantially connected with this State[.]" 735 ILCS 5/2-209(a)(3) and (7).

7.      Venue is proper in this Court because in the Termination Agreement, "Seller and Purchaser irrevocably consent[ed] and submit[ed] to the nonexclusive jurisdiction of the courts of the state and federal district of Cook County, Illinois and waive[d] any objection based on venue of forum non conveniens with respect to any action instituted in those courts arising under this Termination Agreement or in any way connected or related or incidental to the dealings of Purchaser and Seller in respect of this Termination Agreement or any related transactions..." Ex. D, Termination Agreement, § 12.

## BACKGROUND

*Purchase and Sale Agreement and Joint Escrow Instructions*

8.      On April 22, 2026, Plaintiffs, as Seller, and Defendant, as Purchaser, entered into a Purchase and Sale Agreement and Joint Escrow Instructions (together with any amendments or

FILED DATE: 7/8/2026 8:27 PM   2026CH06461

modifications, the "PSA"), for the sale of the Property. A true and correct copy of the PSA (without addenda and exhibits thereto) is attached hereto as **Exhibit A.**[1]

9. On June 1, 2026, Defendant exercised its option under the PSA to extend the closing deadline to June 24, 2026, requiring an additional Ernest Money Deposit ("EMD").

*Agreement to Terminate the PSA*

10. On June 4, 2026, Plaintiffs sent Defendant written notice outlining multiple breaches of the PSA by Defendant—including failure to fund the required additional EMD, unauthorized advertising and promotional activities, and misuse of access rights—and demanded that Defendant immediately cure such defaults. A true and correct copy of the June 4, 2026 correspondence is attached hereto as **Exhibit B.**

11. In the days that followed, additional issues arose between the Parties concerning the transaction, culminating in Defendant indicating that it would not proceed. The Parties thereafter began negotiating a mutual termination of the PSA and exchanged drafts of a Termination Agreement.

12. At the same time, and in parallel with those negotiations, the Parties communicated with the Escrow Agent to facilitate the release of the EMD from escrow in anticipation of termination.

---

[1] The purchase price in the PSA has been redacted for confidentiality purposes. The addenda and exhibits to the PSA will be made available to the Court for in camera review or, if appropriate, filed under seal upon order or request of the Court.

3

*Execution of the Termination Agreement*

13.    On June 18, 2026, Plaintiffs' counsel transmitted a redline and clean version of the negotiated Termination Agreement to Defendant's counsel. A true and correct copy of the June 18, 2026 correspondence is attached hereto as **Exhibit C.**

14.    Seller executed the Termination Agreement on June 18, 2026. A true and correct copy of the Termination Agreement executed by Seller is attached hereto as **Exhibit D.**

*Defendants' Acknowledgment of and Demands under the Executed Termination Agreement*

15.    Defendant repeatedly represented and acknowledged that it also executed the Termination Agreement.

16.    For example, on June 19, 2026, Defendant's counsel sent an email to Plaintiffs' counsel stating "My client signed everything. I can release it once there is confirmation from the title company that the form will work." A true and correct copy of the June 19, 2026 email correspondence is attached hereto as **Exhibit E.**

17.    On June 22, 2026, the Escrow Agent sent an email to Defendant's counsel stating: "We cannot release funds based on a written direction by someone on behalf of an entity whose authority we cannot verify. We have escrow standards that have to be met." *Id.* In response, Defendant's counsel stated: "This is why I would not release the signed documents in case something like this occurred." *Id.*

18.    On June 24, 2026, Defendant sent correspondence titled "SUPPLEMENTAL NOTICE OF DAMAGES, DEMAND FOR IMMEDIATE ACTION, AND ELECTION OF REMEDY" ("June 24 Notice") under the PSA and the "**Mutual Termination and Release Agreement dated June 18, 2026.**" A true and correct copy of the June 24 Notice is attached hereto as **Exhibit F** (emphasis added).

4

FILED DATE: 7/8/2026 8:27 PM    2026CH

19.    In the June 24 Notice Defendant stated: "[t]his correspondence constitutes formal notice from Vairt Inc. regarding the above-referenced transaction, **the Mutual Termination and Release Agreement executed on June 18, 2026**, and the related Payout and Return of Earnest Money Authorization executed by the parties." *Id.* (emphasis added).

20.    In the June 24 Notice Defendant stated: "**[a]s reflected in the executed termination and escrow disbursement documents, the parties agreed to terminate the Purchase and Sale Agreement** and authorized the disbursement of the Earnest Money Deposit held by Escrow Agent." *Id.* (emphasis added).

21.    In the June 24 Notice, the Defendant requested a "written confirmation no later than 3:00 PM Central Time on June 24, 2026, confirming whether the earnest money funds in the amount of $[] will be released and wired in accordance with **the executed authorization documents** today." *Id.* (emphasis added).

22.    On June 25, 2026, Defendant sent an email stating "**[s]ince execution of the Mutual Termination and Release Agreement and Escrow Authorization**, Purchaser has acted promptly and in good faith to provide all information, documentation, banking records, source-of-funds materials, investor information, wire instructions, and other items requested by Seller, Seller's representatives, and Wheatland Title." *Id.* (emphasis added).

*Defendant Reverses Course and Threatens to Cloud Plaintiffs' Title to The Property*

23.    Defendant requested that the EMD be disbursed to an account designated by Defendant.

24.    Upon information and belief, on June 24, 2026, the Escrow Agent refunded a portion of the EMD.

25. Upon information and belief, because a portion of the remaining EMD had originally been deposited by third parties, the Escrow Agent required additional documentation confirming Defendant's authority to direct the disbursement of those funds and/or the third-party depositors' consent to the disbursement of these funds to the account designated by Defendant.

26. Rather than cooperating with the Escrow Agent to complete the disbursement process—notwithstanding Defendant's repeated acknowledgment of the execution of the Termination Agreement—Defendant reversed course and began demanding either an extension of the closing date to pursue the transaction and/or payment not contemplated by the PSA or the Termination Agreement.

27. Defendant further threatened to cloud Plaintiffs' title to the Property through litigation and impair their ability to transfer or otherwise dispose of it, thereby necessitating this declaratory judgment action.

## COUNT I
### (Declaratory Judgment)

28. Plaintiff realleges and incorporates by reference as though fully stated herein paragraphs 1 through 27 of this Complaint.

29. The parties entered into the Termination Agreement.

30. Seller and Purchaser executed the Termination Agreement.

31. The Termination Agreement constitutes a valid and enforceable contract.

32. The Termination Agreement states in part: "[a]s of the Effective Date, the [PSA] is hereby terminated without cause or breach of either party and shall be of no further force or effect, except for those obligations expressly stated herein to survive termination and any provision of the Agreement that expressly survives termination by their terms." Ex. D, Termination Agreement, § 1.

6

FILED DATE: 7/8/2026 8:27 PM    2026CH06461

33.     Pursuant to the Termination Agreement, "Seller and Purchaser each hereby irrevocably waives and releases the other party, together with its respective agents, representatives, brokers, auctioneers, principals, members, managers, officers, directors, employees, affiliates, successors, and assigns, and Escrow Agent, from any and all claims, demands, liabilities, damages, causes of action, obligations, costs, expenses, attorneys' fees, and rights of every kind and nature, whether known or unknown, suspected or unsuspected, fixed or contingent, arising out of or relating to the Agreement, the Property, the Earnest Money Deposit, or the transaction contemplated by the Agreement." Ex. D, Termination Agreement, § 3.

34.     The Termination Agreement provides, "[i]n any action arising out of or relating to this Termination Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees, court costs, expert fees, and expenses from the non-prevailing party." *Id.* § 8.

35.     Despite executing the Termination Agreement and acting pursuant to its terms by requesting and receiving the return of a portion of the EMD, Defendant now disputes the enforceability of the Termination Agreement based on its refusal to deliver the executed signature page.

36.     Delivery of a signature page is not an essential element of contract formation under Illinois law unless expressly required by the contract.

37.     The Termination Agreement does not require or condition its effectiveness on the delivery of the signature pages. Rather, the Termination Agreement provides that "[a]s of the Effective Date, the Agreement is hereby terminated without cause or breach of either party and shall be of no further force or effect" and confirms it "constitutes a valid and binding obligation of such party, enforceable in accordance with its terms." Ex. D, Termination Agreement §§ 1, 10.

7

FILED DATE: 7/8/2026 8:27 PM    2026CH06461

38. As a result, Defendant's refusal to release its signature page is irrelevant and does not affect the validity and enforceability of the Termination Agreement.

39. Defendant represented its objective intent to be bound by the Termination Agreement.

40. An actual controversy exists between the Parties because Defendant nevertheless disputes the enforceability of the Termination Agreement, and threatens to cloud Plaintiffs' title to the Property and impair their ability to transfer or otherwise dispose of the Property.

41. Plaintiffs are entitled to a declaration under 735 ILCS 5/2-701 that the Termination Agreement is valid and enforceable, that the PSA had been terminated, and that Defendant has no right to purchase the Property.

WHEREFORE, Plaintiffs Fox River Resort Club and Silverleaf Resorts, LLC respectfully request that this Court enter a judgment:

(1) Declaring that the Termination Agreement is a valid and enforceable contract;

(2) Declaring that the PSA was terminated;

(3) Declaring that the Defendant does not have a right to purchase the Property pursuant to the PSA or otherwise;

(4) Awarding Plaintiffs attorneys' fees and court costs, expert fees and expenses incurred in enforcing the Termination Agreement; and

(5) Granting any further relief that this Court deems proper and just.

Dated: July 6, 2026

Respectfully submitted,

**PLAINTIFFS FOX RIVER RESORT CLUB and SILVERLEAF RESORTS, LLC**

By: /s/ *Rita M. Alliss Powers*
Rita M. Alliss Powers (ARDC # 6203623)
Martin Kedziora (ARDC # 6300162)
C. Grace Filer (ARDC # 6349009)
GREENBERG TRAURIG, LLP
360 N. Green Street, Suite 1300
Chicago, Illinois 60607
Tel. 312.456.8400
Fax 312.456.8435
powersr@gtlaw.com
kedzioram@gtlaw.com
grace.filer@gtlaw.com

9

FILED DATE: 7/8/2026 8:27 PM   2026CH06461

## VERIFICATION

Under penalties as provided by law pursuant to 735 ILCS 5/1-109, the undersigned certifies that the undersigned is authorized to execute this verification on behalf of Plaintiffs Fox River Resort Club and Silverleaf Resorts, LLC, and that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true

Dated: July 6, 2026

**PLAINTIFFS FOX RIVER RESORT CLUB AND SILVERLEAF RESORTS, LLC**

By: _____

Maria Scicchitano, Authorized Signatory

Case: 1:26-cv-08321 Document #: 1-1 Filed: 07/15/26 Page 33 of 121 PageID #:41

# Exhibit A

Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

FILED DATE: 7/8/2026 8:27 PM   2026CH06461

## PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS

THIS PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (this "Agreement") between Purchaser (defined below) and Seller (defined below) is effective as of the date Seller signs this Agreement (the "Effective Date").

### BACKGROUND

A. Seller agrees to sell the Property (defined below) and Purchaser agrees to purchase the Property from Seller.

NOW, THEREFORE, in consideration of the mutual agreements and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

### AGREEMENT

1. **KEY TERMS.** The following defined terms in this Agreement have the meanings set forth in this Section.

1.1 <u>Seller</u>:

*As to Tract 1 comprising the Property*: Fox River Resort Club, a not-for-profit Illinois corporation, acting as duly appointed attorney-in-fact, and Silverleaf Resorts, LLC, a Texas limited liability company, as their interests may appear

and

*As to Tracts 2, 3 and 4 comprising the Property*: Silverleaf Resorts, LLC, a Texas limited liability company

Mailing Address: 9271 S. John Young Parkway, Orlando, Florida 32819

Email: magreen@holidayinnclub.com

Phone: (407) 395-6835

1.2 <u>Seller's Attorney</u>: Maria Scicchitano, Esq.

Email: magreen@holidayinnclub.com

Phone: (407) 395-6835

1.3 <u>Purchaser</u>: Vairt Inc, a Pennsylvania corporation

Mailing Address: 13308 Buena Vista Road, Waynesboro PA 17268

Email: Jamil@vairt.com

Phone: 5164447715

1.4 <u>Purchaser's Attorney</u>:

Email:

Phone:

1.5 <u>Escrow Agent</u>: Wheatland Title Company

Escrow Officer: Karen Lewellen

Mailing Address: 105 West Veterans Parkway, Yorkville, IL 60560

Email: klewellen@standardtitle.com

Phone: (630) 892-2323

1.6 <u>Title Company</u>: Wheatland Title Company

(PSA – Vacant Improved Property)

n Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

Escrow Officer: Karen Lewellen

Mailing Address: 105 West Veterans Parkway, Yorkville, IL 60560

Email: klewellen@standardtitle.com

Phone: (630) 892-2323

1.7     Seller's Broker: Matthews Real Estate Investment Services, Inc.

Mailing Address: 1600 west End, Ste, 1500, Nashville, TN

Email: matt.fitzgerald@matthews.com

Phone: 608-628-2233

License Number: 478027547

State of License: Illinois

1.8     Purchaser's Broker:_____

Mailing Address:_____

Email:_____

Phone:_____

License Number:_____

State of License:_____

Cooperating Broker Fee (if any): N/A

1.9     Purchase Price. $_____ (which equals the Winning Purchaser's Offer of $_____, plus the Marketing Fee of $_____). The Purchase Price shall be paid in accordance with the terms of this Agreement.

1.10    Earnest Money Deposit. $_____ ( )

1.11    Closing Date. June 9, 2026 (if blank, then thirty (30) calendar days after the Effective Date).

1.12    Closing Cost Allocation: See Section 8 (Closing Costs and Allocations).

2.      THE PROPERTY.

2.1     Description & Agreement to Convey. Subject to the terms and conditions of this Agreement, Seller agrees to sell, assign and convey, and Purchaser hereby agrees to purchase and acquire, all of Seller's right, title and interest in and to the following (the "Property") on the Closing Date. The "Property" shall include the following:

2.1.1   Land. The real property located in LaSalle County, Illinois and legally described in Exhibit A (the "Land") which Land is comprised of Tracts 1, 2, 3 and 4.

2.1.2   Improvements: All buildings (the "Buildings"), improvements, parking facilities and other permanent fixtures located on the Land (collectively, the "Improvements") and all easements (except for certain rights to recreational easements to be terminated by Seller at or prior to Closing, all as more particularly contemplated in paragraph 13.27 below), hereditaments, appurtenances, development rights, and other benefits, if any, pertaining to or affecting the Land (collectively, the "Easements"). The Land, Buildings, Improvements and Easements are hereinafter collectively referred to as the "Real Property".

2.1.3   Intangible Property. To the extent that the same exist and are in Seller's possession at Closing, permits, entitlements, warranties, telephone numbers, architectural or engineering plans and specifications and development rights related to the Real Property which may be unilaterally assigned by Seller (collectively, the "Intangible Property").

2

(PSA – Vacant Improved Property)
43067416.1

gn Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

2.1.4    Personal Property: All furniture, fixtures and equipment ("FF&E") in all of the units in the Buildings contemplated in **Exhibit B** and all other personal property contemplated in **Exhibit C**.

3.    **EARNEST MONEY DEPOSIT.**

3.1    Deposit. Purchaser must deposit the full amount of the Earnest Money Deposit to Escrow Agent no later than 5:00 p.m. in the time zone where the Property is located on the first (1st) business day following Purchaser being declared the winning bidder (even if the sale is subject to Seller's confirmation). The escrow ("Escrow") for the purchase of the Property shall be opened upon Escrow Agent's receipt of the Earnest Money Deposit and a fully signed copy of this Agreement. Purchaser agrees that Earnest Money Deposit is non-refundable (except as specifically described in this Agreement). If Purchaser shall fail to timely make the Earnest Money Deposit, Purchaser will be in default under this Agreement and Seller will be entitled to terminate this Agreement and exercise any and all other remedies.

3.2    Maintenance of Earnest Money Deposit. Escrow Agent will hold the Earnest Money Deposit in a non-interest bearing account.

3.3    Disposition of Earnest Money. The Earnest Money Deposit actually received by the Escrow/Closing Agent will be applied to the Purchase Price at closing, shall immediately become non-refundable, and at Seller's request, shall be immediately released to Seller. The Escrow Agent is authorized to disperse the Earnest Money Deposit pursuant to this Section, without further instruction from Buyer and Seller. The Earnest Money Deposit shall be applied as a credit to Buyer at Closing.

3.4    Payment. On or before 2:00 p.m. (in the time zone where the Property is located) on the Closing Date, Purchaser shall pay to the Escrow Agent in immediately available funds the Purchase Price, less the Earnest Money Deposit and subject to further adjustments for prorations and credits required to be made in accordance with the terms of this Agreement. On or before 5:00 p.m. (in the time zone where the Property is located) on the Closing Date, provided all conditions to Closing have been met hereunder, Purchaser shall instruct Escrow Agent to wire in immediately available funds: (a) the Purchase Price, less the Marketing Fee, to Seller; and (b) the Marketing Fee to Crexi (or as Crexi may designate in writing to Escrow Agent), to such bank account(s) as Seller and Crexi may designate.

3.5    Closing. The purchase and sale of the Property shall be consummated ("Close" or "Closing") on the Closing Date unless Seller and Purchaser agree to a different Closing Date in writing.

4.    **INSPECTIONS AND APPROVALS.**

4.1    Inspections. Purchaser acknowledges, understands and agrees that it has had reasonable opportunity to access the Property and conduct inspections of the Property and further agrees that it waives any and all rights to any additional access to or inspections of the Property.

4.2    Inspection of Documents. Purchaser acknowledges receipt of all relevant materials relating to the Property ("Property Documents"). Purchaser acknowledges, understands and agrees that the Property Documents may have been prepared by parties other than Seller and that Seller makes no representation or warranty whatsoever, express or implied, as to the completeness, content or accuracy of the Property Documents. Purchaser specifically releases Seller from all claims, demands, causes of action, judgments, losses, damages, liabilities, costs and expenses (including without limitation attorney's fees whether suit is instituted or not), whether known or unknown, liquidated or contingent (collectively "Claims") asserted against or incurred by Purchaser by reason of the information contained in, or that should have been contained in, the Property Documents. The provisions of this Section shall survive Closing, or the earlier termination of this Agreement.

4.3    Survey. Purchaser acknowledges that Seller has already ordered and is awaiting receipt of a survey of the Land (the "Existing Survey"). Purchaser may, prior to the Effective Date, at its sole cost and expense, order an update to the Existing Survey (or if there is no Existing Survey, a new survey) (the Existing Survey, as updated, or a new survey, the "Survey"). Under no circumstance is Seller obligated to provide an Existing Survey or procure a new Survey.

4.4    Title Commitment. As part of the Property Documents, Purchaser acknowledges that Seller has delivered to Purchaser or made available for inspection a Commitment for Title Insurance

3

(PSA – Vacant Improved Property)
43067416.1

n Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

2.1.4 <u>Personal Property</u>: All furniture, fixtures and equipment ("FF&E") in all of the units in the Buildings contemplated in <u>Exhibit B</u> and all other personal property contemplated in <u>Exhibit C</u>.

3. **EARNEST MONEY DEPOSIT.**

3.1 <u>Deposit</u>. Purchaser must deposit the full amount of the Earnest Money Deposit to Escrow Agent no later than 5:00 p.m. in the time zone where the Property is located on the first (1ˢᵗ) business day following Purchaser being declared the winning bidder (even if the sale is subject to Seller's confirmation). The escrow ("Escrow") for the purchase of the Property shall be opened upon Escrow Agent's receipt of the Earnest Money Deposit and a fully signed copy of this Agreement. Purchaser agrees that Earnest Money Deposit is non-refundable (except as specifically described in this Agreement). If Purchaser shall fail to timely make the Earnest Money Deposit, Purchaser will be in default under this Agreement and Seller will be entitled to terminate this Agreement and exercise any and all other remedies.

3.2 <u>Maintenance of Earnest Money Deposit</u>. Escrow Agent will hold the Earnest Money Deposit in a non-interest bearing account.

3.3 <u>Disposition of Earnest Money</u>. The Earnest Money Deposit actually received by the Escrow/Closing Agent will be applied to the Purchase Price at closing, shall immediately become non-refundable, and at Seller's request, shall be immediately released to Seller. The Escrow Agent is authorized to disperse the Earnest Money Deposit pursuant to this Section, without further instruction from Buyer and Seller. The Earnest Money Deposit shall be applied as a credit to Buyer at Closing.

3.4 <u>Payment</u>. On or before 2:00 p.m. (in the time zone where the Property is located) on the Closing Date, Purchaser shall pay to the Escrow Agent in immediately available funds the Purchase Price, less the Earnest Money Deposit and subject to further adjustments for prorations and credits required to be made in accordance with the terms of this Agreement. On or before 5:00 p.m. (in the time zone where the Property is located) on the Closing Date, provided all conditions to Closing have been met hereunder, Purchaser shall instruct Escrow Agent to wire in immediately available funds: (a) the Purchase Price, less the Marketing Fee, to Seller; and (b) the Marketing Fee to Crexi (or as Crexi may designate in writing to Escrow Agent), to such bank account(s) as Seller and Crexi may designate.

3.5 <u>Closing</u>. The purchase and sale of the Property shall be consummated ("**Close**" or "**Closing**") on the Closing Date unless Seller and Purchaser agree to a different Closing Date in writing.

4. **INSPECTIONS AND APPROVALS.**

4.1 <u>Inspections</u>. Purchaser acknowledges, understands and agrees that it has had reasonable opportunity to access the Property and conduct inspections of the Property and further agrees that it waives any and all rights to any additional access to or inspections of the Property.

4.2 <u>Inspection of Documents</u>. Purchaser acknowledges receipt of all relevant materials relating to the Property ("Property Documents"). Purchaser acknowledges, understands and agrees that the Property Documents may have been prepared by parties other than Seller and that Seller makes no representation or warranty whatsoever, express or implied, as to the completeness, content or accuracy of the Property Documents. Purchaser specifically releases Seller from all claims, demands, causes of action, judgments, losses, damages, liabilities, costs and expenses (including without limitation attorney's fees whether suit is instituted or not), whether known or unknown, liquidated or contingent (collectively "Claims") asserted against or incurred by Purchaser by reason of the information contained in, or that should have been contained in, the Property Documents. The provisions of this Section shall survive Closing, or the earlier termination of this Agreement.

4.3 <u>Survey</u>. Purchaser acknowledges that Seller has already ordered and is awaiting receipt of a survey of the Land (the "Existing Survey"). Purchaser may, prior to the Effective Date, at its sole cost and expense, order an update to the Existing Survey (or if there is no Existing Survey, a new survey) (the Existing Survey, as updated, or a new survey, the "Survey"). Under no circumstance is Seller obligated to provide an Existing Survey or procure a new Survey.

4.4 <u>Title Commitment</u>. As part of the Property Documents, Purchaser acknowledges that Seller has delivered to Purchaser or made available for inspection a Commitment for Title Insurance

3

(PSA – Vacant Improved Property)
43067416.1

Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

FILED DATE: 7/8/2026 8:27 PM 2026.

(the "Title Commitment") setting forth the status of title to the Land and all exceptions which would appear in an Owner's Policy of Title Insurance, specifying Purchaser as the named insured and showing the Winning Purchaser's Offer as the policy amount.

4.5 Permitted Exceptions. Purchaser shall accept title to the Property, subject to the following exceptions (the "Permitted Exceptions"):

4.5.1 All matters affecting or relating to the title of the Property which are of record on the date of the Title Commitment.

4.5.2 All matters disclosed on the Survey or that would be disclosed by an accurate survey or physical inspection of the Property.

4.5.3 The lien of non-delinquent taxes, assessments and other usual and customary charges assessed against the owners of real property in the state in which the Land is located.

4.5.4 All matters disclosed by the Property Documents.

4.5.5 All building and zoning laws, codes and regulations affecting the Property, including all proffers, special exceptions, conditions, site plan approvals, and other similar matters, if any, relating to the zoning of the Property.

5. SELLER'S OBLIGATIONS PRIOR TO CLOSING. Following the Effective Date and until the Closing, Seller and/or Seller's agents or representatives shall:

5.1 Taxes and Liens. Clear all delinquent taxes and liens applicable to the Property as stated on the Title Commitment.

5.2 Insurance. Keep the Property insured, in an amount sufficient to satisfy any co-insurance requirement or stipulation, against fire and other hazards covered by extended coverage endorsement and comprehensive public liability insurance against claims for bodily injury, death and property damage occurring in, on or about the Property.

5.3 Property Notices. Provide to Purchaser, immediately upon the receipt thereof, any and all written notices relating to the Property received by Seller or its agents or representatives from any governmental or quasi-governmental instrumentality, insurance company, vendor or any other entity or party, which notices are of a type not normally received in the ordinary course of Seller's business, or which may have a material effect upon the Property or result in a material change in a representation or warranty made by Seller hereunder.

5.4 Compliance with Agreements. Take all actions necessary to comply with all agreements, covenants, encumbrances and obligations affecting or relating to the Property and the ownership, operation and maintenance thereof, including without limitation any contracts. Seller shall pay any and all utility bills, tax bills and other invoices and expenses relating to the Property, as and when the same become due, except as otherwise expressly provided herein.

5.5 New Contracts. Seller may, without the prior consent of Purchaser, enter into any new contracts, provided that Seller shall provide Purchaser written notice of such actions and such contracts shall be terminable with no more than thirty (30) days' notice.

5.6 Operation. Maintain the Property in good condition and make repairs and/or replacements in the ordinary course of business in connection with any damage to the Property, and deliver the Property to Purchaser at Closing in the condition existing as of the Effective Date, normal wear and tear and damage by casualty excepted.

6. REPRESENTATIONS AND WARRANTIES.

6.1 By Seller. Seller represents and warrants to Purchaser as of the Effective Date that:

4

(PSA – Vacant Improved Property)
43067416.1

n Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

6.1.1    Seller has the power, right and authority to enter into and perform all of the obligations required of Seller under this Agreement and the instruments and documents referenced herein, and to consummate the transaction contemplated hereby.

6.1.2    This Agreement is, and all agreements, instruments and documents to be executed and delivered by Seller pursuant to this Agreement shall be duly authorized, executed and delivered by Seller. This Agreement is, and all agreements, instruments and documents to be executed and delivered by Seller pursuant to this Agreement shall be, valid and legally binding upon Seller and enforceable in accordance with their respective terms.

6.1.3    Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby does now constitute or shall result in a breach of, or a default under, any agreement, document, instrument or other obligation to which Seller is a party or by which Seller may be bound.

6.1.4    There are no actions, suits or proceedings pending or threatened, against or affecting Seller that could adversely affect its ability to perform its obligations hereunder.

6.2    Limitation on Remedies.    Notwithstanding anything herein to the contrary, if Purchaser discovers prior to Closing that one or more of the representations and warranties under the provisions of this Section are false or untrue as of the Closing Date, Purchaser's sole remedy will be to exercise its rights as set forth in the Section of this Agreement entitled "Termination Due to Breach."

6.3    Survival.    The representations and warranties by Seller set forth in this Section shall not survive Closing of this transaction, and no action or claim may be brought against Seller by Purchaser or any affiliate of Purchaser with respect to a breach of such representations or warranties or any action, suit or other proceedings commenced or pursued, for or in respect of any breach of any representation or warranty made by Seller in this Agreement from and after the Closing.

6.4    By Purchaser.    Purchaser represents and warrants to Seller as of the Effective Date that:

6.4.1    Purchaser is a corporation, partnership, limited liability company, trust or other type of business organization that is duly organized, validly existing and in good standing under the laws of the state in which it was organized, and Purchaser is qualified to do business in the jurisdiction in which the Property is located.

6.4.2    Purchaser has taken all requisite action and obtained all requisite consents, releases and permissions in connection with entering into this Agreement and the instruments and documents referenced herein or required under any covenant, agreement, encumbrance, law or regulation with respect to the obligations required hereunder, and no consent of any other party is required for the performance by Purchaser of its obligations hereunder.

6.4.3    This Agreement is, and all agreements, instruments and documents to be executed and delivered by Purchaser pursuant to this Agreement shall be, duly authorized, executed and delivered by and legally binding upon Purchaser and enforceable in accordance with their respective terms.

6.4.4    Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby does now constitute or shall result in a breach of, or a default under, any agreement, document, instrument or other obligation to which Purchaser is a party or by which Purchaser may be bound, or any law, statute, ordinance, rule, governmental regulation or any writ, injunction, order or decree of any court or governmental body, applicable to Purchaser.

6.4.5    No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or state bankruptcy law is pending against or, to the best of Purchaser's knowledge, contemplated by Purchaser.

6.4.6    There are no actions, suits, claims or other proceedings pending or, to the best of Purchaser's knowledge, contemplated or threatened against Purchaser, which if determined adversely to Seller, could adversely affect its ability to perform its obligations hereunder.

5

(PSA – Vacant Improved Property)
43067416.1

gn Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

6.5    Broker. Seller and Purchaser each represents to the other that it has had no dealings, negotiations, or consultations with any broker, representative, employee, agent or other intermediary in connection with the sale of the Property, except that Purchaser has retained the services of Purchaser's Broker and Seller has retained the services of Seller's Broker. Seller shall be solely responsible for paying the fees and commissions owed to Seller's Broker, pursuant to a separate written agreement between Seller and Seller's Broker, and Purchaser shall be solely responsible for paying the fees and commissions owed to Purchaser's Broker, pursuant to a separate written agreement between Purchaser and Purchaser's Broker; provided, however, if Seller's Broker has agreed to offer a Cooperating Broker Fee (in which case the Cooperating Broker Fee shall have been advertised on the Website (as defined herein)), then Seller's Broker shall be responsible to pay a Cooperating Broker Fee to Purchaser's Broker in the amount set forth in this Agreement.

6.6    Property Condition.

6.6.1    Release of Claims. Purchaser releases Seller from any and all Claims (whether known or unknown, and whether contingent or liquidated) arising from or related to (a) any defects, errors or omissions in the design or construction of the Property, whether the same are a result of negligence or otherwise; or (b) other conditions (including environmental conditions) affecting the Property, whether the same are a result of negligence or otherwise. The release set forth in this Section specifically includes any Claims under any Environmental Laws, under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., or with respect to any environmental risk. "Environmental Laws" includes, but is not limited to, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. §§6901 et seq.), the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.), the Emergency Planning and Community Right to Know Act (42 U.S.C. §§11001 et seq.), the Clean Air Act (42 U.S.C. §§7401 et seq.), the Clean Water Act (33 U.S.C. §§1251 et seq.), the Toxic Substances Control Act (15 U.S.C. §§2601 et seq.), the Hazardous Materials Transportation Act ( 49 U.S.C. §§1801 et seq.), the Occupational Safety and Health Act (29 U.S.C. §§651 et seq.), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. §§136 et seq.), and the Safe Drinking Water Act (42 U.S.C. §§300f et seq.), as any of the same may be amended from time to time, and any state or local law dealing with environmental matters, and any regulations, orders, rules, procedures, guidelines and the like promulgated in connection therewith, regardless of whether the same are in existence on the date of this Agreement. THE CONVEYED PROPERTY IS BEING CONVEYED "AS IS", "WHERE IS", AND "WITH ALL FAULTS" AS OF THE CLOSING DATE, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED, OTHER THAN AS SET FORTH IN THIS AGREEMENT.

6.6.2    Acknowledgment of Inspection. Purchaser acknowledges and agrees that (a) Purchaser had an opportunity to inspect the Property and its operations prior to the Effective Date, (b) if this transaction is consummated, Purchaser will be purchasing the Property pursuant to Purchaser's independent examination, study, inspection and knowledge of the Property, and (c) Purchaser is relying upon its own determination of the value and condition of the Property and not on any information provided or to be provided by Seller. Purchaser is relying solely upon its own inspections, investigations, research and analyses in entering into this Agreement and is not relying in any way upon any representations or warranties (except those expressly provided in this Agreement), statements, plans, specifications, cost estimates, studies, reports, descriptions, guidelines or other information or material furnished by Seller or its representatives to Purchaser or its representatives, whether oral or written, express or implied, of any nature whatsoever regarding any such matters.

6.6.3    RELEASE. PURCHASER RELEASES SELLER AND ANY SERVICER, AGENT, REPRESENTATIVE, MANAGER, AFFILIATE, OFFICER, PARTNER, SHAREHOLDER OR EMPLOYEE OF SELLER (A "SELLER RELATED PARTY") FROM ALL CLAIMS, LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES WHICH PURCHASER OR ANY PARTY RELATED TO OR AFFILIATED WITH PURCHASER (A "PURCHASER RELATED PARTY") HAS OR MAY HAVE ARISING FROM OR RELATED TO ANY MATTER OR THING RELATED TO THE PHYSICAL CONDITION OF THE PROPERTY, ANY CONSTRUCTION DEFECTS, ANY ERRORS OR OMISSIONS IN THE DESIGN OR CONSTRUCTION OF THE PROPERTY AND ANY ENVIRONMENTAL CONDITIONS AT, IN, ON OR

(PSA – Vacant Improved Property)
43067416.1

gn Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

UNDER THE PROPERTY, AND PURCHASER WILL NOT LOOK TO SELLER OR ANY SELLER RELATED PARTY IN CONNECTION WITH THE FOREGOING FOR ANY REDRESS OR RELIEF.

6.6.4 ASSUMPTION. EFFECTIVE AS OF THE CLOSING DATE, PURCHASER WILL ASSUME ALL OF SELLER'S LIABILITIES AND OBLIGATIONS WITH RESPECT TO PERSONAL PROPERTY AND INTANGIBLE PROPERTY ARISING AND ACCRUING FROM AND AFTER THE CLOSING DATE.

6.6.5 SURVIVAL. THE ACKNOWLEDGMENTS AND AGREEMENTS OF PURCHASER SET FORTH IN THIS SECTION WILL SURVIVE THE CLOSING.

7. CONDITIONS PRECEDENT TO CLOSING.

7.1 Purchaser's Conditions. Purchaser's obligations to Close are subject to the following conditions precedent:

7.1.1 The representations and warranties of Seller in this Agreement are true, complete and accurate in all material respects as of the Closing Date, and Seller has performed in all material respects all covenants and obligations required to be performed by Seller on or before the Closing Date.

7.1.2 The Escrow Agent is irrevocably committed to issue to Purchaser an ALTA form owner's policy of title insurance (the "Purchaser's Title Policy") in the amount of the Purchase Price, less Marketing Fee, showing fee title to the Real Property vested solely in Purchaser and subject only to the following: (a) the standard, preprinted exclusions to Purchaser's Title Policy; (b) liens to secure payment of real estate taxes and assessments not yet due and payable; (c) matters affecting the Real Property created by or consented to by Purchaser; and (d) Permitted Exceptions.

7.2 Seller's Conditions. Seller's obligations to Close are subject to the following conditions precedent:

7.2.1 Purchaser's representations and warranties contained in this Agreement shall be true, complete and accurate in all material respects as of the Closing Date.

7.2.2 Purchaser shall have performed in all material respects all covenants and obligations required to be performed by Purchaser on or before the Closing Date.

7.3 Waiver of Conditions. Either party may waive its respective closing conditions in its sole discretion. By proceeding to Closing, each party waives its respective closing conditions and irrevocably releases the other party from any liability arising from any facts known by such waiving party that would otherwise have resulted in a failure of a closing condition.

8. CLOSING COSTS AND PRORATIONS.

8.1 Pre-Closing Costs. Purchaser and Seller acknowledge that the Escrow Agent may incur certain costs while processing this transaction which must be paid prior to Closing. The Escrow Agent is authorized and instructed to release funds for payment of such costs prior to Closing from funds deposited into Escrow by Purchaser. Such funds are not refundable and the Escrow Agent is released from any liability for payment of any such funds released through the Escrow prior to the Closing. The Escrow Agent is authorized to charge the appropriate party for costs incurred, or credit the appropriate party for credits, as applicable at Closing or upon termination of this Agreement.

8.2 Closing Cost Allocation: Purchaser and Seller shall pay closing costs as described in this Section 8.2 (and the Escrow Agent is authorized to (i) pay Seller's costs from Seller's proceeds, and (ii) pay Purchaser's costs from funds deposited into Escrow by Purchaser):

7

(PSA – Vacant Improved Property)
43067416.1

n Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

| Closing Costs (as applicable) | Seller Pays | Purchaser Pays | 50% Seller/ 50% Purchaser |
|---|---|---|---|
| Title Search Fee | X | | |
| Owner's Title Insurance Policy (Standard Coverage) | X | | |
| Additional Title Coverage or Endorsements Requested by Purchaser | | X | |
| Lender's Title Insurance Policy | | X | |
| Closing Agent Fees | | | X |
| State and/or Local Transfer Taxes | | | X |
| Credit Reports, Loan Fees, Loan Points, Reports and Inspections Required by Purchaser's Lender, Appraisal Fees, Mortgage Notarization and Recording Fees, and All Other Costs In Connection With Purchaser's Loan | | X | |
| Seller's Loan Prepayment Fees and All Other Costs In Connection With Seller's Existing Loan | X | | |
| Recording Fees | | X | |
| Recording Documents to Remove Encumbrances | X | | |
| Real Estate Broker/Agent Commissions Due Listing Broker | X | | |
| Offered Cooperating Real Estate Broker/Agent Commissions Due Purchaser's Broker | X | | |
| Additional Real Estate Broker/Agent Commissions Due Purchaser's Broker (If Any) | | X | |
| Common Interest Development Transfer Fee | | | X |
| Common Interest Development Document Preparation Fees | | | X |
| Private Transfer Fee | | | X |
| Any Reports and Inspections Requested by Purchaser | | X | |
| Seller's Attorney Fees | X | | |
| Purchaser's Attorney Fees | | X | |
| All Other Closing Costs | Any closing costs or charges of closing this transaction not specifically mentioned shall be paid and adjusted In accordance with local custom or ordinance in the jurisdiction in which the property is located. | | |

8.3     Prorations. All revenues collected, and all expenses, including, personal property taxes, installment payments of special assessment liens, vault charges, sewer charges, utility charges, reimbursement of maintenance and repair expenses and normally prorated operating expenses billed or paid as of the Closing Date (or estimates for invoices for such operating expenses which are unbilled as of the Closing Date but shall include expenses applicable to a time period on or after the Closing Date), shall be prorated as of 11:59 p.m. on the day before the Closing Date and shall be adjusted against the Purchase Price due at Closing. Seller and Purchaser acknowledge and agree that no re-proration shall occur post-Closing for any reason, known or unknown at the time of Closing or thereafter, and all proration figures included in the Settlement Statement (as defined herein) shall be final upon execution by the parties.

8.3.1     Utility Deposits. Seller shall be entitled to any refundable deposits held for utility accounts affecting the Property.

8.4     Taxes. General real estate taxes and special assessments relating to the Property payable during the year in which Closing occurs shall be prorated with respect to the Property as of the day before the Closing Date. If Closing shall occur before the actual taxes and special assessments payable during such year are known, the apportionment of taxes shall be upon the basis of taxes for the Property payable during the immediately preceding year. If, as the result of an appeal of the assessed valuation of the Property for any real estate tax year prior to (or including) the Closing, there is issued after Closing an administrative ruling, judicial decision or settlement by which the assessed value of the Property for such tax year is reduced, and a real estate tax refund issued, Seller shall be entitled to all such refunds relating to the period prior to Closing. If Seller engaged the tax appeal agent then the tax appeal agent shall remain responsible solely to Seller for such appeal. If the appeal is successfully culminated either prior to or after the proposed sale transaction, and Purchaser would benefit from such appeal for the current or subsequent

8

(PSA – Vacant Improved Property)
43067416.1

Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

tax year, then Purchaser shall pay a pro-rata share portion of the costs and expenses incurred by Seller in connection with the appeal.

8.5     In General. Any other costs or charges of closing this transaction not specifically mentioned in this Agreement shall be paid and adjusted in accordance with local custom or ordinance in the jurisdiction in which the Property is located.

8.6     Purpose and Intent. Except as expressly provided herein, the purpose and intent as to the provisions of prorations and apportionments set forth in this Section and elsewhere in this Agreement are that Seller shall bear all expenses of ownership and operation of the Property and shall receive all income therefrom accruing through midnight of the day preceding the Closing, and Purchaser shall bear all such expenses and receive all such income accruing thereafter.

9.     CLOSING AND ESCROW.

9.1     Seller's Documents. On or before the Closing Date, Seller must deliver to Escrow Agent the following original documents, signed and, if applicable, acknowledged (collectively, the "Seller's Documents"):

9.1.1     Special Warranty Deeds conveying title to Purchaser of the Real Property in the forms attached hereto as **Exhibit D-1** and **Exhibit D-2** (collectively, the "Deeds").

9.1.2     Affidavits pursuant to the Foreign Investment and Real Property Tax Act in the forms attached hereto as **Exhibit E-1** and **Exhibit E-2** (collectively, the "FIRPTA Affidavits").

9.1.3     An Assignment and Assumption Agreement and Bill of Sale in the form attached hereto as **Exhibit F** (the "Assignment and Assumption Agreement").

9.1.4     A Post Closing Agreement in the form attached hereto as **Exhibit G** (the "Post Closing Agreement").

9.1.5     A Release of Lien in the form attached hereto as **Exhibit H** (the "Release of Lien").

9.1.6     If not previously executed and recorded prior to Closing, the Mutual Release and Termination of Recreation and Use Easement contemplated in paragraph 13.27 below.

9.1.7

9.1.8     The joint settlement statement (the "Settlement Statement"), prepared by Escrow Agent.

9.1.9     Such other documents, certificates and other instruments as may be reasonably required by Title Company or Escrow Agent to consummate the transaction contemplated in this Agreement.

9.2     Purchaser's Documents. On or before the Closing Date, Purchaser must (a) deliver to Escrow Agent the Purchase Price less the Marketing Fee, plus Purchaser's share of closing costs, prorations and expenses as described in this Agreement, (b) cause the payment of the Marketing Fee to Crexi, and (c) deliver to Escrow Agent the following original documents, signed and, if applicable, acknowledged (collectively, the "Purchaser's Documents"):

9.2.1     The Assignment and Assumption Agreement;

9.2.2     The Post Closing Agreement;

9.2.3     Evidence of Purchaser's authority, and the authority of the person executing any documents at Closing on behalf of Purchaser, acceptable to Seller and Escrow Agent, to enter into the transactions contemplated by this Agreement.

9.2.4     The Settlement Statement.

9.2.5     Such other documents, certificates and instruments as may be reasonably required to consummate the transaction contemplated in this Agreement.

9

(PSA – Vacant Improved Property)
43067416.1

Envelope ID: 270C0BF0-0819-8520-810C-05A95B72479F

9.3 Possession. At the Closing, Purchaser will be entitled to possession of the Property, subject to the Permitted Exceptions.

9.4 Escrow Closing. At Closing, the Escrow Agent is authorized and irrevocably instructed to do the following:

9.4.1 Record the Deed.

9.4.2 Pay all fees, costs, deed and transfer taxes for the sale of the Property that are required to be paid by Seller and Purchaser under this Agreement, the portion of any fees charged by the Escrow Agent which are payable by Seller and Purchaser (if any) and other expenses relating to the sale of the Property which are required to be paid by Seller and Purchaser.

9.4.3 Pay to Seller the balance of the Purchase Price and any other funds remaining in the Escrow after the Closing.

Copies of all Purchaser's Documents, final Settlement Statements and copy of Deed will be submitted to Crexi, via email to ywalsh@crexi.com, at the same time such Purchaser's Documents are delivered to the Escrow Agent.

## 10. DAMAGE, DESTRUCTION AND CONDEMNATION.

10.1 Casualty. Except as provided herein, Seller assumes all risk of loss or damage to the Property by fire or other casualty until consummation of Closing, at which time all risk of loss or damage to the Property by fire or other casualty shall be transferred to Purchaser. If at any time after the Effective Date but on or prior to the Closing Date any portion of the Property is destroyed or damaged as a result of fire or any other cause whatsoever, Seller shall promptly give written notice thereof to Purchaser. If the estimated cost to repair the damage or destruction exceeds more than half of the Purchase Price, as reasonably estimated by Seller, Purchaser shall have the right to terminate this Agreement by written notice to Seller within ten (10) days following the date upon which Purchaser receives Seller's written notice of the destruction or damage, in which event this Agreement shall terminate, the Earnest Money Deposit shall be returned to Purchaser and neither party shall have any further obligation to the other, other than those obligations that expressly survive termination of this Agreement. If Purchaser does not elect to so terminate this Agreement within said ten (10) day period, or if the cost of repair is equal to or less than half of the Purchase Price, this Agreement shall remain in full force and effect and the parties shall proceed to Closing without any reduction or adjustment in the Purchase Price, except that all insurance proceeds will be assigned to Purchaser and Seller will pay to Purchaser any deductible under Seller's insurance policy.

10.2 Condemnation. In the event, at any time on or prior to the Closing Date, any action or proceeding is filed under which the Property, or any portion thereof, may be taken pursuant to any law, ordinance or regulation or by condemnation or the right of eminent domain, Seller shall promptly give written notice thereof (which notice shall describe the type of action being taken against the Property, and which portions of the Property will be affected thereby) to Purchaser. If the taking would substantially prevent Purchaser from continuing the existing use of the Property, then Purchaser shall have the right to terminate this Agreement by written notice to Seller within ten (10) days following the date upon which Purchaser receives Seller's written notice of such action or proceeding, in which event this Agreement shall terminate, the Earnest Money Deposit shall be returned to Purchaser and neither party shall have any further obligation to the other, other than those obligations that expressly survive termination of this Agreement. If Purchaser does not elect to so terminate this Agreement within said ten (10) day period, this Agreement shall remain in full force and effect and the parties shall proceed to closing without any reduction or adjustment in the Purchase Price, except that all condemnation proceeds will be assigned to Purchaser.

## 11. TERMINATION FOR BREACH AND CANCELLATION OF ESCROW.

11.1 Termination Due to Breach. If Closing does not or cannot occur on or before the Closing Date due to a breach of this Agreement by Purchaser or Seller, then the non-breaching party may terminate this Agreement and cancel the Escrow by written notice to the breaching party and the Escrow Agent. If Purchaser fails to timely deposit the Earnest Money Deposit, then Seller may immediately terminate this Agreement by written notice to Purchaser. Upon any such termination and/or cancellation, the breaching party shall pay all cancellation fees of Escrow Agent. If Seller is the breaching party, the Escrow Agent shall return the Earnest Money Deposit to Purchaser, and Purchaser shall be entitled to

10

(PSA – Vacant Improved Property)
43067416.1

Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

pursue remedies at law or in equity, provided, however, that Seller's monetary liability hereunder shall not exceed Purchaser's actual, verifiable third-party expenses and shall be capped at Fifty Thousand and 00/100 Dollars ($50,000.00). If Purchaser is the breaching party, then the following shall apply:

PURCHASER AND SELLER AGREE THAT IT WOULD BE EXTREMELY DIFFICULT TO DETERMINE SELLER'S ACTUAL DAMAGES RESULTING FROM A BREACH BY PURCHASER. IN THE EVENT OF A BREACH BY PURCHASER, SELLER SHALL BE ENTITLED TO AN AMOUNT EQUAL TO THE EARNEST MONEY DEPOSIT AS LIQUIDATED DAMAGES AND AS SELLER'S EXCLUSIVE REMEDY. PURCHASER AGREES THAT SUCH AMOUNT IS A REASONABLE PRE-ESTIMATE OF SELLER'S ACTUAL DAMAGES FOR BREACH OF THIS AGREEMENT AND IS NOT A PENALTY. IF ESCROW AGENT IS IN POSSESSION OF THE EARNEST MONEY DEPOSIT, THEN ESCROW AGENT SHALL DELIVER THE EARNEST MONEY DEPOSIT TO SELLER. DESPITE THE FOREGOING, IF APPLICABLE LAW LIMITS THE AMOUNT OF THE LIQUIDATED DAMAGES PAYABLE TO SELLER UPON A BREACH BY PURCHASER, SELLER SHALL ONLY BE ENTITLED TO THE AMOUNT PERMITTED BY LAW, AND ANY EXCESS SHALL BE PROMPTLY RETURNED TO PURCHASER. PURCHASER EXPRESSLY WAIVES AND RELEASES ANY LIEN (OR RIGHTS THERETO) THAT PURCHASER MAY HAVE WITH RESPECT TO THE PROPERTY IN CONNECTION WITH THIS AGREEMENT.

Seller's Initials ___DMH___ / ___BTL___       Purchaser's Initials ___MS___ / _____

11.2    Costs Upon Termination and Cancellation of Escrow. Except as otherwise set forth in this Section 11, upon termination of this Agreement and cancellation of Escrow pursuant to this Section 11, all costs incurred in connection with the transactions contemplated by this Agreement (including, without limitation, payments for loan applications, inspections, appraisals, and other reports) shall be the sole responsibility of the party incurring such costs.

11.3    Escrow Agent Authorization. If Escrow Agent receives a written notice from a party to cancel the Escrow in accordance with this Section 11, and Escrow Agent can confirm that the other party also received the notice, Escrow Agent is authorized to comply with the notice if Escrow Agent does not receive a written objection within ten (10) calendar days after such other party received the notice.

11.4    Termination. Upon any termination of this Agreement pursuant to any right of a party to terminate set forth in this Agreement, (a) the Earnest Money Deposit shall be paid over to the party entitled to the same, (b) all documents deposited by Purchaser and Seller into escrow shall be returned by Escrow Agent to the party depositing the same, and (c) all copies of all Property Documents provided to Purchaser by Seller shall be returned to Seller, whereupon the parties will have no continuing liability to each other, unless otherwise expressly stated in any provision of this Agreement. Notwithstanding anything to the contrary provided by this Agreement, in the event Purchaser fails to close on or before the Closing Date, Purchaser hereby authorizes the Escrow Agent to release the Earnest Money Deposit to the Seller.

11.5    Attorneys' Fees. Notwithstanding anything to the contrary in this Agreement, in the event that either Seller or Purchaser, as the case may be, shall bring a lawsuit against the other party for breach of such party's obligations under this Agreement, the losing party shall pay the prevailing party's costs and expenses incurred in connection with such litigation, including without limitation reasonable attorneys' fees. The "prevailing party" shall be determined by the court hearing such matter.

12.    NOTICES. Any notice required or permitted to be given hereunder may be served by a party or its attorney and must be in writing, and shall be deemed to be given (a) when hand-delivered, (b) one (1) business day after pickup by Emery Air Freight, United Parcel Service (Overnight) or Federal Express, or another similar overnight express service, (c) when transmitted by telecopy or facsimile, provided that confirmation of the receipt of same is noted upon transmission of same by the sender's telecopy machine, or (d) when transmitted by electronic correspondence, in any case addressed or sent to the parties at their respective addresses set forth hereinabove, or in each case to such other address as either party may from time to time designate by giving notice in writing pursuant to this Section to the other

11

(PSA – Vacant Improved Property)
43067416.1

Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

pursue remedies at law or in equity, provided, however, that Seller's monetary liability hereunder shall not exceed Purchaser's actual, verifiable third-party expenses and shall be capped at Fifty Thousand and 00/100 Dollars ($50,000.00). If Purchaser is the breaching party, then the following shall apply:

> PURCHASER AND SELLER AGREE THAT IT WOULD BE EXTREMELY DIFFICULT TO DETERMINE SELLER'S ACTUAL DAMAGES RESULTING FROM A BREACH BY PURCHASER. IN THE EVENT OF A BREACH BY PURCHASER, SELLER SHALL BE ENTITLED TO AN AMOUNT EQUAL TO THE EARNEST MONEY DEPOSIT AS LIQUIDATED DAMAGES AND AS SELLER'S EXCLUSIVE REMEDY. PURCHASER AGREES THAT SUCH AMOUNT IS A REASONABLE PRE-ESTIMATE OF SELLER'S ACTUAL DAMAGES FOR BREACH OF THIS AGREEMENT AND IS NOT A PENALTY. IF ESCROW AGENT IS IN POSSESSION OF THE EARNEST MONEY DEPOSIT, THEN ESCROW AGENT SHALL DELIVER THE EARNEST MONEY DEPOSIT TO SELLER. DESPITE THE FOREGOING, IF APPLICABLE LAW LIMITS THE AMOUNT OF THE LIQUIDATED DAMAGES PAYABLE TO SELLER UPON A BREACH BY PURCHASER, SELLER SHALL ONLY BE ENTITLED TO THE AMOUNT PERMITTED BY LAW, AND ANY EXCESS SHALL BE PROMPTLY RETURNED TO PURCHASER. PURCHASER EXPRESSLY WAIVES AND RELEASES ANY LIEN (OR RIGHTS THERETO) THAT PURCHASER MAY HAVE WITH RESPECT TO THE PROPERTY IN CONNECTION WITH THIS AGREEMENT.

Seller's Initials [ DMA / BTL ]          Purchaser's Initials [ JMS / ]

11.2    Costs Upon Termination and Cancellation of Escrow. Except as otherwise set forth in this Section 11, upon termination of this Agreement and cancellation of Escrow pursuant to this Section 11, all costs incurred in connection with the transactions contemplated by this Agreement (including, without limitation, payments for loan applications, inspections, appraisals, and other reports) shall be the sole responsibility of the party incurring such costs.

11.3    Escrow Agent Authorization. If Escrow Agent receives a written notice from a party to cancel the Escrow in accordance with this Section 11, and Escrow Agent can confirm that the other party also received the notice, Escrow Agent is authorized to comply with the notice if Escrow Agent does not receive a written objection within ten (10) calendar days after such other party received the notice.

11.4    Termination.  Upon any termination of this Agreement pursuant to any right of a party to terminate set forth in this Agreement, (a) the Earnest Money Deposit shall be paid over to the party entitled to the same, (b) all documents deposited by Purchaser and Seller into escrow shall be returned by Escrow Agent to the party depositing the same, and (c) all copies of all Property Documents provided to Purchaser by Seller shall be returned to Seller, whereupon the parties will have no continuing liability to each other, unless otherwise expressly stated in any provision of this Agreement. Notwithstanding anything to the contrary provided by this Agreement, in the event Purchaser fails to close on or before the Closing Date, Purchaser hereby authorizes the Escrow Agent to release the Earnest Money Deposit to the Seller.

11.5    Attorneys' Fees.  Notwithstanding anything to the contrary in this Agreement, in the event that either Seller or Purchaser, as the case may be, shall bring a lawsuit against the other party for breach of such party's obligations under this Agreement, the losing party shall pay the prevailing party's costs and expenses incurred in connection with such litigation, including without limitation reasonable attorneys' fees. The "prevailing party" shall be determined by the court hearing such matter.

12.    NOTICES. Any notice required or permitted to be given hereunder may be served by a party or its attorney and must be in writing, and shall be deemed to be given (a) when hand-delivered, (b) one (1) business day after pickup by Emery Air Freight, United Parcel Service (Overnight) or Federal Express, or another similar overnight express service, (c) when transmitted by telecopy or facsimile, provided that confirmation of the receipt of same is noted upon transmission of same by the sender's telecopy machine, or (d) when transmitted by electronic correspondence, in any case addressed or sent to the parties at their respective addresses set forth hereinabove, or in each case to such other address as either party may from time to time designate by giving notice in writing pursuant to this Section to the other

11

(PSA – Vacant Improved Property)
43067416.1

Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

party. Telephone numbers are for informational purposes only. Effective notice will be deemed given only as provided above, except as otherwise expressly provided in this Agreement.

13. **MISCELLANEOUS.**

13.1 Entire Agreement. This Agreement, together with the Schedules and Exhibits attached hereto, all of which are incorporated by reference, is the entire agreement between the parties with respect to the subject matter hereof, and no alteration, modification or interpretation hereof shall be binding unless in writing and signed by both parties.

13.2 Severability. If any provision of this Agreement or its application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstances, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

13.3 Applicable Law. This Agreement shall be construed and enforced in accordance with the internal laws of the State in which the Property is located. Purchaser irrevocably consents and submits to the nonexclusive jurisdiction of the courts of the state and federal district of Cook County, Illinois and waives any objection based on venue of *forum non conveniens* with respect to any action instituted in those courts arising under this Agreement or in any way connected or related or incidental to the dealings of Purchaser and Seller in respect of this Agreement or any related transactions, in each case whether now existing or later arising, and whether in contract, tort, equity or otherwise, and agrees that any dispute with respect to any of those matters will be heard only in the courts described above.

13.4 Assignability. Purchaser may not assign or record all or any part of this Agreement without the express prior written consent of Seller. Despite the foregoing, Purchaser may assign this Agreement to any entity wholly owned, directly or indirectly, by Purchaser; provided, however, that, in such event, the undersigned Purchaser shall remain liable for the obligations of Purchaser under this Agreement.

13.5 Successors Bound. This Agreement shall be binding upon and inure to the benefit of Purchaser and Seller and their respective successors and permitted assigns.

13.6 No Public Disclosure. Prior to Closing, all press releases or other dissemination of information to the media or responses to requests from the media for information relating to the transaction contemplated herein shall be subject to the prior written consent of Purchaser and Seller.

13.7 Captions; Interpretation. The captions in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement or the scope or content of any of its provisions. Whenever the context may require, words used in this Agreement shall include the corresponding feminine, masculine, or neuter forms, and the singular shall include the plural and vice versa. Unless the context expressly indicates otherwise, all references to "Section" are to sections of this Agreement.

13.8 No Partnership. Nothing contained in this Agreement shall be construed to create a partnership or joint venture between the parties or their successors-in-interest or permitted assigns.

13.9 Time of Essence. Time is of the essence with respect to the performance of the obligations of Seller and Purchaser under this Agreement.

13.10 Counterparts and Electronic Signatures. This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument. Facsimile, documents executed, scanned and transmitted electronically and electronic signatures shall be deemed original signatures for purposes of this Agreement and all matters related thereto, with such facsimile, scanned and electronic signatures having the same legal effect as original signatures. Seller and Purchaser agree that this Agreement, any Addendum thereto or any other document necessary for the consummation of the transaction contemplated by this Agreement shall be accepted, executed or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act ("E-Sign Act"), Title 15, United States Code, Sections 7001 et seq., the Uniform Electronic Transaction Act

12

(PSA – Vacant Improved Property)
43067416.1

Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

("UETA") and any applicable state law. Any document accepted, executed or agreed to in conformity with such laws will be binding on both Seller and Purchaser the same as if it were physically executed, and Purchaser hereby consents to the use of any third-party electronic signature capture service providers as may be chosen by Seller.

13.11 Recordation. Purchaser and Seller agree not to record this Agreement or any memorandum hereof.

13.12 Proper Execution. This Agreement shall have no binding force and effect on either party unless and until both Purchaser and Seller shall have executed and delivered this Agreement.

13.13 Waiver. No waiver of any breach of any agreement or provision contained herein shall be deemed a waiver of any preceding or succeeding breach of any other agreement or provision herein contained. No extension of time for the performance of any obligation or act shall be deemed an extension of time for the performance of any other obligation or act.

13.14 Business Days. If any date herein set forth for the performance of any obligations by Seller or Purchaser or for the delivery of any instrument or notice as herein provided should fall on a Saturday, Sunday or Legal Holiday (hereinafter defined), the compliance with such obligations or delivery shall be deemed acceptable on the next business day following such Saturday, Sunday or Legal Holiday. As used herein, the term "Legal Holiday" shall mean any local or federal holiday on which post offices are closed in the state in which the Property is located.

13.15 Limitation of Liability. No present or future partner, director, officer, member, shareholder, employee, advisor, affiliate, servicer or agent of or in Seller, Purchaser or any affiliate of any of the foregoing will have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or in connection with the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter. The limitations of liability contained in this paragraph will survive the termination of this Agreement or the Closing, as applicable, and are in addition to, and not in limitation of, any limitation on liability applicable to either party provided elsewhere in this Agreement or by law or by any other contract, agreement or instrument. In no event will Seller or Purchaser be liable for any consequential, exemplary or punitive damages under any circumstances in connection with this Agreement or the transaction contemplated hereby.

13.16 Back-Up Contracts. Notwithstanding anything herein to the contrary, Seller reserves the right to continue marketing the Property for sale and to entertain letters of intent regarding the sale of the Property while this Agreement is outstanding, provided Seller shall not enter into any binding back-up agreements with respect to the sale of the Property for so long as this Agreement is in force.

13.17 Waiver of Jury Trial. PURCHASER WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT, (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF PURCHASER AND SELLER IN RESPECT OF THIS AGREEMENT OR RELATED TRANSACTIONS, IN EACH CASE WHETHER NOW EXISTING OR LATER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. PURCHASER AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT SELLER MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF PURCHASER TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

13.18 No Third-Party Beneficiary. This Agreement is solely for the benefit of Purchaser and Seller and Purchaser's permitted assigns, and no other person or entity is entitled to the benefit or may enforce any of the provisions of this Agreement, except where expressly provided herein to the contrary and that each of Crexi Technologies, LLC, Commercial Real Estate Exchange, Inc. and their affiliates (collectively, "Crexi") is an express and intended third-party beneficiary of this Agreement.

13.19 Purchaser Representation and Consent. Purchaser acknowledges and confirms that it has had every opportunity to obtain legal representation in this matter and, if the name of Purchaser's counsel is not set forth in this Agreement then Purchaser has either intentionally declined to obtain representation, or not advised Seller of its representation; further, Purchaser confirms that it is a

13

(PSA – Vacant Improved Property)
43067416.1

n Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

sophisticated purchaser of similar commercial properties, is familiar with all rights and remedies of the laws of the jurisdiction governing this Agreement, and specifically waives any right to further representation. Purchaser confirms and acknowledges that it is not relying on any legal advice from Seller, Seller's counsel, the Seller's Broker, Crexi, or any other party in this matter.

13.20  Auction Terms and Conditions. Purchaser represents and warrants that Purchaser has received, read and accepts all terms and conditions pertaining to the sale of the Property (the "Terms and Conditions"), which have been made available on the auction website www.crexi.com (the "Website") and which Terms and Conditions are incorporated herein by reference. In the event of any conflict or inconsistency between the Terms and Conditions and this Agreement, this Agreement shall control and prevail in all respects.

13.21  Purchaser and Buyer. When used in this Agreement or any document concerning the parties to this Agreement, the terms "Purchaser" and "Buyer" shall have the same meaning and be used interchangeably.

13.22  Section 1031 Like-Kind Exchange. Either Seller or Purchaser may consummate the purchase of the Property as part of a so-called like kind exchange (the "Exchange") pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended (the "Code"), provided that: (a) the Closing shall not be delayed or adversely affected by reason of the Exchange, nor shall the consummation or accomplishment of the Exchange be a condition to Purchaser's or Seller's obligations under this Agreement; (b) either Seller or Purchaser may effectuate the Exchange through a qualified intermediary, so long as neither of their respective rights and obligations under this Agreement are adversely affected thereby; and (c) neither Seller nor Purchaser shall be required to make an assignment of the purchase agreement for the exchange property or be required to acquire or hold title to any real property for the purposes of consummating the Exchange. Neither Seller nor Purchaser shall, by this Agreement or acquiescence to the Exchange, (i) have their rights under this Agreement adversely affected or diminished in any manner, or (ii) be responsible for compliance with or be deemed to have warranted to the other that the Exchange in fact complies with Section 1031 of the Code.

13.23  Prohibited Persons and Transactions. Purchaser represents and warrants to Purchaser's knowledge: (i) Purchaser is not a Prohibited Person (defined below); (ii) none of its investors, affiliates or brokers or other agents (if any), acting or benefiting in any capacity in connection with this Agreement is a Prohibited Person; (iii) the funds or other assets Purchaser will transfer to Seller under this Agreement are not the property of, or beneficially owned, directly or indirectly, by a Prohibited Person; and (iv) the funds or other assets Purchaser will transfer to Seller under this Agreement are not the proceeds of specified unlawful activity as defined by 18 U.S.C. § 1956(c)(7). "Prohibited Person" means any of the following: (a) a person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) (the "Executive Order"); (b) a person or entity owned or controlled by, or acting for or on behalf of any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (c) a person or entity that is named as a "specially designated national" or "blocked person" on the most current list published by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") at its official website, http://www.treas.gov/offices/enforcement/ofac; (d) a person or entity that is otherwise the target of any economic sanctions program currently administered by OFAC; or (e) a person or entity that is affiliated with any person or entity identified in clause (a), (b), (c) and/or (d) above. The foregoing representations shall survive Closing and any termination of this Agreement.

13.24  Local Requirements. Some counties, cities, municipalities and other state subdivisions may require a certificate of occupancy, certificate of use or code compliance certificate and/or inspection ("Local Requirement") in order to transfer and/or occupy the Property. If a Local Requirement is required for the Property to be transferred to or occupied by Purchaser, Purchaser waives such Local Requirements to the extent waivable. To the extent any such Local Requirement is not waivable by Purchaser, Purchaser shall comply with the Local Requirement at Purchaser's sole cost, including, without limitation, the correction of any violations or performance of other work which may be required in connection therewith. Seller makes no representation as to whether a Local Requirement applies. Purchaser shall indemnify, defend and hold Seller harmless from and against all fines, penalties, costs, expenses, claims

14

Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

and liabilities arising out of or relating to any Local Requirements. This paragraph shall survive Closing indefinitely.

13.25 Form of Agreement. Purchaser and Seller acknowledge that no representation, recommendation or warranty is made by Crexi or any broker relating to the legal sufficiency or tax consequences of this Agreement or any attachments hereto, and Purchaser and Seller each represent and warrant that it has consulted with, had the opportunity to consult with or waived the right to consult with counsel in connection with this Agreement.

13.26 Riders. If any state-specific riders or other addenda are attached hereto ("Riders"), the terms of such Riders are incorporated herein by reference and to the extent of any conflict between the terms of this Agreement and the terms of any such Riders, the terms of the Riders shall control.

13.27 Mutual Release and Termination of Recreation and Use Easement. Purchaser acknowledges that in the data room provided by Crexi there is a Recreation and Use Agreement and supplements and/or amendments thereto which provides the current owner and guests/invitees of the Property the right to use certain amenities at the Fox River Resort for an annual fee and/or additional per use charge pursuant to a Recreation and Use Easement dated December 17, 1997 and recorded under Clerk's File No. R97-20660 of the Recorder's Office of LaSalle County, Illinois, as amended and/or supplemented from time to time (the "Recreation and Use Easement"). At or prior to Closing, Seller will record a mutual release and termination of the Recreation and Use Easement ("Mutual Release and Termination of Recreation and Use Easement") in the form attached hereto as **Exhibit I** which will among other things, release the Real Property and terminate the Recreation and Use Easement, ceasing any rights to use the amenities under the Recreation and Use Easement.

## 14. ESCROW AGREEMENT

14.1 Deposit. Escrow Agent agrees to deposit the Earnest Money Deposit. Upon written notification from Seller or Purchaser in accordance with the terms of this Agreement, Escrow Agent shall release the funds in accordance with and pursuant to the written instructions. In the event of a dispute between any of the parties hereto sufficient in the sole discretion of Escrow Agent to justify its doing so, Escrow Agent shall be entitled to tender unto the registry or custody of any court of competent jurisdiction all money or property in its hands held under the terms of this Agreement, together with such legal pleading as it deems appropriate, and thereupon be discharged.

14.2 Escrow. Seller and Purchaser covenant and agree that in performing any of its duties under this Agreement, Escrow Agent shall not be liable for any loss, costs or damage which it may incur as a result of serving as Escrow Agent hereunder, except for any loss, costs or damage arising out of its willful default or gross negligence. Accordingly, Escrow Agent shall not incur any liability with respect to (i) any action taken or omitted to be taken in good faith upon advice of its counsel given with respect to any questions relating to its duties and responsibilities, or (ii) to any action taken or omitted to be taken in reliance upon any document, including any written notice of instruction provided for in this Agreement, not only as to its due execution and the validity and effectiveness of its provisions, but also to the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by a proper person or persons and to conform with the provisions of this Agreement.

14.3 Indemnity. Seller and Purchaser hereby agree to indemnify and hold harmless Escrow Agent against any and all losses, claims, damages, liabilities and expenses, including without limitation, reasonable costs of investigation and attorneys' fees and disbursements which may be imposed upon or incurred by Escrow Agent in connection with its serving as Escrow Agent hereunder, except for any loss, costs or damage arising out of its willful default or gross negligence. The provisions of this Section shall survive a termination of this Agreement.

14.4 Substitution of Escrow Agent. If Purchaser desires to utilize an escrow agent other than the Escrow Agent originally named herein, Purchaser may request a substitution of escrow agent by written notice to Seller. Seller shall be permitted to accept or reject any such requested substitution of escrow agent in Seller's sole and absolute discretion. If Seller accepts the requested substitution, then Purchaser shall be solely responsible to pay any and all escrow cancellation and transfer fees associated

(PSA – Vacant Improved Property)
43067416.1

Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

with the cancellation of the escrow with the originally named escrow agent and the transfer of the file to the substituted escrow agent, along with any increase in closing costs incurred by Seller as a result of such substitution of the escrow agent. If Seller rejects the requested substitution of escrow agent, then Purchaser and Seller shall continue under this Agreement with the originally named Escrow Agent hereunder.

*[Signature Pages Follow]*

16

(PSA – Vacant Improved Property)
43067416.1

Envelope ID: 270C0BF0-0819-8528-810C-05A95B72479F

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement on the dates set forth below, effective as of the date first set forth above.

SELLER:

SILVERLEAF RESORTS, LLC,
a Texas limited liability company

By: Donna M Hansen

Name: Donna M. Hansen

Title: Vice President

Date: 4/22/2026

FOX RIVER RESORT CLUB, a not-for-profit Illinois corporation

By: Brian T Lower

Name: Brian T. Lower

Title: Director

Date: 4/22/2026

PURCHASER:

Vairt Inc.
a Pennsylvania corporation

By: JAMIL AHMED SUKHERA

Name: JAMIL AHMED SUKHERA

Title: CEO

Date: 4/22/2026

By: _____

Name: _____

Title: _____

Date: _____

17

(PSA – Vacant Improved Property)
43067416.1

## ACKNOWLEDGEMENT BY ESCROW AGENT

IN WITNESS WHEREOF, Escrow Agent has signed this Agreement for the limited purposes set forth herein.

ESCROW AGENT:
WHEATLAND TITLE COMPANY

By: _____

Name: _____

Title: _____

Date: _____

18

(PSA – Vacant Improved Property)
43087416.1

Envelope ID: 270C0BF0-0819-8526-810C-05A95B72470F

## EXHIBIT A

### Real Property Description

### Tract 1

ALL THAT PART OF THE FOLLOWING DESCRIBED PROPERTY LOCATED IN SECTION 32, TOWNSHIP 35 NORTH, RANGE 5 EAST OF LOTS 1, 2, 3, 4 AND 5 IN THE SUBDIVISION OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 32, LOT 6 IN THE SUBDIVISION OF THE NORTHEAST QUARTER OF SECTION 32, ALL AS PER PLAT RECORDED IN THE OFFICE OF THE RECORDER OF DEEDS IN BOOK G OF PLATS, PAGE 40, THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 32, THE EAST HALF OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 32, PART OF THE NORTH HALF OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 32, AND PART OF LOT 9 IN THE SUBDIVISION OF THE SOUTH HALF OF SECTION 29, ALL IN TOWNSHIP 35 NORTH, RANGE 5 EAST OF THE THIRD PRINCIPAL MERIDIAN ALL DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF THE NORTHWEST QUARTER OF SAID SECTION 32; THENCE SOUTH 0 DEGREES 35 MINUTES 41 SECONDS EAST 1325.84 FEET ALONG THE EAST LINE OF THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 32 TO THE NORTHWEST CORNER OF SAID LOT 6;

THENCE NORTH 89 DEGREES 28 MINUTES 17 SECONDS EAST 1324.72 FEET ALONG THE NORTH LINE OF SAID LOT 6 TO THE NORTHEAST CORNER OF SAID LOT 6;

THENCE SOUTH 0 DEGREES 38 MINUTES 08 SECONDS EAST 1324.59 FEET ALONG THE EAST LINE OF SAID LOT 6 TO THE SOUTHEAST CORNER OF SAID LOT 6;

THENCE SOUTH 89 DEGREES 25 MINUTES 02 SECONDS WEST 2662.21 FEET ALONG THE SOUTH LINE OF SAID LOTS 6, 5, AND 4 TO THE SOUTHWEST CORNER OF SAID LOT 4;

THENCE NORTH 0 DEGREES 19 MINUTES 09 SECONDS WEST 665.35 FEET ALONG THE WEST LINE OF SAID LOT 4 AND THE EAST LINE OF SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 32 TO THE SOUTHEAST CORNER OF THE NORTH HALF OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 32;

THENCE SOUTH 89 DEGREES 31 MINUTES 21 SECONDS WEST 1343.06 FEET ALONG THE SOUTH LINE OF THE NORTH HALF OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 32 TO THE SOUTHWEST CORNER OF THE NORTH HALF OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 32;

THENCE NORTH 0 DEGREES 52 MINUTES 44 SECONDS WEST 333.25 FEET ALONG THE WEST LINE OF THE NORTH HALF OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 32 TO A POINT;

THENCE NORTH 14 DEGREES 23 MINUTES 31 SECONDS EAST 39.03 FEET TO A POINT;

EXHIBIT A

Envelope ID: 270C0BF0-0819-8526-810C-05A95B72470F

THENCE NORTH 10 DEGREES 16 MINUTES 11 SECONDS EAST 101.61 FEET TO A POINT;

THENCE NORTH 14 DEGREES 40 MINUTES 10 SECONDS EAST 81.23 FEET TO A POINT;

THENCE NORTH 37 DEGREES 25 MINUTES 04 SECONDS EAST 75.56 FEET TO A POINT;

THENCE NORTH 62 DEGREES 01 MINUTES 11 SECONDS EAST 57.88 FEET TO A POINT;

THENCE NORTH 68 DEGREES 52 MINUTES 39 SECONDS EAST 53.89 FEET TO A POINT;

THENCE NORTH 56 DEGREES 34 MINUTES 04 SECONDS EAST 23.66 FEET TO A POINT ON THE NORTH LINE OF THE NORTH HALF OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 32;

THENCE NORTH 89 DEGREES 37 MINUTES 36 SECONDS EAST 463.97 FEET ALONG SAID NORTH LINE TO THE SOUTHWEST CORNER OF THE EAST HALF NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 32;

THENCE NORTH 0 DEGREES 10 MINUTES 54 SECONDS WEST 1322.32 FEET ALONG THE WEST LINE OF THE EAST HALF OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 32 TO THE NORTHWEST CORNER OF THE EAST HALF OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 32;

THENCE NORTH 89 DEGREES 31 MINUTES 31 SECONDS EAST 190.86 FEET ALONG THE NORTH LINE OF THE NORTHWEST QUARTER OF SAID SECTION 32 TO A POINT ON THE SOUTH LINE OF LOT 3700 IN FOX RIVER DELLS LAND DEVELOPMENT SUBDIVISION;

THENCE NORTH 79 DEGREES 45 MINUTES 54 SECONDS EAST 547.93 FEET ALONG THE SOUTH LINE OF FOX RIVER DELLS LAND DEVELOPMENT SUBDIVISION TO THE SOUTHEAST CORNER OF LOT 3716 IN SAID FOX RIVER DELLS LAND DEVELOPMENT SUBDIVISION;

THENCE NORTH 10 DEGREES 59 MINUTES 06 SECONDS WEST 266.0 FEET ALONG THE EAST LINE OF SAID LOT 3716 AND THE EAST LINE OF THE WEST 5.0 ACRES OF SAID LOT 9 TO THE NORTHEAST CORNER OF SAID LOT 3716 AND THE NORTHWEST CORNER OF THE WEST 5.0 ACRES OF SAID LOT 9;

THENCE NORTH 79 DEGREES 45 MINUTES 54 SECONDS EAST 426.97 FEET ALONG THE NORTH LINE OF SAID LOT 9 TO THE NORTHEAST CORNER OF SAID LOT 9;

THENCE SOUTH 51 DEGREES 56 MINUTES 51 SECONDS EAST 685.21 FEET ALONG THE EAST LINE OF SAID LOT 9 TO THE SOUTHEAST CORNER OF SAID LOT 9;

THENCE NORTH 89 DEGREES 31 MINUTES 31 SECONDS EAST 346.50 FEET ALONG THE NORTH LINE OF THE NORTHWEST QUARTER OF SAID SECTION 32 TO THE POINT OF BEGINNING.

EXHIBIT A

ALL SITUATED IN LASALLE COUNTY, ILLINOIS.

EXCEPT

PART OF THE LOT 4 IN THE SUBDIVISION OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 32, TOWNSHIP 35 NORTH, RANGE 5 EAST OF THE THIRD PRINCIPAL MERIDIAN, AS PER THE PLAT RECORDED IN THE OFFICE OF THE RECORDER OF DEEDS IN BOOK G OF PLATS, PAGE 40, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF SAID LOT 4; THENCE NORTH 00 DEGREES 19 MINUTES 09 SECONDS WEST 467.84 FEET ALONG THE WEST LINE OF SAID LOT 4 TO THE SOUTHWEST CORNER OF FOX RIVER RESORT SECTION 5, AS PER THE PLAT RECORDED AS DOCUMENT NO. R2000-24053; THENCE SOUTH 57 DEGREES 12 MINUTES 12 SECONDS EAST 229.68 FEET ALONG THE SOUTH LINE OF SAID SECTION 5; THENCE SOUTH 80 DEGREES 43 MINUTES 43 SECONDS EAST 121.88 FEET ALONG THE SOUTH LINE OF SAID SECTION 5O THE SOUTHEAST CORNER OF SAID SECTION 5, SAID CORNER ALSO BEING ON THE WEST LINE OF FOX RIVER RESORT SECTION 4, AS PER DOCUMENT NO. R99-31754; THENCE SOUTH 00 DEGREES 14 MINUTES 10 SECONDS WEST 320.64 FEET ALONG THE WEST LINE OF SAID SECTION 4 TO THE SOUTHWEST CORNER OF SAID SECTION 4 AND THE SOUTH LINE OF SAID LOT 4; THENCE SOUTH 89 DEGREES 25 MINUTES 02 SECONDS WEST 309.45 FEET ALONG THE SOUTH LINE OF SAID LOT 4 TO THE POINT OF BEGINNING, ALL BEING SITUATED IN MISSION TOWNSHIP, LASALLE COUNTY, ILLINOIS.

EXHIBIT A

Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

## Tract 2

PART OF LOT 9 IN THE SUBDIVISION OF THE SOUTH HALF OF SECTION 29, TOWNSHIP 35 NORTH, RANGE 5 EAST OF THE THIRD PRINCIPAL MERIDIAN DESCRIBED AS FOLLOWS; COMMENCING AT THE SOUTHWEST CORNER OF THE EAST HALF OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SAID SECTION 29, THENCE NORTH 89 DEGREES 31 MINUTES 31 SECONDS EAST 190.86 FEET ALONG THE SOUTH LINE OF THE SOUTHWEST QUARTER OF SAID SECTION 29 TO A POINT ON THE SOUTH LINE OF LOT 3700 IN FOX RIVER DELLS LAND DEVELOPMENT SUBDIVISION, THE TRUE POINT OF BEGINNING, THENCE NORTH 79 DEGREES 41 MINUTES 45 SECONDS EAST 567.95 FEET ALONG THE SOUTH LINE OF FOX RIVER DELLS LAND DEVELOPMENT SUBDIVISION AND ITS EXTENSION EASTERLY TO A POINT 20 FEET EASTERLY OF THE SOUTHEAST CORNER OF LOT 3716 IN SAID FOX RIVER DELLS LAND DEVELOPMENT SUBDIVISION, THENCE NORTH 10 DEGREES 58 MINUTES 28 SECONDS WEST 265.80 FEET ALONG A LINE PARALLEL WITH THE EAST LINE OF SAID LOT 3716 TO A POINT ON THE NORTH LINE OF SAID LOT 9, SAID POINT BEING 20 FEET EASTERLY OF THE NORTHEAST CORNER OF SAID LOT 3716 AS MEASURED ALONG THE NORTH LINE OF SAID LOT 9, THENCE NORTH 79 DEGREES 48 MINUTES 23 SECONDS EAST 406.97 FEET ALONG THE NORTH LINE OF SAID LOT 9 TO THE NORTHEAST CORNER OF SAID LOT 9, THENCE SOUTH 51 DEGREES 55 MINUTES 32 SECONDS EAST 685.21 FEET ALONG THE EAST LINE OF SAID LOT 9 TO THE SOUTHEAST CORNER OF SAID LOT 9, SAID POINT BEING ON THE SOUTH LINE OF THE SOUTHWEST QUARTER OF SAID SECTION 29, THENCE SOUTH 89 DEGREES 31 MINUTES 31 SECONDS WEST 1448.19 FEET ALONG THE SOUTH LINE OF THE SOUTHWEST QUARTER OF SAID SECTION 29 TO THE POINT OF BEGINNING, ALL CONTAINING 6.612 ACRES MORE OR LESS, ALL SITUATED IN LASALLE COUNTY, ILLINOIS AND SUBJECT TO THE RIGHTS OF THE PUBLIC TO THAT PORTION BEING USED AS A PUBLIC HIGHWAY.

EXHIBIT A

Envelope ID: 270C0BF0-081B-8526-810C-05A95B72479F

## Tract 3

PART OF LOT 3 IN THE SUBDIVISION OF THE SOUTH HALF OF SECTION 29, TOWNSHIP 35 NORTH, RANGE 5 EAST OF THE THIRD PRINCIPAL MERIDIAN, AS PER PLAT RECORDED IN BOOK G, PAGE 44 AT THE LASALLE COUNTY RECORDERS OFFICE DESCRIBED AS FOLLOWS; BEGINNING AT THE SOUTHEAST CORNER OF LOT 3713 OF FOX RIVER DELLS LAND DEVELOPMENT SUBDIVISION, RECORDED AS DOC. NO. 694707 AT THE LASALLE COUNTY RECORDERS OFFICE, THENCE NORTH 8 DEGREES 04 MINUTES 11 SECONDS WEST 72.48 FEET ALONG THE EAST LINE OF SAID LOT 3713 TO A POINT, THENCE NORTH 57 DEGREES 44 MINUTES 59 SECONDS WEST 106.33 FEET ALONG THE NORTH LINE OF SAID LOT 3713 TO A POINT, THENCE NORTH 44 DEGREES 18 MINUTES 13 SECONDS WEST 58.73 FEET ALONG SAID NORTH LINE TO A POINT, THENCE NORTH 56 DEGREES 06 MINUTES 49 SECONDS WEST 133.89 FEET ALONG SAID NORTH LINE TO A POINT, THENCE NORTH 64 DEGREES 12 MINUTES 24 SECONDS WEST 122.52 FEET ALONG SAID NORTH LINE TO THE EAST BANK OF THE FOX RIVER, THENCE NORTHEASTERLY ALONG THE EAST BANK OF THE FOX RIVER TO THE NORTH LINE OF LOT 3 IN THE SUBDIVISION OF THE SOUTH HALF OF SAID SECTION 29, THENCE NORTH 82 DEGREES 47 MINUTES 07 SECONDS EAST 169.08 FEET ALONG THE NORTH LINE OF SAID LOT 3 TO A POINT 1065.82 FEET WEST OF AS MEASURED ALONG THE NORTH LINE OF SAID LOT 3 FROM THE NORTHEAST CORNER OF SAID LOT 3, THENCE SOUTH 35 DEGREES 47 MINUTES 57 SECONDS EAST 402.98 FEET TO A POINT, THENCE SOUTH 25 DEGREES 32 MINUTES 15 SECONDS WEST 455.67 FEET TO A POINT, THENCE SOUTH 10 DEGREES 14 MINUTES 06 SECONDS EAST 127.03 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF NORTH 3653RD ROAD, THENCE SOUTH 81 DEGREES 55 MINUTES 49 SECONDS WEST 66.05 FEET ALONG THE NORTH RIGHT OF WAY LINE OF SAID NORTH 3653 ROAD TO THE POINT OF BEGINNING, CONTAINING 6.363 ACRES MORE OR LESS, ALL SITUATED IN LASALLE COUNTY, ILLINOIS.

## Tract 4

PART OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 33, TOWNSHIP 35 NORTH, RANGE 5 EAST OF THE THIRD PRINCIPAL MERIDIAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT 33 FEET SOUTH OF THE NORTHWEST CORNER OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER; THENCE CONTINUING SOUTH 304.19 FEET TO A POINT ON THE WESTERLY RIGHT-OF-WAY LINE OF ILLINOIS ROUTE 71; THENCE NORTH 34 DEGREES, 26 MINUTES, 00 SECONDS EAST 116.45 FEET ALONG THE WESTERLY RIGHT-OF-WAY LINE OF ILLINOIS ROUTE 71 TO A POINT; THENCE NORTH 28 DEGREES, 09 MINUTES, 00 SECONDS EAST 214.77 FEET ALONG SAID WESTERLY RIGHT-OF-WAY LINE TO A POINT; THENCE NORTH 84 DEGREES, 32 MINUTES, 04 SECONDS WEST 161.23 FEET TO THE POINT OF BEGINNING, IN MISSION TOWNSHIP, SITUATED IN LASALLE COUNTY, IL.

EXHIBIT A

# Exhibit B

| From: | Sciacchitano, Maria |
|---|---|
| To: | Jamil Ahmed Sukhera |
| Cc: | Rosenblum, Hugh; Andrew Hallas III; Vanessa Walsh; David Amezquita; Robert Anderson |
| Subject: | Purchase and Sale Agreement and Joint Escrow Instructions effective as of April 22, 2026 by and between Fox River Resort Club and Silverleaf Resorts, LLC and Vairt Inc. |
| Importance: | High |

Jamil,

As you are aware, I represent the Seller in connection with that certain Purchase and Sale Agreement and Joint Escrow Instructions effective as of April 22, 2026 by and between Fox River Resort Club, a not-for-profit Illinois corporation, acting as duly appointed attorney-in-fact and Silverleaf Resorts, LLC, a Texas limited liability company (collectively, the "**Seller**") and Vairt Inc., a Pennsylvania corporation ("**Purchaser**") concerning certain real property located in LaSalle County, Illinois (the "**Property**"), as amended from time to time (the "**PSA**").

Seller has attempted to accommodate Purchaser's requests and facilitate Purchaser's due diligence efforts throughout the transaction. However, several recent actions and omissions of Purchaser have caused significant concern and require immediate attention.

First, Purchaser has failed to timely deposit the Additional Deposit in the amount of ██████, equivalent to ███ of the Purchase Price, required under the PSA. On June 1, 2026, Purchaser provided written notice of its election to exercise extension option one (1) of two (2) available under the Addendum to PSA (Extension Option Addendum) (the "**Extension Option Addendum**"). In accordance with the terms of the Extension Option Addendum, Purchaser was required to deliver the Additional Deposit concurrently with delivery of the notice of exercised extension option. As of the date of this email, Escrow Agent has not received the Additional Deposit. As you are aware, earnest money obligations are material contractual requirements and Seller expressly reserves all rights and remedies arising from Purchaser's failure to comply with those obligations.

Second, Purchaser has repeatedly requested property tours conducted by Seller's local general manager for Purchaser, various business associates and individuals who appear to be prospective customers or end users of Purchaser's anticipated post-closing business venture(s). These requests have become excessive and are imposing an unreasonable burden on Seller's personnel and operations. Seller reminds Purchaser that access rights under the PSA are intended to facilitate legitimate due diligence activities and are not intended nor authorized to support marketing, promotional, pre-sales, customer solicitation, or business development activities unrelated to the consummation of the transaction.

Third, Seller has become aware that Purchaser has disseminated unauthorized

advertisements and promotional materials through social media and other public channels regarding Purchaser's intended future development and use of the Property. Such communications have been made without Seller's authorization and create the potential for confusion regarding ownership, operational control, and the status of the Property. This behavior directly conflicts with Section 13.6 of the PSA which states, "Prior to Closing, all press releases or other dissemination of information to the media or responses to requests from the media for information relating to the transaction contemplated herein shall be subject to the prior written consent of Purchaser and Seller." For the avoidance of doubt, Seller has not authorized or consented to any of the advertisement or promotional material disseminated by Purchaser.

Fourth, Seller has been informed that Purchaser intends to conduct a property tour on Sunday, June 7, 2026, with Purchaser's purported partners. Seller has become aware of advertisements disseminated by Purchaser promoting what appears to be an "open house" event scheduled for the same date and time. Seller has not authorized any open house, public event, marketing event, customer event, promotional event, or similar activity at the Property. The apparent overlap between the advertised event and the requested tour raises serious concerns regarding the intended purpose of the visit, the potential involvement of members of the public, and security of the Property and personnel. For the avoidance of doubt, Seller cannot accommodate a tour of Property on Sunday, June 7, 2026. Therefore, Purchaser should notify the appropriate persons that they will not be admitted to tour the Property on that date.

Finally, Purchaser has failed to execute and return the requested addendum to the PSA sent by Crexi via Docusign on May 7, 2026. Despite multiple opportunities to do so, Seller has not received a fully executed copy from Purchaser.

Accordingly, Seller hereby demands that Purchaser:

1. Immediately satisfy all outstanding earnest money deposit obligations required by the Extension Option Addendum no later than Friday, June 5, 2026 at 12 pm EST;
2. Cease and desist from advertising, marketing, promoting, offering, or otherwise publicly representing any future ownership, operation, development, event, product, service, or business activity associated with the Property without Seller's prior written consent;
3. Cease and desist from organizing, promoting, conducting, or facilitating any public tours, open houses, customer visits, promotional events, or similar activities at the Property;
4. Remove any existing advertisements, social media posts, event listings, or other public communications that suggest Purchaser presently possesses authority to market, operate, or host events at the Property;
5. Immediately issue a statement through all media channels that the proposed June 7th

"open house" is cancelled and produce proof of such statement to Seller **no later than Friday, June 5, 2026 at 12 pm EST**;

6. Immediately execute and return the pending addendum, if Purchaser intends to proceed with the transaction; and

7. When submitting any request for future tours of the Property, with at least seven (7) calendar days advanced notice, submit directly to me and include the names of each attendee and each attendee's relationship to the Purchaser. Further, any future tours of the Property shall be limited to no more than four (4) attendees at a time. For the avoidance of doubt, all attendees should be an owner or owner representative of Purchaser and not prospective customers or end users of Purchaser's anticipated post-closing business venture(s).

Nothing contained in this correspondence shall be construed as a waiver of any rights, claims, remedies, defaults, or defenses available to Seller under the PSA, at law, or in equity. To the contrary, Seller expressly reserves all such rights and remedies. Based on the information currently available to Seller, Seller believes that Purchaser's conduct raises substantial concerns regarding Purchaser's compliance with Purchaser's obligations under the PSA and Seller is actively considering whether immediate termination is warranted. Seller notes that Purchaser's failure to timely deliver the required Additional Deposit, together with the other matters addressed herein, may constitute one or more defaults under the PSA. Seller is presently evaluating its rights and remedies arising from such conduct. Seller specifically reserves the right to determine that Purchaser is in default of the PSA and to exercise any and all remedies available thereunder.

Without limitation, Seller expressly reserves its contractual right to immediately terminate the PSA by written notice in the event Purchaser has failed to timely deposit the Earnest Money Deposit as required by the PSA and as set forth above. Seller further reserves the right, upon any Purchaser default, to terminate the PSA and Escrow, seek release and delivery of the Earnest Money Deposit as liquidated damages, recover any cancellation fees chargeable to the breaching party, deny further access to the Property except as expressly authorized by Seller, and pursue all other rights and remedies available under the PSA and applicable law.

Seller's willingness to continue discussions, consider Purchaser's requests, permit any additional Property access, or refrain from immediately exercising its remedies shall not be construed as a waiver, election of remedies, modification of the PSA, or agreement that Purchaser is not in default. Any such rights may be exercised by Seller at any time and without further waiver or prejudice.

I trust that Purchaser will promptly address these matters and avoid any further conduct that

FILED DATE: 7/8/2026 8:27 PM   2026CH06461

may prejudice Seller's interests or interfere with the orderly administration of the transaction.

Sincerely,

Maria Scicchitano, Esq.

# Exhibit C

| | |
|---|---|
| **From:** | Scicchitano, Maria |
| **To:** | Melton, Ray |
| **Subject:** | RE: There was a typo I fixed |
| **Attachments:** | image001.png |
| | image004.png |
| | image015.png |
| | image017.png |
| | image019.png |
| | image021.png |
| | image022.png |
| | image002.png |
| | image009.png |
| | image010.png |
| | image011.png |
| | image012.png |
| | image013.png |
| | image014.png |
| | image016.png |
| | image018.png |
| | image020.png |
| | 2026.06.18-Mutual Termination Agreement for Fox River Resort-Draft v8 MNS Redline-Rev date & signatory of SLR.pdf |
| | 2026.06.18-Mutual Termination Agreement for Fox River Resort-Draft v8 MNS Clean.docx |

Ray,

Attached is a redline and clean version of the Mutual Termination Agreement. Within the redline, the only changes made since yesterday's draft were to the Effective Date and signatory of one of the Sellers. Given the email received from Wheatland Title as to processing of the earnest money deposit, please let me know if the attached clean version of the Mutual Termination Agreement is acceptable to your client and may be circulated via Docusign for signatures. As you are aware, tomorrow is a Federal holiday and many people will be out of office so I'd like to get this wrapped up today if possible.

**Maria Scicchitano**
*Manager | Acquisitions & Development*
Holiday Inn Club Vacations

9271 S John Young Pkwy
Orlando, FL 32819
t: (407) 395-6835
e: magreen@holidayinnclub.com



---

**From:** Scicchitano, Maria
**Sent:** Wednesday, June 17, 2026 4:50 PM
**To:** 'Melton, Ray' <RMelton@amundsendavislaw.com>
**Subject:** RE: There was a typo I fixed

Hi Ray,

Thanks for catching that. Attached is the clean version accepting the change to typo in Section 6.

As discussed, I will email the title company under separate cover regarding the release of EMD and copy you.

Thanks,

**Maria Scicchitano**
*Manager | Acquisitions & Development*
Holiday Inn Club Vacations

9271 S John Young Pkwy
Orlando, FL 32819
t: (407) 395-6835
e: magreen@holidayinnclub.com



From: Melton, Ray <RMelton@amundsendavislaw.com>
Sent: Wednesday, June 17, 2026 4:34 PM
To: Scicchitano, Maria <MaGreen@holidayinnclub.com>
Subject: There was a typo I fixed

Let me know if this ok. I am going to call you about one more issue he brought up which more logistics than anything.
Ray

**Ray Melton**
Partner
Direct: 815 904 8808
rmelton@amundsendavislaw.com
308 W. State Street, Suite 320, Rockford, IL 61101
www.amundsendavislaw.com



This message is intended only for the individual or entity to which it is addressed and may contain information that is attorney work product, privileged, confidential and/or exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and delete or destroy the message. Thank you.

Case: 1.26-cv-08321 Document #: 1-1 Filed: 07/15/26 Page 67 of 121 PageID #:75

# Exhibit D

Adobe ID: A35504B5-5EF1-8185-8328-8820DDECF28D
Property Address: 2558 N. 3653 Rd, Sheridan, IL 60551

## MUTUAL TERMINATION AND RELEASE AGREEMENT

This Mutual Termination and Release Agreement ("**Termination Agreement**") is entered into as of this 18th day of June, 2026 (the "**Effective Date**"), by and between Fox River Resort Club, a not-for-profit Illinois corporation and Silverleaf Resorts, LLC, a Texas limited liability company (collectively, the "**Seller**") and Vairt Inc., a Pennsylvania corporation (the "**Purchaser**").

## RECITALS

WHEREAS, Seller and Purchaser entered into that certain Purchase and Sale Agreement and Joint Escrow Instructions dated April 22, 2026 as amended, modified or supplemented from time to time, which arose from an auction in which the Seller and Purchaser participated, (the "**Agreement**") for the purchase and sale of real property located in LaSalle County, Illinois;

WHEREAS, Seller and Purchaser desire to mutually terminate the PSA and fully resolve all disputes and claims relating thereto, subject to the terms of this Termination Agreement; and

WHEREAS, any capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Seller and Purchaser agree as follows:

1. **Termination of Agreement**. As of the Effective Date, the Agreement is hereby terminated without cause or breach of either party and shall be of no further force or effect, except for those obligations expressly stated herein to survive termination and any provision of the Agreement that expressly survives termination by their terms.

2. **Disbursement of Earnest Money Deposit**. Seller and Purchaser mutually agree and hereby authorize Escrow Agent to disburse the Earnest Money Deposit held pursuant to the Agreement in the total sum of Seven Hundred Eighty-Five Thousand Three Hundred Seventy-Five and 00/100 Dollars (███████) as follows:

   To Seller:          $0.00

   To Purchaser:       ███████

   To Escrow Agent:    $ ███ as reimbursement for cancellation fees, administrative costs, expenses incurred by Escrow Agent in connection with the Agreement and termination thereof.

   The foregoing disbursement shall constitute full and complete satisfaction of all rights and claims of Seller and Purchaser to the Earnest Money Deposit.

3. **Waiver and Release**. Seller and Purchaser each acknowledge and agree that neither Seller nor Purchaser admits any breach, fault, wrongdoing or liability under the Agreement and that this Termination Agreement is intended solely as a mutual compromise and settlement of disputed matters relating to the Agreement.

   Except as expressly provided herein, Seller and Purchaser each hereby irrevocably waives and

Envelope ID: A35504B5-5EF1-8185-8325-8526DDECF2BD

Property Address: 2558 N. 3653 Rd, Sheridan, IL 60551

releases the other party, together with its respective agents, representatives, brokers, auctioneers, principals, members, managers, officers, directors, employees, affiliates, successors, and assigns, and Escrow Agent, from any and all claims, demands, liabilities, damages, causes of action, obligations, costs, expenses, attorneys' fees, and rights of every kind and nature, whether known or unknown, suspected or unsuspected, fixed or contingent, arising out of or relating to the Agreement, the Property, the Earnest Money Deposit, or the transaction contemplated by the Agreement.

Notwithstanding anything contained herein to the contrary, the releases set forth in this Section apply solely to claims arising out of or relating to the Agreement and the transactions contemplated thereby. The releases do not apply to, and expressly exclude, any claim arising from or relating to (i) a breach of this Termination Agreement, including without limitation the confidentiality, non-disparagement and permitted public statement provisions or (ii) enforcement of this Termination Agreement. Seller and Purchaser expressly reserve all rights and remedies with respect to any future breach of this Termination Agreement.

4. **Non-Disparagement**. Commencing on and after the Effective Date of this agreement, Seller and Purchaser agree that neither party shall, directly or indirectly, make, publish, communicate or cause to be communicated any false, misleading, defamatory, disparaging or derogatory statements directly related to the other party or its respective officers, directors, managers, members, owners, employees, affiliated entities that share common ownership with the parties or business operations. The obligations of this Section shall survive indefinitely following execution of this Termination Agreement. Each separate communication, publication, post, disclosure, interview, comment, or transmission shall constitute a separate breach of this Termination Agreement. The parties acknowledge that the obligations contained in this Termination Agreement are independent covenants and are not released, waived, or otherwise affected by the mutual releases contained herein.

5. **Confidentiality**.
Except as expressly permitted herein, Seller and Purchaser shall keep strict confidentiality of the Agreement, this Termination Agreement, the negotiations between the parties, the contemplated transaction, the reasons for termination and all non-public information concerning the contemplated transaction. Neither party shall disclose such information to any third party except: (i) to its attorneys, accountants, lenders, consultants, insurers and other professional advisors who have a need to know and who are informed of the confidential nature of such information; (ii) as required by applicable law, court order, subpoena or governmental authority; or (iii) as necessary to enforce rights under this Termination Agreement or as needed to pursue its claims against third-parties. Any party required by law to disclose confidential information shall, to the extent legally permissible, provide prior notice to the other party and cooperate in seeking confidential treatment of such information. Each separate communication, publication, post, disclosure, interview, comment, or transmission shall constitute a separate breach of this Termination Agreement. The parties acknowledge that the obligations contained in this Termination Agreement are independent covenants and are not released, waived, or otherwise affected by the mutual releases contained herein.

6. **Permitted Public Statement**. The sole public statement that may be made by either party regarding the parties involvement related to the Agreement shall be:

> "The parties have mutually decided not to move forward with the transaction at this time."

Envelope ID: A35504B5-5EF1-8165-8325-8526DDECF28D

Property Address: 2558 N. 3653 Rd, Sheridan, IL 60551

Except for the foregoing statement, neither party shall disclose, publish, post, comment upon, discuss or communicate any information regarding: (i) the Agreement or its terms; (ii) the negotiations between the parties; (iii) the reason(s) for termination as it relates to the parties; or (iv) any disputes, claims or disagreements between the parties relating to the Agreement, whether through social media websites, blogs, interviews, press releases, podcasts, public presentations, online forums or any other form of communication. Each separate communication, publication, post, disclosure, interview, comment, or transmission shall constitute a separate breach of this Termination Agreement. The parties acknowledge that the obligations contained in this Termination Agreement are independent covenants and are not released, waived, or otherwise affected by the mutual releases contained herein. Notwithstanding anything in this Termination Agreement to the contrary, including any release, confidentiality, non-disparagement or similar provision, neither party shall be prohibited or restricted from asserting, bringing, maintaining or pursuing any claim, action or proceeding against any third-party, including without limitation, claims for defamation, business disparagement, tortious interference, or any other applicable causes of action related to the Agreement and the failure of the transaction contemplated in the Agreement. The exercise of such rights shall not excuse compliance with any confidentiality, non-disparagement, or other obligations set forth in this Termination Agreement.

7. **Equitable Relief**. Seller and Purchaser acknowledge that a breach of Sections 4, 5, or 6 may cause immediate and irreparable harm, for which monetary damages alone may be inadequate. Accordingly, in the event of any actual or threatened breach of Sections 4, 5, or 6, the non-breaching party shall be entitled to temporary, preliminary, and permanent injunctive relief, specific performance, and all other equitable remedies available at law or in equity, without the necessity of proving actual damages or posting bond.

8. **Attorney's Fees**. In any action arising out of or relating to this Termination Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees, court costs, expert fees, and expenses from the non-prevailing party. The prevailing party shall be entitled to recover all reasonable attorneys' fees and costs incurred in investigating, stopping, and remedying any breach of Sections 4, 5, or 6.

9. **No Admission of Liability**. This Termination Agreement constitutes a compromise of disputed claims and shall not be construed as an admission of liability, fault, breach, or wrongdoing by any party.

10. **Representations**. Each party represents and warrants to the other that: (i) it has the full power, authority and legal capacity to enter into and perform its obligations under this Termination Agreement; (ii) the individual executing this Termination Agreement on its behalf has been duly authorized to do so and to bind such party to the terms of this Termination Agreement; (iii) this Termination Agreement constitutes a valid and binding obligation of such p-arty, enforceable in accordance with its terms; (iv) except as expressly provided in this Termination Agreement, such party is not relying upon any representation, warranty, promise or statement made by the other party in connection with the termination of the Agreement; and (v) to the best of its knowledge, it has not assigned, transferred or otherwise conveyed any rights, claims or interests arising out of or related to the Agreement to any third party.

11. **Survival**. Sections 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 and 13 of this Termination Agreement shall survive execution and termination of the Agreement.

12. **Governing Law**. This Termination Agreement shall be governed by and construed in accordance with the laws of the State of Illinois. Seller and Purchaser irrevocably consents and submits to the

Envelope ID: A35504B5-5EF1-8165-8325-8526DDECF2BD

Property Address: 2558 N. 3653 Rd, Sheridan, IL 60551

nonexclusive jurisdiction of the courts of the state and federal district of Cook County, Illinois and waives any objection based on venue of forum non conveniens with respect to any action instituted in those courts arising under this Termination Agreement or in any way connected or related or incidental to the dealings of Purchaser and Seller in respect of this Termination Agreement or any related transactions, in each case whether now existing or later arising, and whether in contract, tort, equity or otherwise, and agrees that any dispute with respect to any of those matters will be heard only in the courts described above.

13. **Return of Documents.** Escrow Agent shall deliver to Seller and Purchaser, as applicable, all documents and other items deposited by Seller and Purchaser in connection with the transaction contemplated by the Agreement.

14. **Counterparts; Electronic Signatures.** This Termination Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile, PDF, electronic and electronically transmitted signatures shall have the same legal force and effect as original signatures.

*[Signature Pages Follow]*

Page | 4

Envelope ID: A35504B6-5EF1-8106-8325-8520DDECF28D

Property Address: 2558 N. 3653 Rd, Sheridan, IL 60551

FILED DATE: 7/8/2025 8:27 PM 2025CH00

**Seller**:                                                    **Purchaser**:

**Fox River Resort Club**, a not-for-profit Illinois        **Valrt Inc.**, a Pennsylvania corporation
corporation

Signed by:

By: *Brian T. Lower*                                          By: _____
Name: ~~Amy B. Bacon~~ Brian T. Lower                        Name:  Jamil Ahmed Sukhera
Title:  Governor                                             Title:  CEO


**Silverleaf Resorts, LLC**, a Texas limited
liability company

Signed by:

By: _____
Name:  Donna M. Hansen
Title:  Vice President

Page | 5

**Exhibit E**

| From: | Melton, Ray |
|---|---|
| To: | Karen Lewellen |
| Cc: | Scicchitano, Maria; Megan Hopkins |
| Subject: | Re: Proposed pay return form |
| Date: | Friday, June 19, 2026 9:38:06 AM |
| Attachments: | image010.png |
| | image011.png |
| | image012.png |
| | image013.png |
| | image014.png |
| | image015.png |
| | image016.png |

My client signed everything. I can release it once there is confirmation from
The title company that the form will work.
Ray
Sent from my iPhone

On Jun 19, 2026, at 8:16 AM, Karen Lewellen <klewellen@standardtitle.com> wrote:

[EXTERNAL]

I am just confirming a couple of things about your document but I will let you know as soon as possible.

Karen Lewellen
Escrow Officer
Standard Title Company
a Wheatland Title Company
215 S Schuyler Ave
Kankakee, IL 60901
(815) 933-5100 ext 7228
(815) 935-0624 fax
klewellen@standardtitle.com
<image008.jpg>

<image009.jpg>

***BE AWARE!*** **WARNING – Wire Fraud Advisory!**
**Wire fraud and email hacking/phishing attacks are on the rise!**

- If you receive an email containing Wire Transfer Instructions. **DO NOT RESPOND TO THE EMAIL!**
- Call your escrow officer/close immediately, using a previously known phone number and **NOT a** number provided in the email, to verify the info prior to sending funds.
- Standard Title Company **does not alter its wiring instructions.**
- If you receive new wiring instructions, please notify me immediately.

**We are not responsible for any wires sent by you to an incorrect bank account.**
Note: As of January 1, 2010, the "Good Funds" section of the Title Insurance Act (215 ILCS 155/26) requires that any title company or title agent acting in connection with a closing, settlement or escrow may accept only wired funds for amounts of $50,000 or greater from any party to the transaction anything up to $49,999 must be in the form of a cashier's or certified check.

From: Melton, Ray <RMelton@amundsendavislaw.com>
Sent: Thursday, June 18, 2026 5:31 PM
To: Scicchitano, Maria <MaGreen@holidayinnclub.com>; Karen Lewellen <klewellen@standardtitle.com>
Cc: Megan Hopkins <mhopkins@wheatlandtitle.com>
Subject: RE: Proposed pay return form

I also need confirmation from Karen regarding the payout form?

FILED DATE: 7/8/2026 8:27 PM 2026CH06646

Ray Melton
Partner
Direct: 815 904 8808
rmelton@amundsendavislaw.com
308 W. State Street, Suite 320, Rockford, IL 61101
www.amundsendavislaw.com

This message is intended only for the individual or entity to which it is addressed and may contain information that is attorney work product, privileged, confidential and/or exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and delete or destroy the message. Thank you.

From: Scicchitano, Maria <MaGreen@holidayinnclub.com>
Sent: Thursday, June 18, 2026 5:28 PM
To: Melton, Ray <RMelton@amundsendavislaw.com>; Karen Lewellen <klewellen@standardtitle.com>
Cc: Megan Hopkins <mhopkins@wheatlandtitle.com>
Subject: RE: Proposed pay return form

[EXTERNAL]

I can circulate the documents via Docusign once @Karen Lewellen confirms the Payout and Return of Earnest Money Authorization is acceptable for release of EMD.

From: Melton, Ray <RMelton@amundsendavislaw.com>
Sent: Thursday, June 18, 2026 5:14 PM
To: Scicchitano, Maria <MaGreen@holidayinnclub.com>
Cc: Karen Lewellen <klewellen@standardtitle.com>
Subject: RE: Proposed pay return form

The changes are fine. I just need confirmation from Karen this will work. Unfortunately, our office is closed tomorrow and I won't be able to get you the docusign until Monday. I can try to send to my client now, but I about 50% getting it to work.

Ray

Ray Melton
Partner
Direct: 815 904 8808
rmelton@amundsendavislaw.com
308 W. State Street, Suite 320, Rockford, IL 61101
www.amundsendavislaw.com

This message is intended only for the individual or entity to which it is addressed and may contain information that is attorney work product, privileged, confidential and/or exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and delete or destroy the message. Thank you.

From: Scicchitano, Maria <MaGreen@holidayinnclub.com>
Sent: Thursday, June 18, 2026 5:11 PM
To: Melton, Ray <RMelton@amundsendavislaw.com>
Cc: Karen Lewellen <klewellen@standardtitle.com>
Subject: RE: Proposed pay return form

[EXTERNAL]

Thanks Ray. Attached is a redline and clean version of the Payout form. Please let me know if my redlines are acceptable so we can finalize.

Maria Scicchitano
Manager | Acquisitions & Development
Holiday Inn Club Vacations

9271 S John Young Pkwy
Orlando, FL 32819
t: (407) 395-6835
e: magreen@holidayinnclub.com

<image011.png><image012.png><image013.png><image014.png><image015.png>

<image016.png>

---

From: Melton, Ray <RMelton@amundsendavislaw.com>
Sent: Thursday, June 18, 2026 4:58 PM
To: Scicchitano, Maria <MaGreen@holidayinnclub.com>
Cc: Karen Lewellen <klewellen@standardtitle.com>
Subject: FW: Proposed pay return form

Maria, I am so sorry, I accidently emailed this to Karen Twice. See my previous email below.

Ray

Ray Melton
Partner
Direct: 615 904 8808
rmelton@amundsendavislaw.com
300 W. State Street, Suite 320, Rockford, IL 61101
www.amundsendavislaw.com

<image010.png>

This message is intended only for the individual or entity to which it is addressed and may contain information that is attorney work product, privileged, confidential and/or exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and delete or destroy the message. Thank you.

---

From: Melton, Ray
Sent: Thursday, June 18, 2026 3:57 PM
To: 'Karen Lewellen' <klewellen@standardtitle.com>; 'Karen Lewellen' <klewellen@standardtitle.com>
Subject: Proposed pay return form

Here is the first draft of this, can both you confirm this is acceptable and then I can get my client to sign.

Ray

Ray Melton
Partner
Direct: 615 904 8808
rmelton@amundsendavislaw.com
300 W. State Street, Suite 320, Rockford, IL 61101
www.amundsendavislaw.com

<image010.png>

This message is intended only for the individual or entity to which it is addressed and may contain information that is attorney work product, privileged, confidential and/or exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and delete or destroy the message. Thank you.

DISCLAIMER:

9271 S John Young Pkwy
Orlando, FL 32819
t: (407) 395-6835
e: magreen@holidayinnclub.com

<image011.png><image012.png><image013.png><image014.png><image015.png>

<image016.png>

---

From: Melton, Ray <RMelton@amundsendavislaw.com>
Sent: Thursday, June 18, 2026 4:58 PM
To: Scicchitano, Maria <MaGreen@holidayinnclub.com>
Cc: Karen Lewellen <klewellen@standardtitle.com>
Subject: FW: Proposed pay return form

Maria, I am so sorry, I accidently emailed this to Karen Twice. See my previous email below.

Ray

Ray Melton
Partner
Direct: 815 904 8808
rmelton@amundsendavislaw.com
308 W. State Street, Suite 320, Rockford, IL 61101
www.amundsendavislaw.com

<image010.png>

This message is intended only for the individual or entity to which it is addressed and may contain information that is attorney work product, privileged, confidential and/or exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and delete or destroy the message. Thank you.

---

From: Melton, Ray
Sent: Thursday, June 18, 2026 3:57 PM
To: 'Karen Lewellen' <klewellen@standardtitle.com>; 'Karen Lewellen' <klewellen@standardtitle.com>
Subject: Proposed pay return form

Here is the first draft of this, can both you confirm this is acceptable and then I can get my client to sign.
Ray

Ray Melton
Partner
Direct: 815 904 8808
rmelton@amundsendavislaw.com
308 W. State Street, Suite 320, Rockford, IL 61101
www.amundsendavislaw.com

<image010.png>

This message is intended only for the individual or entity to which it is addressed and may contain information that is attorney work product, privileged, confidential and/or exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and delete or destroy the message. Thank you.

DISCLAIMER:

The contents of this communication and included attachments may contain confidential, proprietary, trademarked, copyrighted, privileged or private information and/or attorney work-product, or is legally protected from disclosure. It is only for the use of the intended recipient(s) to which it is addressed. Electronic transmissions may be monitored for misuse and/or abuse of e-mails and system networks. Liability arising out of the content of any communication will not be accepted. The safety and integrity of electronic communications cannot be guaranteed, and sender will not accept liability for any damage or loss arising out of this communication. Unless officially authorized, any views expressed are the personal views of the sender. If you are not an intended recipient or their authorized agent, or it was sent to you in error, you may not use, review, act in reliance or forbearance on, disseminate, disclose, reproduce, forward, copy or store any part or portion of this communication and/or attachment(s) without the express consent of the sender, must notify the sender immediately, and promptly delete the communication along with any attachments from all media and/or medium on which it may exist.

DISCLAIMER:
The contents of this communication and included attachments may contain confidential, proprietary, trademarked, copyrighted, privileged or private information and/or attorney work-product, or is legally protected from disclosure. It is only for the use of the intended recipient(s) to which it is addressed. Electronic transmissions may be monitored for misuse and/or abuse of e-mails and system networks. Liability arising out of the content of any communication will not be accepted. The safety and integrity of electronic communications cannot be guaranteed, and sender will not accept liability for any damage or loss arising out of this communication. Unless officially authorized, any views expressed are the personal views of the sender. If you are not an intended recipient or their authorized agent, or it was sent to you in error, you may not use, review, act in reliance or forbearance on, disseminate, disclose, reproduce, forward, copy or store any part or portion of this communication and/or attachment(s) without the express consent of the sender, must notify the sender immediately, and promptly delete the communication along with any attachments from all media and/or medium on which it may exist.

FILED DATE: 7/8/2026 8:27 PM 2026CH06

# Exhibit F

| | |
|---|---|
| **From:** | Jamil Ahmed Sukhera |
| **To:** | Megan Hopkins; Melton, Ray; lschoolfield@wheatlandtitle.com; klewellen@standardtitle.com; Andrew Hallas III; Vanessa Walsh; Robert Anderson; John Wrenn; Rosenblum, Hugh; Scicchitano, Maria |
| **Subject:** | SUPPLEMENTAL NOTICE OF DAMAGES, DEMAND FOR IMMEDIATE ACTION, AND ELECTION OF REMEDY |
| **Date:** | Wednesday, June 24, 2026 10:24:31 AM |

Date: June 24, 2026

Via Electronic Mail

RE: Fox River Resort
2558 N. 3653 Road
Sheridan, Illinois 60551

Purchase and Sale Agreement dated April 22, 2026
Mutual Termination and Release Agreement dated June 18, 2026
Escrow No. RE-WTC-25-14551-LS

To Seller, Seller's Counsel, and Escrow Agent:

This correspondence constitutes formal notice from Vairt Inc. regarding the above-referenced transaction, the Mutual Termination and Release Agreement executed on June 18, 2026, and the related Payout and Return of Earnest Money Authorization executed by the parties.

As reflected in the executed termination and escrow disbursement documents, the parties agreed to terminate the Purchase and Sale Agreement and authorized the disbursement of the Earnest Money Deposit held by Escrow Agent. Under the executed disbursement authorization, the sum of ▮▮▮▮▮ was authorized to be returned to Vairt Inc., with $▮▮▮ retained by Escrow Agent for administrative expenses. Further, the parties expressly directed that such funds be disbursed following receipt of Vairt Inc.'s wire instructions.

Following execution of the foregoing documents, Vairt Inc. acted in good faith and fully cooperated with all requests made by Seller, Seller's representatives, Escrow Agent, and related parties. Without limitation, Vairt Inc. provided source-of-funds documentation, investor information, banking records, transaction support materials, and other information requested in connection with the release of the earnest money deposit.

During this period, Vairt Inc. reasonably relied upon the parties' continued communications, requests for documentation, and ongoing discussions regarding resolution of the transaction and disbursement of funds. In reliance thereon, Vairt Inc. refrained from immediately pursuing available legal remedies and continued to devote substantial resources toward achieving an orderly and mutually beneficial resolution.

To date, however, the authorized funds have not been released.

The continued uncertainty regarding the disposition of the earnest money deposit has caused and continues to cause substantial commercial harm to Vairt Inc. In particular, Vairt Inc. has been actively pursuing the acquisition of a Hilton-branded hotel asset located in Jackson, Mississippi that is being offered through a court-supervised receivership sale process. Today represents the final day of that process. The inability to obtain certainty regarding the availability of funds that were previously authorized for return has materially impacted Vairt

Inc.'s ability to deploy capital, evaluate acquisition opportunities, satisfy financing requirements, and conduct its ordinary business operations.

Vairt Inc. hereby demands written confirmation no later than 3:00 PM Central Time on June 24, 2026, confirming whether the earnest money funds in the amount of ███████ will be released and wired in accordance with the executed authorization documents today.

In the event the funds are not released by such time, Vairt Inc. remains willing to pursue a commercially reasonable resolution designed to preserve the transaction and avoid unnecessary litigation and expense. Accordingly, Vairt Inc. hereby proposes the following:

PROPOSED COMMERCIAL RESOLUTION

Seller shall agree to rescind the termination process and execute an amendment to the Purchase and Sale Agreement extending the closing date for a period of sixty (60) days.

Vairt Inc. remains prepared to negotiate in good faith regarding additional consideration, revised milestones, financing requirements, closing conditions, proof-of-funds requirements, reporting obligations, or such other commercially reasonable provisions as may be necessary to facilitate a successful closing.

Vairt Inc. remains ready, willing, and able to complete the acquisition, provided that a reasonable extension is granted and the parties proceed in good faith toward consummation of the transaction.

Nothing contained herein shall be deemed a waiver, limitation, election, release, or relinquishment of any rights, claims, remedies, defenses, causes of action, or equitable relief available to Vairt Inc., whether arising under the Purchase and Sale Agreement, the Mutual Termination and Release Agreement, the escrow instructions, applicable Illinois law, or otherwise. All such rights and remedies are expressly reserved.

This notice is submitted in good faith with the objective of resolving the matter promptly and avoiding unnecessary litigation, while preserving Vairt Inc.'s ability to protect its legal and business interests.

—

**Thanks for your time,**

*Jamil Ahmed Sukhera*

*Founder & CEO*

+1 516 444 77 15 | a.s@vairt.com | www.vairt.com



**Real Estate Investment Accessible for All.**

*No Creation of Agency/Fiduciary Relationship: Any information provided by, or discussion with, an employee of Vairt (or any subsidiary) regarding*

Inc.'s ability to deploy capital, evaluate acquisition opportunities, satisfy financing requirements, and conduct its ordinary business operations.

Vairt Inc. hereby demands written confirmation no later than 3:00 PM Central Time on June 24, 2026, confirming whether the earnest money funds in the amount of ▮▮▮▮ will be released and wired in accordance with the executed authorization documents today.

In the event the funds are not released by such time, Vairt Inc. remains willing to pursue a commercially reasonable resolution designed to preserve the transaction and avoid unnecessary litigation and expense. Accordingly, Vairt Inc. hereby proposes the following:

## PROPOSED COMMERCIAL RESOLUTION

Seller shall agree to rescind the termination process and execute an amendment to the Purchase and Sale Agreement extending the closing date for a period of sixty (60) days.

Vairt Inc. remains prepared to negotiate in good faith regarding additional consideration, revised milestones, financing requirements, closing conditions, proof-of-funds requirements, reporting obligations, or such other commercially reasonable provisions as may be necessary to facilitate a successful closing.

Vairt Inc. remains ready, willing, and able to complete the acquisition, provided that a reasonable extension is granted and the parties proceed in good faith toward consummation of the transaction.

Nothing contained herein shall be deemed a waiver, limitation, election, release, or relinquishment of any rights, claims, remedies, defenses, causes of action, or equitable relief available to Vairt Inc., whether arising under the Purchase and Sale Agreement, the Mutual Termination and Release Agreement, the escrow instructions, applicable Illinois law, or otherwise. All such rights and remedies are expressly reserved.

This notice is submitted in good faith with the objective of resolving the matter promptly and avoiding unnecessary litigation, while preserving Vairt Inc.'s ability to protect its legal and business interests.

—
**Thanks for your time,**

*Jamil Ahmed Sukhera*

*Founder & CEO*

+1 516 444 77 15 | a.s@vairt.com | www.vairt.com



Real Estate Investment Accessible for All.

*No Creation of Agency/Fiduciary Relationship: Any information provided by, or discussion with, an employee of Vairt (or any subsidiary) regarding*

FILED DATE: 7/8/2026 8:27 PM   2026CH06

the Vairt marketplace should not be considered, nor is it intended to be, real estate advice in any manner and is for informational purposes only. Unless a fully executed agency agreement is in place with Vairt, any such information or conversations are not intended to, nor does it, create a fiduciary or other similar relationship with Vairt or any subsidiary.

# Exhibit B

Case: 1:26-cv-08321 Document #: 1-1 Filed: 07/15/26 Page 84 of 121 PageID #:92

The document is acceptable however can we be provided with something showing the person signing as the authority to sign on behalf of the company?

Could I get the articles of organization and operating agreement for each entity?

Karen Lewellen
*Escrow Officer*
Standard Title Company
a Wheatland Title Company
215 S Schuyler Ave
Kankakee, IL 60901
(815) 933 5100 ext 7225
(815) 935-0624 fax
klewellen@standardtitle.com



### BE AWARE!        WARNING – Wire Fraud Advisory!

Wire fraud and email hacking/phishing attacks are on the rise!

- If you receive an email containing Wire Transfer Instructions. **DO NOT RESPOND TO THE EMAIL!**
- Call your escrow officer/close immediately, using a previously known phone number and **NOT** a number provided in the email, to verify the info prior to sending funds.
- Standard Title Company does not alter its wiring instructions.
- If you receive new wiring instructions, please notify me immediately.

We are not responsible for any wires sent by you to an Incorrect bank account.

Note: As of January 1, 2010, the "Good Funds" section of the Title Insurance Act (215 ILCS 155/26) requires that any title company or title agent acting in connection with a closing, settlement or escrow may accept only wired funds for amounts of $50,000 or greater from any party to the transaction anything up to $49,999 must be in the form of a cashier's or certified check.

**From:** Scicchitano, Maria <MaGreen@holidayinnclub.com>
**Sent:** Friday, June 19, 2026 9:54 AM
**To:** Melton, Ray <RMelton@amundsendavislaw.com>; Karen Lewellen <klewellen@standardtitle.com>
**Cc:** Megan Hopkins <mhopkins@wheatlandtitle.com>
**Subject:** Re: Proposed pay return form

Thanks Ray. @Karen Lewellen Please advise if the form provided is acceptable. Seller is insisting that all documents are signed no later than today.

**From:** Melton, Ray <RMelton@amundsendavislaw.com>
**Sent:** Friday, 19 June 2026 09:37:04
**To:** Karen Lewellen <klewellen@standardtitle.com>
**Cc:** Scicchitano, Maria <MaGreen@holidayinnclub.com>; Megan Hopkins <mhopkins@wheatlandtitle.com>
**Subject:** Re: Proposed pay return form

My client signed everything. I can release it once there is confirmation from

Case: 1:26-cv-08321 Document #: 1-1 Filed: 07/15/26 Page 85 of 121 PageID #:93

The title company that the form will work.

Ray

Sent from my iPhone

On Jun 19, 2026, at 8:16 AM, Karen Lewellen <klewellen@standardtitle.com> wrote:

[EXTERNAL]

I am just confirming a couple of things about your document but I will let you know as soon as possible.

Karen Lewellen
Escrow Officer
Standard Title Company
a Wheatland Title Company
215 S Schuyler Ave
Kankakee, IL 60901
(815) 933-5100 ext 7228
(815) 935-0624 fax
klewellen@standardtitle.com
<image008.jpg>

<image009.jpg>

**BE AWARE!**        **WARNING – Wire Fraud Advisory!**

**Wire fraud and email hacking/phishing attacks are on the rise!**

- If you receive an email containing Wire Transfer Instructions. **DO NOT RESPOND TO THE EMAIL!**
- Call your escrow officer/close immediately, using a previously known phone number and **NOT** a number provided in the email, to verify the info prior to sending funds.
- Standard Title Company does not alter its wiring instructions.
- If you receive new wiring instructions, please notify me immediately.

**We are not responsible for any wires sent by you to an incorrect bank account.**

Note: As of January 1, 2010, the "Good Funds" section of the Title Insurance Act (215 ILCS 155/26) requires that any title company or title agent acting in connection with a closing, settlement or escrow may accept only wired funds for amounts of $50,000 or greater from any party to the transaction anything up to $49,999 must be in the form of a cashier's or certified check.

---

**From:** Melton, Ray <RMelton@amundsendavislaw.com>
**Sent:** Thursday, June 18, 2026 5:31 PM
**To:** Scicchitano, Maria <MaGreen@holidayinnclub.com>; Karen Lewellen <klewellen@standardtitle.com>
**Cc:** Megan Hopkins <mhopkins@wheatlandtitle.com>
**Subject:** RE: Proposed pay return form

I also need confirmation from Karen regarding the payout form?

**Ray Melton**
Partner
Direct: 815 904 8808
rmelton@amundsendavislaw.com
308 W. State Street, Suite 320, Rockford, IL 61101
www.amundsendavislaw.com

<image010.png>

This message is intended only for the individual or entity to which it is addressed and may contain information that is attorney work product, privileged, confidential and/or exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and delete or destroy the message. Thank you.

**From:** Scicchitano, Maria <MaGreen@holidayinnclub.com>
**Sent:** Thursday, June 18, 2026 5:28 PM
**To:** Melton, Ray <RMelton@amundsendavislaw.com>; Karen Lewellen <klewellen@standardtitle.com>
**Cc:** Megan Hopkins <mhopkins@wheatlandtitle.com>
**Subject:** RE: Proposed pay return form

[EXTERNAL]

I can circulate the documents via Docusign once @Karen Lewellen confirms the Payout and Return of Earnest Money Authorization is acceptable for release of EMD.

**From:** Melton, Ray <RMelton@amundsendavislaw.com>
**Sent:** Thursday, June 18, 2026 5:14 PM
**To:** Scicchitano, Maria <MaGreen@holidayinnclub.com>
**Cc:** Karen Lewellen <klewellen@standardtitle.com>
**Subject:** RE: Proposed pay return form

The changes are fine. I just need confirmation from Karen this will work. Unfortunately, our office is closed tomorrow and I won't be able to get you the docusign until Monday. I can try to send to my client now, but I about 50% getting it to work.

Ray

**Ray Melton**
Partner
Direct: 815 904 8808
rmelton@amundsendavislaw.com
308 W. State Street, Suite 320, Rockford, IL 61101
www.amundsendavislaw.com

<image010.png>

This message is intended only for the individual or entity to which it is addressed and may contain information that is attorney work product, privileged, confidential and/or exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and delete or destroy the message. Thank you

**From:** Scicchitano, Maria <MaGreen@holidayinnclub.com>
**Sent:** Thursday, June 18, 2026 5:11 PM
**To:** Melton, Ray <RMelton@amundsendavislaw.com>
**Cc:** Karen Lewellen <klewellen@standardtitle.com>
**Subject:** RE: Proposed pay return form

[EXTERNAL]

Thanks Ray. Attached is a redline and clean version of the Payout form. Please let me know if my redlines are acceptable so we can finalize.

**Maria Scicchitano**
*Manager | Acquisitions & Development*
Holiday Inn Club Vacations

9271 S John Young Pkwy
Orlando, FL 32819
t: (407) 395-6835
e: magreen@holidayinnclub.com

<image011.png><image012.png><image013.png><image014.png><image015.png>

<image016.png>

**From:** Melton, Ray <RMelton@amundsendavislaw.com>
**Sent:** Thursday, June 18, 2026 4:58 PM
**To:** Scicchitano, Maria <MaGreen@holidayinnclub.com>
**Cc:** Karen Lewellen <klewellen@standardtitle.com>
**Subject:** FW: Proposed pay return form

Maria, I am so sorry, I accidently emailed this to Karen Twice. See my previous email below.

Ray

**Ray Melton**
**Partner**
Direct: 815 904 8808
rmelton@amundsendavislaw.com
308 W. State Street, Suite 320, Rockford, IL 61101
www.amundsendavislaw.com

<kimage010.png>

This message is intended only for the individual or entity to which it is addressed and may contain information that is attorney work product, privileged, confidential and/or exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and delete or destroy the message. Thank you.

**From:** Melton, Ray
**Sent:** Thursday, June 18, 2026 3:57 PM
**To:** 'Karen Lewellen' <klewellen@standardtitle.com>; 'Karen Lewellen' <klewellen@standardtitle.com>
**Subject:** Proposed pay return form

Here is the first draft of this, can both you confirm this is acceptable and then I can get my client to sign.

Ray

**Ray Melton**
**Partner**
Direct: 815 904 8808
rmelton@amundsendavislaw.com
308 W. State Street, Suite 320, Rockford, IL 61101
www.amundsendavislaw.com

<kimage010.png>

This message is intended only for the individual or entity to which it is addressed and may contain information that is attorney work product, privileged, confidential and/or exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and delete or destroy the message. Thank you.

**DISCLAIMER:**

The contents of this communication and included attachments may contain confidential, proprietary, trademarked, copyrighted, privileged or private information and/or attorney work-product, or is legally protected from disclosure. It is only for the use of the intended recipient(s) to which it is addressed. Electronic transmissions may be monitored for misuse and/or abuse of e-mails and system networks. Liability arising out of the content of any communication will not be accepted. The safety and integrity of electronic communications cannot be guaranteed, and sender will not accept liability for any damage or loss arising out of this communication. Unless officially authorized, any views expressed are the personal views of the sender. If you are not an intended recipient or their authorized agent, or it was sent to you in error, you may not use, review, act in reliance or forbearance on, disseminate, disclose, reproduce, forward, copy or store any part or portion of this communication and/or

attachment(s) without the express consent of the sender, must notify the sender immediately, and promptly delete the communication along with any attachments from all media and/or medium on which it may exist.

DISCLAIMER:

The contents of this communication and included attachments may contain confidential, proprietary, trademarked, copyrighted, privileged or private information and/or attorney work-product, or is legally protected from disclosure. It is only for the use of the intended recipient(s) to which it is addressed. Electronic transmissions may be monitored for misuse and/or abuse of e-mails and system networks. Liability arising out of the content of any communication will not be accepted. The safety and integrity of electronic communications cannot be guaranteed, and sender will not accept liability for any damage or loss arising out of this communication. Unless officially authorized, any views expressed are the personal views of the sender. If you are not an intended recipient or their authorized agent, or it was sent to you in error, you may not use, review, act in reliance or forbearance on, disseminate, disclose, reproduce, forward, copy or store any part or portion of this communication and/or attachment(s) without the express consent of the sender, must notify the sender immediately, and promptly delete the communication along with any attachments from all media and/or medium on which it may exist.

DISCLAIMER:

The contents of this communication and included attachments may contain confidential, proprietary, trademarked, copyrighted, privileged or private information and/or attorney work-product, or is legally protected from disclosure. It is only for the use of the intended recipient(s) to which it is addressed. Electronic transmissions may be monitored for misuse and/or abuse of e-mails and system networks. Liability arising out of the content of any communication will not be accepted. The safety and integrity of electronic communications cannot be guaranteed, and sender will not accept liability for any damage or loss arising out of this communication. Unless officially authorized, any views expressed are the personal views of the sender. If you are not an intended recipient or their authorized agent, or it was sent to you in error, you may not use, review, act in reliance or forbearance on, disseminate, disclose, reproduce, forward, copy or store any part or portion of this communication and/or attachment(s) without the express consent of the sender, must notify the sender immediately, and promptly delete the communication along with any attachments from all media and/or medium on which it may exist.

# Exhibit C

Case: 1:26-cv-08321 Document #: 1-1 Filed: 07/15/26 Page 90 of 121 PageID #:98

From: Scicchitano, Maria
To: Melton, Ray
Subject: RE: Proposed pay return form (CRE-WTC-25-14551-LS) Silverleaf Resorts
Attachments: [illegible list of attachments]

This is most certainly your client's problem as it is Vairt that has been unable to provide satisfactory documentation to the title company to verify signing authority. That is not a requirement that is isolated to this particular title company. It's commercially standard in any real estate transaction and should not be a problem for your client to provide. The Sellers have already provided acceptable documentation pertaining to signing authority. Let's hope your client can provide anything more recent from the PA SOS or can provide an affidavit satisfactory to the title company. This needs to be resolved today.

**Maria Scicchitano**
Manager | Acquisitions & Development
Holiday Inn Club Vacations

9271 S John Young Pkwy
Orlando, FL 32819
t: (407) 395-6835
e: magreen@holidayinnclub.com

---

From: Melton, Ray <RMelton@amundsendavislaw.com>
Sent: Monday, June 22, 2026 1:14 PM
To: Scicchitano, Maria <MaGreen@holidayinnclub.com>
Subject: FW: Proposed pay return form (CRE-WTC-25-14551-LS) Silverleaf Resorts

This is why I would not release the signed documents in case something like this occurred. As far as I am concerned this is the title company you selected so its not our problem. We will cooperate as much as we can. I asked my client if he had anything more recent from the PA sos....

Ray

**Ray Melton**
Partner
[illegible contact details]

The message is intended only for the individual or entity to which it is addressed and may contain information that is attorney work product, privileged, confidential and/or exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and delete or destroy the message. Thank you.

From: Megan Hopkins <MHopkins@wheatlandtitle.com>
Sent: Monday, June 22, 2026 1:09 PM
To: Scicchitano, Maria <MaGreen@holidayinnclub.com>; Karen Lewellen <lewellen@standardtitle.com>; Melton, Ray <RMelton@amundsendavislaw.com>; Diskey, Kelley <kelley.diskey@fnf.com>
Subject: RE: Proposed pay return form (CRE-WTC-25-14551-LS) Silverleaf Resorts

[EXTERNAL]

Hi Maria,

We cannot release funds based on a written direction by someone on behalf of an entity whose authority we cannot verify. We have escrow standards that have to be met. When we look at the Pennsylvania Secretary of State business search, it is showing that Vairt, Inc.'s information as not available, so we cannot verify independently. We are accepting direction to wire $784,825 from this individual so our company needs to be comfortable with who that direction is coming from. @Diskey, Kelley - as part of Fidelity's involvement on the timeshare part of this project, have you collected anything or have any documentation that would support entity authority/signatories for Vairt?

Thank you.

---

From: Scicchitano, Maria <MaGreen@holidayinnclub.com>
Sent: Monday, June 22, 2026 12:09 PM
To: Karen Lewellen <lewellen@standardtitle.com>; Melton, Ray <RMelton@amundsendavislaw.com>
Cc: Megan Hopkins <MHopkins@wheatlandtitle.com>; Diskey, Kelley <kelley.diskey@fnf.com>
Subject: Re: Proposed pay return form
Importance: High

Karen, since Jamil is the original signatory of the PSA and will also be the signer of this document, is that not sufficient? Or is there something else that can be provided to satisfy Wheatland? This needs to get wrapped up today.

---

From: Karen Lewellen <lewellen@standardtitle.com>
Sent: Monday, 22 June 2026 11:22:51
To: Melton, Ray <RMelton@amundsendavislaw.com>; Scicchitano, Maria <MaGreen@holidayinnclub.com>
Cc: Megan Hopkins <MHopkins@wheatlandtitle.com>; Diskey, Kelley <kelley.diskey@fnf.com>
Subject: RE: Proposed pay return form

Could he provided the more current one, please and thank you

**Karen Lewellen**
Escrow Officer
Standard Title Company
a Wheatland Title Company
215 S Schuyler Ave
Kankakee, IL 60901



Exhibit D

Case: 1:26-cv-08321 Document #: 1-1 Filed: 07/15/26 Page 92 of 121 PageID #:100

On Thu, Jun 25, 2026 at 1:00 AM Jamil Ahmed Sukhera <jamil@vairt.com>
wrote:

> Maria,
>
> We respectfully disagree with the assertion that the delay is the result of
> information not being provided by Buyer.
>
> Since execution of the Mutual Termination and Release Agreement and
> Escrow Authorization, Buyer has acted promptly and in good faith to provide
> all information, documentation, banking records, source-of-funds
> materials, investor information, wire instructions, and other items
> requested by Seller, Seller's representatives, and Wheatland Title.
> If Wheatland Title contends that any information remains outstanding,
> please identify with specificity:

Case: 1:26-cv-08321 Document #: 1-1 Filed: 07/15/26 Page 94 of 121 PageID #:102

- The exact information allegedly missing;
- The date such information was first requested;
- The party requesting such information;
- The legal or compliance basis requiring such information; and
- The specific reason such information prevents release of funds already authorized by the parties.

To date, Buyer has not received any clear explanation identifying a specific deficiency that would justify the continued delay.

Given the circumstances and the substantial delay associated with the termination process, Buyer has carefully reevaluated its position. Buyer remains interested in acquiring the Property and, rather than continuing down an uncertain path regarding termination and release of funds, is prepared to move forward with closing the transaction.

Accordingly, Buyer requests that Seller advise whether Seller remains willing to proceed with the transaction and coordinate a discussion among the parties regarding an immediate path to closing, including any necessary extension, amendment, revised timeline, or other commercially reasonable accommodations required to consummate the transaction.

Buyer remains ready, willing, and able to work in good faith toward completing the acquisition and believes that a prompt closing may be the most practical and commercially reasonable resolution for all parties.

We look forward to Seller's response.

On Thu, Jun 25, 2026 at 12:36 AM Scicchitano, Maria <MaGreen@holidayinnclub.com> wrote:

> Good afternoon,
>
> We have talked to Wheatland Title, and they informed us that the delay in releasing the funds is directly related to required information that has not been provided by Buyer. Continued delay in finalizing the termination of the purchase agreement will also cause significant harm to the Seller. Sellers remain willing to work in good faith toward mutual termination of the purchase agreement and encourage the Buyer to take any actions necessary to finalize the termination as soon as possible.
>
> **Maria Scicchitano**
> *Manager | Acquisitions & Development*
> Holiday Inn Club Vacations
>
> _____
>
> 9271 S John Young Pkwy
> Orlando, FL 32819
> t: (407) 395-6835
> e: magreen@holidayinnclub.com

- The exact information allegedly missing;
- The date such information was first requested;
- The party requesting such information;
- The legal or compliance basis requiring such information; and
- The specific reason such information prevents release of funds already authorized by the parties.

To date, Buyer has not received any clear explanation identifying a specific deficiency that would justify the continued delay.

Given the circumstances and the substantial delay associated with the termination process, Buyer has carefully reevaluated its position. Buyer remains interested in acquiring the Property and, rather than continuing down an uncertain path regarding termination and release of funds, is prepared to move forward with closing the transaction.

Accordingly, Buyer requests that Seller advise whether Seller remains willing to proceed with the transaction and coordinate a discussion among the parties regarding an immediate path to closing, including any necessary extension, amendment, revised timeline, or other commercially reasonable accommodations required to consummate the transaction.

Buyer remains ready, willing, and able to work in good faith toward completing the acquisition and believes that a prompt closing may be the most practical and commercially reasonable resolution for all parties.

We look forward to Seller's response.

On Thu, Jun 25, 2026 at 12:36 AM Scicchitano, Maria <MaGreen@holidayinnclub.com> wrote:

> Good afternoon,
>
> We have talked to Wheatland Title, and they informed us that the delay in releasing the funds is directly related to required information that has not been provided by Buyer. Continued delay in finalizing the termination of the purchase agreement will also cause significant harm to the Seller. Sellers remain willing to work in good faith toward mutual termination of the purchase agreement and encourage the Buyer to take any actions necessary to finalize the termination as soon as possible.
>
>
> **Maria Scicchitano**
> *Manager | Acquisitions & Development*
> Holiday Inn Club Vacations
>
> ---
>
> 9271 S John Young Pkwy
> Orlando, FL 32819
> t: (407) 395-6835
> e: magreen@holidayinnclub.com

Case: 1:26-cv-08321 Document #: 1-1 Filed: 07/15/26 Page 96 of 121 PageID #:104

&lt;image001.png&gt;&lt;image002.png&gt;&lt;image003.png&gt;&lt;image004.png&gt;&lt;image005.png&gt;

&lt;image006.png&gt;

**From:** Jamil Ahmed Sukhera &lt;jamil@vairt.com&gt;
**Sent:** Wednesday, June 24, 2026 1:14 PM
**To:** Scicchitano, Maria &lt;MaGreen@holidayinnclub.com&gt;
**Cc:** Megan Hopkins &lt;mhopkins@wheatlandtitle.com&gt;; Melton, Ray &lt;rmelton@amundsendavislaw.com&gt;; jschoolfield@wheatlandtitle.com; klewellen@standardtitle.com; Andrew Hallas III &lt;ahallas@crexi.com&gt;; Vanessa Walsh &lt;vwalsh@crexi.com&gt;; Robert Anderson &lt;robert.anderson@matthews.com&gt;; John Wrenn &lt;john.wrenn@matthews.com&gt;; Rosenblum, Hugh &lt;HRosenblum@holidayinnclub.com&gt;
**Subject:** Re: SUPPLEMENTAL NOTICE OF DAMAGES, DEMAND FOR IMMEDIATE ACTION, AND ELECTION OF REMEDY

Dear Maria,

Today is the final day to settle this matter. We will not be discussing this further tomorrow.

As previously stated, the delay in releasing the earnest money has caused significant commercial harm and the failure of a separate deal. If the funds are not available within the next two hours, Vairt Inc. will move to pursue the closing of the property as an alternative to the termination agreement.

I look forward to your immediate confirmation that the wire has been initiated.

On Wed, Jun 24, 2026 at 9:57 PM Scicchitano, Maria &lt;MaGreen@holidayinnclub.com&gt; wrote:

> All,
>
> Seller is proceeding with mutual termination of the purchase and sale agreement and working diligently with the buyer, buyer's counsel and escrow agent to release the earnest money deposit. I have already requested a call with Megan and Ray for this afternoon. Ray has advised that he and his client are available any time after 2 pm CST. @Megan Hopkins please advise if you or another authorized

representative of Wheatland Title will be available at 2 pm CST or later today to discuss.

Thanks,

**Maria Scicchitano**
*Manager | Acquisitions & Development*
Holiday Inn Club Vacations

---

9271 S John Young Pkwy
Orlando, FL 32819
t: (407) 395-6835
e: magreen@holidayinnclub.com
<image001.png><image002.png><image003.png><image004.png><image005.png>

**<image006.png>**

---

**From:** Jamil Ahmed Sukhera <jamil@vairt.com>
**Sent:** Wednesday, June 24, 2026 10:24 AM
**To:** Megan Hopkins <mhopkins@wheatlandtitle.com>; Melton, Ray <rmelton@amundsendavislaw.com>; jschoolfield@wheatlandtitle.com; klewellen@standardtitle.com; Andrew Hallas III <ahallas@crexi.com>; Vanessa Walsh <vwalsh@crexi.com>; Robert Anderson <robert.anderson@matthews.com>; John Wrenn <john.wrenn@matthews.com>; Rosenblum, Hugh <HRosenblum@holidayinnclub.com>; Scicchitano, Maria <MaGreen@holidayinnclub.com>
**Subject:** SUPPLEMENTAL NOTICE OF DAMAGES, DEMAND FOR IMMEDIATE ACTION, AND ELECTION OF REMEDY

Date: June 24, 2026
Via Electronic Mail
RE: Fox River Resort
2558 N. 3653 Road
Sheridan, Illinois 60551
Purchase and Sale Agreement dated April 22, 2026
Mutual Termination and Release Agreement dated June 18, 2026
Escrow No. RE-WTC-25-14551-LS
To Seller, Seller's Counsel, and Escrow Agent:
This correspondence constitutes formal notice from Vairt Inc. regarding the above-referenced transaction, the Mutual Termination and Release Agreement executed on June 18, 2026, and the related Payout and Return of Earnest Money Authorization executed by the parties.

As reflected in the executed termination and escrow disbursement documents, the parties agreed to terminate the Purchase and Sale Agreement and authorized the disbursement of the Earnest Money Deposit held by Escrow Agent. Under the executed disbursement authorization, the sum of $784,825.00 was authorized to be returned to Vairt Inc., with $550.00 retained by Escrow Agent for administrative expenses. Further, the parties expressly directed that such funds be disbursed following receipt of Vairt Inc.'s wire instructions.

Following execution of the foregoing documents, Vairt Inc. acted in good faith and fully cooperated with all requests made by Seller, Seller's representatives, Escrow Agent, and related parties. Without limitation, Vairt Inc. provided source-of-funds documentation, investor information, banking records, transaction support materials, and other information requested in connection with the release of the earnest money deposit.

During this period, Vairt Inc. reasonably relied upon the parties' continued communications, requests for documentation, and ongoing discussions regarding resolution of the transaction and disbursement of funds. In reliance thereon, Vairt Inc. refrained from immediately pursuing available legal remedies and continued to devote substantial resources toward achieving an orderly and mutually beneficial resolution.

To date, however, the authorized funds have not been released. The continued uncertainty regarding the disposition of the earnest money deposit has caused and continues to cause substantial commercial harm to Vairt Inc. In particular, Vairt Inc. has been actively pursuing the acquisition of a Hilton-branded hotel asset located in Jackson, Mississippi that is being offered through a court-supervised receivership sale process. Today represents the final day of that process. The inability to obtain certainty regarding the availability of funds that were previously authorized for return has materially impacted Vairt Inc.'s ability to deploy capital, evaluate acquisition opportunities, satisfy financing requirements, and conduct its ordinary business operations.

Vairt Inc. hereby demands written confirmation no later than 3:00 PM Central Time on June 24, 2026, confirming whether the earnest money funds in the amount of $784,825.00 will be released and wired in accordance with the executed authorization documents today.

In the event the funds are not released by such time, Vairt Inc. remains willing to pursue a commercially reasonable resolution designed to preserve the transaction and avoid unnecessary litigation and expense. Accordingly, Vairt Inc. hereby proposes the following:

PROPOSED COMMERCIAL RESOLUTION

Seller shall agree to rescind the termination process and execute an amendment to the Purchase and Sale Agreement extending the closing date for a period of sixty (60) days.

Vairt Inc. remains prepared to negotiate in good faith regarding additional consideration, revised milestones, financing requirements, closing conditions, proof-of-funds requirements, reporting obligations, or such other commercially reasonable provisions as may be necessary to facilitate a successful closing.

Vairt Inc. remains ready, willing, and able to complete the acquisition, provided that a reasonable extension is granted and the parties proceed in good faith toward consummation of the transaction.

Nothing contained herein shall be deemed a waiver, limitation, election, release, or relinquishment of any rights, claims, remedies, defenses, causes of action, or equitable relief available to Vairt Inc., whether arising under the Purchase and Sale Agreement, the Mutual Termination and Release Agreement, the escrow instructions, applicable Illinois law, or otherwise. All such rights and remedies are expressly reserved.

This notice is submitted in good faith with the objective of resolving the matter promptly and avoiding unnecessary litigation, while preserving Vairt Inc.'s ability to protect its legal and business interests.

--

**Thanks for your time,**

*Jamil Ahmed Sukhera*

*Founder & CEO*

+1 516 444 77 15 | a.s@vairt.com | www.vairt.com



Real Estate Investment Accessible for All

No Creation of Agency/Fiduciary Relationship: Any information provided by, or discussion with, an employee of Vairt (or any subsidiary) regarding the Vairt marketplace should not be considered, nor is it intended to be, real estate advice in any manner and is for informational purposes only. Unless a fully executed agency agreement is in place with Vairt, any such information or conversations are not intended to, nor does it, create a fiduciary or other similar relationship with Vairt or any subsidiary.

**DISCLAIMER:**

The contents of this communication and included attachments may contain confidential, proprietary, trademarked, copyrighted, privileged or private information and/or attorney work-product, or is legally protected from disclosure. It is only for the use of the intended recipient(s) to which it is addressed. Electronic transmissions may be monitored for misuse and/or abuse of e-mails and system networks. Liability arising out of the content of any communication will not be accepted. The safety and integrity of electronic communications cannot be guaranteed, and sender will not accept liability for any damage or loss arising out of this communication. Unless officially authorized, any views expressed are the personal views of the sender. If you are not an intended recipient or their authorized agent, or it was sent to you in error, you may not use, review, act in reliance or forbearance on, disseminate, disclose, reproduce, forward, copy or store any part or portion of this communication and/or attachment(s) without the express consent of the sender, must notify the sender immediately, and promptly delete the communication along with any attachments from all media and/or medium on which it may exist.

--

**Thanks for your time,**

*Jamil Ahmed Sukhera*

*Founder & CEO*

+1 516 444 77 15 | a.s@vairt.com | www.vairt.com



**Real Estate Investment Accessible for All.**

*No Creation of Agency/Fiduciary Relationship: Any information provided by, or discussion with, an employee of Vairt (or any subsidiary) regarding the Vairt marketplace should not be considered, nor is it intended to be, real estate advice in any manner and is for informational purposes only. Unless a fully executed agency agreement is in place with Vairt, any such information or conversations are not intended to, nor does it, create a fiduciary or other similar relationship with Vairt or any subsidiary.*

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION

FOX RIVER RESORT CLUB, a Not-For-Profit Illinois Corporation, and SILVERLEAF RESORTS, LLC, a Texas Limited Liability Company,

        Plaintiffs,

        v.

VAIRT INC., Pennsylvania Corporation,

        Defendant.

Case No. **2026CH06461**
Judge: Calendar, 2

## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs Fox River Resort Club, a Not-For-Profit Illinois Corporation, and Silverleaf Resorts, LLC, a Texas Limited Liability Company (together "Plaintiffs" or "Seller"), by and through their attorneys, Greenberg Traurig, LLP, bring this Verified Complaint for Declaratory Judgment ("Complaint") against Vairt Inc., a Pennsylvania Corporation ("Defendant" or "Purchaser", and collectively with the Plaintiffs, the "Parties"), and allege as follows:

### NATURE OF THE CASE

1. This is a single-count action seeking declaration of the Parties' rights under that certain Mutual Termination and Release Agreement (the "Termination Agreement"), pursuant to which the Parties terminated a Purchase and Sale Agreement and Joint Escrow Instructions ("PSA") relating to a commercial property located at 2558 N. 3653 Road, Sheridan, Illinois 60551 ("Property"). Specifically, Plaintiffs seek declaration that the Termination Agreement is a valid and enforceable contract, the PSA has been terminated by the Parties by the Termination Agreement, and that Defendant has no right to purchase the Property.

2. Notwithstanding the Parties' execution of the Termination Agreement, Defendant continues to assert that the Termination Agreement is unenforceable and that it has a right to buy

the Property, thereby clouding Plaintiffs' title to the Property and imperiling Plaintiffs' ability to transfer or otherwise dispose of the Property, thus necessitating this declaratory judgment action.

## PARTIES

3.    Plaintiff Fox River Resort Club is an Illinois non-profit corporation.

4.    Plaintiff Silverleaf Resorts is a Texas limited liability company.

5.    Defendant Vairt Inc. is a Pennsylvania corporation.

## JURISDICTION AND VENUE

6.    Jurisdiction is proper in this Court because this cause of action arises out of "the ownership, use, or possession of any real estate situated in this State;" and "the performance of a[] contract or promise substantially connected with this State[.]" 735 ILCS 5/2-209(a)(3) and (7).

7.    Venue is proper in this Court because in the Termination Agreement, "Seller and Purchaser irrevocably consent[ed] and submit[ed] to the nonexclusive jurisdiction of the courts of the state and federal district of Cook County, Illinois and waive[d] any objection based on venue of forum non conveniens with respect to any action instituted in those courts arising under this Termination Agreement or in any way connected or related or incidental to the dealings of Purchaser and Seller in respect of this Termination Agreement or any related transactions..." Ex. D, Termination Agreement, § 12.

## BACKGROUND

*Purchase and Sale Agreement and Joint Escrow Instructions*

8.    On April 22, 2026, Plaintiffs, as Seller, and Defendant, as Purchaser, entered into a Purchase and Sale Agreement and Joint Escrow Instructions (together with any amendments or

modifications, the "PSA"), for the sale of the Property. A true and correct copy of the PSA (without addenda and exhibits thereto) is attached hereto as **Exhibit A.**[1]

9.      On June 1, 2026, Defendant exercised its option under the PSA to extend the closing deadline to June 24, 2026, requiring an additional Ernest Money Deposit ("EMD").

*Agreement to Terminate the PSA*

10.      On June 4, 2026, Plaintiffs sent Defendant written notice outlining multiple breaches of the PSA by Defendant—including failure to fund the required additional EMD, unauthorized advertising and promotional activities, and misuse of access rights—and demanded that Defendant immediately cure such defaults. A true and correct copy of the June 4, 2026 correspondence is attached hereto as **Exhibit B.**

11.      In the days that followed, additional issues arose between the Parties concerning the transaction, culminating in Defendant indicating that it would not proceed. The Parties thereafter began negotiating a mutual termination of the PSA and exchanged drafts of a Termination Agreement.

12.      At the same time, and in parallel with those negotiations, the Parties communicated with the Escrow Agent to facilitate the release of the EMD from escrow in anticipation of termination.

---

[1] The purchase price in the PSA has been redacted for confidentiality purposes. The addenda and exhibits to the PSA will be made available to the Court for in camera review or, if appropriate, filed under seal upon order or request of the Court.

3

*Execution of the Termination Agreement*

13.     On June 18, 2026, Plaintiffs' counsel transmitted a redline and clean version of the negotiated Termination Agreement to Defendant's counsel. A true and correct copy of the June 18, 2026 correspondence is attached hereto as **Exhibit C.**

14.     Seller executed the Termination Agreement on June 18, 2026. A true and correct copy of the Termination Agreement executed by Seller is attached hereto as **Exhibit D.**

*Defendants' Acknowledgment of and Demands under the Executed Termination Agreement*

15.     Defendant repeatedly represented and acknowledged that it also executed the Termination Agreement.

16.     For example, on June 19, 2026, Defendant's counsel sent an email to Plaintiffs' counsel stating "My client signed everything. I can release it once there is confirmation from the title company that the form will work." A true and correct copy of the June 19, 2026 email correspondence is attached hereto as **Exhibit E.**

17.     On June 22, 2026, the Escrow Agent sent an email to Defendant's counsel stating: "We cannot release funds based on a written direction by someone on behalf of an entity whose authority we cannot verify. We have escrow standards that have to be met." *Id.* In response, Defendant's counsel stated: "This is why I would not release the signed documents in case something like this occurred." *Id.*

18.     On June 24, 2026, Defendant sent correspondence titled "SUPPLEMENTAL NOTICE OF DAMAGES, DEMAND FOR IMMEDIATE ACTION, AND ELECTION OF REMEDY" ("June 24 Notice") under the PSA and the **"Mutual Termination and Release Agreement dated June 18, 2026."** A true and correct copy of the June 24 Notice is attached hereto as **Exhibit F** (emphasis added).

4

19. In the June 24 Notice Defendant stated: "[t]his correspondence constitutes formal notice from Vairt Inc. regarding the above-referenced transaction, **the Mutual Termination and Release Agreement executed on June 18, 2026,** and the related Payout and Return of Earnest Money Authorization executed by the parties." *Id.* (emphasis added).

20. In the June 24 Notice Defendant stated: "**[a]s reflected in the executed termination and escrow disbursement documents, the parties agreed to terminate the Purchase and Sale Agreement** and authorized the disbursement of the Earnest Money Deposit held by Escrow Agent." *Id.* (emphasis added).

21. In the June 24 Notice, the Defendant requested a "written confirmation no later than 3:00 PM Central Time on June 24, 2026, confirming whether the earnest money funds in the amount of $[] will be released and wired in accordance with **the executed authorization documents today.**" *Id.* (emphasis added).

22. On June 25, 2026, Defendant sent an email stating "[s]ince execution of the **Mutual Termination and Release Agreement and Escrow Authorization,** Purchaser has acted promptly and in good faith to provide all information, documentation, banking records, source-of-funds materials, investor information, wire instructions, and other items requested by Seller, Seller's representatives, and Wheatland Title." *Id.* (emphasis added).

*Defendant Reverses Course and Threatens to Cloud Plaintiffs' Title to The Property*

23. Defendant requested that the EMD be disbursed to an account designated by Defendant.

24. Upon information and belief, on June 24, 2026, the Escrow Agent refunded a portion of the EMD.

5

25. Upon information and belief, because a portion of the remaining EMD had originally been deposited by third parties, the Escrow Agent required additional documentation confirming Defendant's authority to direct the disbursement of those funds and/or the third-party depositors' consent to the disbursement of these funds to the account designated by Defendant.

26. Rather than cooperating with the Escrow Agent to complete the disbursement process—notwithstanding Defendant's repeated acknowledgment of the execution of the Termination Agreement—Defendant reversed course and began demanding either an extension of the closing date to pursue the transaction and/or payment not contemplated by the PSA or the Termination Agreement.

27. Defendant further threatened to cloud Plaintiffs' title to the Property through litigation and impair their ability to transfer or otherwise dispose of it, thereby necessitating this declaratory judgment action.

## COUNT I
### (Declaratory Judgment)

28. Plaintiff realleges and incorporates by reference as though fully stated herein paragraphs 1 through 27 of this Complaint.

29. The parties entered into the Termination Agreement.

30. Seller and Purchaser executed the Termination Agreement.

31. The Termination Agreement constitutes a valid and enforceable contract.

32. The Termination Agreement states in part: "[a]s of the Effective Date, the [PSA] is hereby terminated without cause or breach of either party and shall be of no further force or effect, except for those obligations expressly stated herein to survive termination and any provision of the Agreement that expressly survives termination by their terms." Ex. D, Termination Agreement, § 1.

6



38. As a result, Defendant's refusal to release its signature page is irrelevant and does not affect the validity and enforceability of the Termination Agreement.

39. Defendant represented its objective intent to be bound by the Termination Agreement.

40. An actual controversy exists between the Parties because Defendant nevertheless disputes the enforceability of the Termination Agreement, and threatens to cloud Plaintiffs' title to the Property and impair their ability to transfer or otherwise dispose of the Property.

41. Plaintiffs are entitled to a declaration under 735 ILCS 5/2-701 that the Termination Agreement is valid and enforceable, that the PSA had been terminated, and that Defendant has no right to purchase the Property.

**WHEREFORE**, Plaintiffs Fox River Resort Club and Silverleaf Resorts, LLC respectfully request that this Court enter a judgment:

(1) Declaring that the Termination Agreement is a valid and enforceable contract;

(2) Declaring that the PSA was terminated;

(3) Declaring that the Defendant does not have a right to purchase the Property pursuant to the PSA or otherwise;

(4) Awarding Plaintiffs attorneys' fees and court costs, expert fees and expenses incurred in enforcing the Termination Agreement; and

(5) Granting any further relief that this Court deems proper and just.

8

Dated: July 6, 2026

Respectfully submitted,

**PLAINTIFFS FOX RIVER RESORT CLUB and SILVERLEAF RESORTS, LLC**

By: /s/ *Rita M. Alliss Powers*
Rita M. Alliss Powers (ARDC # 6203623)
Martin Kedziora (ARDC # 6300162)
C. Grace Filer (ARDC # 6349009)
GREENBERG TRAURIG, LLP
360 N. Green Street, Suite 1300
Chicago, Illinois 60607
Tel. 312.456.8400
Fax 312.456.8435
powersr@gtlaw.com
kedzioram@gtlaw.com
grace.filer@gtlaw.com

9

## VERIFICATION

Under penalties as provided by law pursuant to 735 ILCS 5/1-109, the undersigned certifies that the undersigned is authorized to execute this verification on behalf of Plaintiffs Fox River Resort Club and Silverleaf Resorts, LLC, and that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Dated: July 6, 2026

PLAINTIFFS FOX RIVER RESORT CLUB
AND SILVERLEAF RESORTS, LLC

By: _____

Maria Scicchitano, Authorized Signatory

Case: 1:26-cv-08321 Document #: 1-1 Filed: 07/15/26 Page 111 of 121 PageID #:119

# Exhibit A

# Exhibit A

Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

## PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS

THIS PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (this "Agreement") between Purchaser (defined below) and Seller (defined below) is effective as of the date Seller signs this Agreement (the "Effective Date").

### BACKGROUND

A. Seller agrees to sell the Property (defined below) and Purchaser agrees to purchase the Property from Seller.

NOW, THEREFORE, In consideration of the mutual agreements and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

### AGREEMENT

1. **KEY TERMS.** The following defined terms in this Agreement have the meanings set forth In this Section.

1.1 Seller:

*As to Tract 1 comprising the Property:* Fox River Resort Club, a not-for-profit Illinois corporation, acting as duly appointed attorney-in-fact, and Silverleaf Resorts, LLC, a Texas limited liability company, as their interests may appear

and

*As to Tracts 2, 3 and 4 comprising the Property:* Silverleaf Resorts, LLC, a Texas limited liability company

Mailing Address: 9271 S. John Young Parkway, Orlando, Florida 32819

Email: magreen@holidayinnclub.com

Phone: (407) 395-6835

1.2 Seller's Attorney: Maria Scicchitano, Esq.

Email: magreen@holidayinnclub.com

Phone: (407) 395-6835

1.3 Purchaser: Vairt Inc, a Pennsylvania corporation

Mailing Address: 13308 Buena Vista Road, Waynesboro PA 17268

Email: Jamil@vairt.com

Phone: 5164447715

1.4 Purchaser's Attorney: _____

Email: _____

Phone: _____

1.5 Escrow Agent: Wheatland Title Company

Escrow Officer: Karen Lewellen

Mailing Address: 105 West Veterans Parkway, Yorkville, IL 60560

Email: klewellen@standardtitle.com

Phone: (630) 892-2323

1.6 Title Company: Wheatland Title Company

(PSA – Vacant Improved Property)

Docusign Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

Escrow Officer: Karen Lewellen

Mailing Address: 105 West Veterans Parkway, Yorkville, IL 60560

Email: klewellen@standardtitle.com

Phone: (630) 892-2323

1.7    Seller's Broker: Matthews Real Estate Investment Services, Inc.

Mailing Address: 1600 west End, Ste, 1500, Nashville, TN

Email: matt.fitzgerald@matthews.com

Phone: 608-628-2233

License Number: 478027547

State of License: Illinois

1.8    Purchaser's Broker: _____

Mailing Address: _____

Email: _____

Phone: _____

License Number: _____

State of License: _____

Cooperating Broker Fee (if any): N/A

1.9    Purchase Price. $_ _____ (which equals the Winning Purchaser's Offer of $_ ___, plus the Marketing Fee of $_ ____). The Purchase Price shall be paid in accordance with the terms of this Agreement.

1.10    Earnest Money Deposit. $_ _____ ( )

1.11    Closing Date. June 9, 2026 (if blank, then thirty (30) calendar days after the Effective Date).

1.12    Closing Cost Allocation: See Section 8 (Closing Costs and Allocations).

2.    THE PROPERTY.

    2.1    Description & Agreement to Convey. Subject to the terms and conditions of this Agreement, Seller agrees to sell, assign and convey, and Purchaser hereby agrees to purchase and acquire, all of Seller's right, title and interest in and to the following (the "Property") on the Closing Date. The "Property" shall include the following:

    2.1.1    Land. The real property located in LaSalle County, Illinois and legally described in Exhibit A (the "Land") which Land is comprised of Tracts 1, 2, 3 and 4.

    2.1.2    Improvements: All buildings (the "Buildings"), improvements, parking facilities and other permanent fixtures located on the Land (collectively, the "Improvements") and all easements (except for certain rights to recreational easements to be terminated by Seller at or prior to Closing, all as more particularly contemplated in paragraph 13.27 below), hereditaments, appurtenances, development rights, and other benefits, if any, pertaining to or affecting the Land (collectively, the "Easements"). The Land, Buildings, Improvements and Easements are hereinafter collectively referred to as the "Real Property".

    2.1.3    Intangible Property. To the extent that the same exist and are in Seller's possession at Closing, permits, entitlements, warranties, telephone numbers, architectural or engineering plans and specifications and development rights related to the Real Property which may be unilaterally assigned by Seller (collectively, the "Intangible Property").

(PSA – Vacant Improved Property)
43067416.1

2.1.4 _Personal Property_: All furniture, fixtures and equipment ("**FF&E**") in all of the units in the Buildings contemplated in **Exhibit B** and all other personal property contemplated in **Exhibit C**.

## 3. EARNEST MONEY DEPOSIT.

3.1 _Deposit_. Purchaser must deposit the full amount of the Earnest Money Deposit to Escrow Agent no later than 5:00 p.m. in the time zone where the Property is located on the first (1st) business day following Purchaser being declared the winning bidder (even if the sale is subject to Seller's confirmation). The escrow ("**Escrow**") for the purchase of the Property shall be opened upon Escrow Agent's receipt of the Earnest Money Deposit and a fully signed copy of this Agreement. Purchaser agrees that Earnest Money Deposit is non-refundable (except as specifically described in this Agreement). If Purchaser shall fail to timely make the Earnest Money Deposit, Purchaser will be in default under this Agreement and Seller will be entitled to terminate this Agreement and exercise any and all other remedies.

3.2 _Maintenance of Earnest Money Deposit_. Escrow Agent will hold the Earnest Money Deposit in a non-interest bearing account.

3.3 _Disposition of Earnest Money_. The Earnest Money Deposit actually received by the Escrow/Closing Agent will be applied to the Purchase Price at closing, shall immediately become non-refundable, and at Seller's request, shall be immediately released to Seller. The Escrow Agent is authorized to disperse the Earnest Money Deposit pursuant to this Section, without further instruction from Buyer and Seller. The Earnest Money Deposit shall be applied as a credit to Buyer at Closing.

3.4 _Payment_. On or before 2:00 p.m. (in the time zone where the Property is located) on the Closing Date, Purchaser shall pay to the Escrow Agent in immediately available funds the Purchase Price, less the Earnest Money Deposit and subject to further adjustments for prorations and credits required to be made in accordance with the terms of this Agreement. On or before 5:00 p.m. (in the time zone where the Property is located) on the Closing Date, provided all conditions to Closing have been met hereunder, Purchaser shall instruct Escrow Agent to wire in immediately available funds: (a) the Purchase Price, less the Marketing Fee, to Seller; and (b) the Marketing Fee to Crexi (or as Crexi may designate in writing to Escrow Agent), to such bank account(s) as Seller and Crexi may designate.

3.5 _Closing_. The purchase and sale of the Property shall be consummated ("**Close**" or "**Closing**") on the Closing Date unless Seller and Purchaser agree to a different Closing Date in writing.

## 4. INSPECTIONS AND APPROVALS.

4.1 _Inspections_. Purchaser acknowledges, understands and agrees that it has had reasonable opportunity to access the Property and conduct inspections of the Property and further agrees that it waives any and all rights to any additional access to or inspections of the Property.

4.2 _Inspection of Documents_. Purchaser acknowledges receipt of all relevant materials relating to the Property ("**Property Documents**"). Purchaser acknowledges, understands and agrees that the Property Documents may have been prepared by parties other than Seller and that Seller makes no representation or warranty whatsoever, express or implied, as to the completeness, content or accuracy of the Property Documents. Purchaser specifically releases Seller from all claims, demands, causes of action, judgments, losses, damages, liabilities, costs and expenses (including without limitation attorney's fees whether suit is instituted or not), whether known or unknown, liquidated or contingent (collectively "**Claims**") asserted against or incurred by Purchaser by reason of the information contained in, or that should have been contained in, the Property Documents. The provisions of this Section shall survive Closing, or the earlier termination of this Agreement.

4.3 _Survey_. Purchaser acknowledges that Seller has already ordered and is awaiting receipt of a survey of the Land (the "**Existing Survey**"). Purchaser may, prior to the Effective Date, at its sole cost and expense, order an update to the Existing Survey (or if there is no Existing Survey, a new survey) (the Existing Survey, as updated, or a new survey, the "**Survey**"). Under no circumstance is Seller obligated to provide an Existing Survey or procure a new Survey.

4.4 _Title Commitment_. As part of the Property Documents, Purchaser acknowledges that Seller has delivered to Purchaser or made available for inspection a Commitment for Title Insurance

3

(PSA – Vacant Improved Property)
43067416.1

Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

(the "**Title Commitment**") setting forth the status of title to the Land and all exceptions which would appear in an Owner's Policy of Title Insurance, specifying Purchaser as the named insured and showing the Winning Purchaser's Offer as the policy amount.

    4.5    Permitted Exceptions. Purchaser shall accept title to the Property, subject to the following exceptions (the "**Permitted Exceptions**"):

    4.5.1    All matters affecting or relating to the title of the Property which are of record on the date of the Title Commitment.

    4.5.2    All matters disclosed on the Survey or that would be disclosed by an accurate survey or physical inspection of the Property.

    4.5.3    The lien of non-delinquent taxes, assessments and other usual and customary charges assessed against the owners of real property in the state in which the Land is located.

    4.5.4    All matters disclosed by the Property Documents.

    4.5.6    All building and zoning laws, codes and regulations affecting the Property, including all proffers, special exceptions, conditions, site plan approvals, and other similar matters, if any, relating to the zoning of the Property.

    5.    **SELLER'S OBLIGATIONS PRIOR TO CLOSING.** Following the Effective Date and until the Closing, Seller and/or Seller's agents or representatives shall:

    5.1    Taxes and Liens. Clear all delinquent taxes and liens applicable to the Property as stated on the Title Commitment.

    5.2    Insurance. Keep the Property insured, in an amount sufficient to satisfy any co-insurance requirement or stipulation, against fire and other hazards covered by extended coverage endorsement and comprehensive public liability insurance against claims for bodily injury, death and property damage occurring in, on or about the Property.

    5.3    Property Notices. Provide to Purchaser, immediately upon the receipt thereof, any and all written notices relating to the Property received by Seller or its agents or representatives from any governmental or quasi-governmental instrumentality, insurance company, vendor or any other entity or party, which notices are of a type not normally received in the ordinary course of Seller's business, or which may have a material effect upon the Property or result in a material change in a representation or warranty made by Seller hereunder.

    5.4    Compliance with Agreements. Take all actions necessary to comply with all agreements, covenants, encumbrances and obligations affecting or relating to the Property and the ownership, operation and maintenance thereof, including without limitation any contracts. Seller shall pay any and all utility bills, tax bills and other invoices and expenses relating to the Property, as and when the same become due, except as otherwise expressly provided herein.

    5.5    New Contracts. Seller may, without the prior consent of Purchaser, enter into any new contracts, provided that Seller shall provide Purchaser written notice of such actions and such contracts shall be terminable with no more than thirty (30) days' notice.

    5.6    Operation. Maintain the Property in good condition and make repairs and/or replacements in the ordinary course of business in connection with any damage to the Property, and deliver the Property to Purchaser at Closing in the condition existing as of the Effective Date, normal wear and tear and damage by casualty excepted.

    6.    **REPRESENTATIONS AND WARRANTIES.**

    6.1    By Seller. Seller represents and warrants to Purchaser as of the Effective Date that:

(PSA – Vacant Improved Property)
43067416.1

Envelope ID: 270C0BF0-0819-8526-810C-05A95B72479F

6.1.1    Seller has the power, right and authority to enter into and perform all of the obligations required of Seller under this Agreement and the instruments and documents referenced herein, and to consummate the transaction contemplated hereby.

6.1.2    This Agreement is, and all agreements, instruments and documents to be executed and delivered by Seller pursuant to this Agreement shall be duly authorized, executed and delivered by Seller. This Agreement is, and all agreements, instruments and documents to be executed and delivered by Seller pursuant to this Agreement shall be, valid and legally binding upon Seller and enforceable in accordance with their respective terms.

6.1.3    Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby does now constitute or shall result in a breach of, or a default under, any agreement, document, instrument or other obligation to which Seller is a party or by which Seller may be bound.

6.1.4    There are no actions, suits or proceedings pending or threatened, against or affecting Seller that could adversely affect its ability to perform its obligations hereunder.

6.2    Limitation on Remedies.    Notwithstanding anything herein to the contrary, if Purchaser discovers prior to Closing that one or more of the representations and warranties under the provisions of this Section are false or untrue as of the Closing Date, Purchaser's sole remedy will be to exercise its rights as set forth in the Section of this Agreement entitled "Termination Due to Breach."

6.3    Survival.    The representations and warranties by Seller set forth in this Section shall not survive Closing of this transaction, and no action or claim may be brought against Seller by Purchaser or any affiliate of Purchaser with respect to a breach of such representations or warranties or any action, suit or other proceedings commenced or pursued, for or in respect of any breach of any representation or warranty made by Seller in this Agreement from and after the Closing.

6.4    By Purchaser.    Purchaser represents and warrants to Seller as of the Effective Date that:

6.4.1    Purchaser is a corporation, partnership, limited liability company, trust or other type of business organization that is duly organized, validly existing and in good standing under the laws of the state in which it was organized, and Purchaser is qualified to do business in the jurisdiction in which the Property is located.

6.4.2    Purchaser has taken all requisite action and obtained all requisite consents, releases and permissions in connection with entering into this Agreement and the instruments and documents referenced herein or required under any covenant, agreement, encumbrance, law or regulation with respect to the obligations required hereunder, and no consent of any other party is required for the performance by Purchaser of its obligations hereunder.

6.4.3    This Agreement is, and all agreements, instruments and documents to be executed and delivered by Purchaser pursuant to this Agreement shall be, duly authorized, executed and delivered by and legally binding upon Purchaser and enforceable in accordance with their respective terms.

6.4.4    Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby does now constitute or shall result in a breach of, or a default under, any agreement, document, instrument or other obligation to which Purchaser is a party or by which Purchaser may be bound, or any law, statute, ordinance, rule, governmental regulation or any writ, injunction, order or decree of any court or governmental body, applicable to Purchaser.

6.4.5    No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or state bankruptcy law is pending against or, to the best of Purchaser's knowledge, contemplated by Purchaser.

6.4.6    There are no actions, suits, claims or other proceedings pending or, to the best of Purchaser's knowledge, contemplated or threatened against Purchaser, which if determined adversely to Seller, could adversely affect its ability to perform its obligations hereunder.

5

(PSA – Vacant Improved Property)
43067416.1

DocuSign Envelope ID: 270C0BF0-0619-8526-810C-06A95B72479F

6.5     Broker. Seller and Purchaser each represents to the other that it has had no dealings, negotiations, or consultations with any broker, representative, employee, agent or other intermediary in connection with the sale of the Property, except that Purchaser has retained the services of Purchaser's Broker and Seller has retained the services of Seller's Broker. Seller shall be solely responsible for paying the fees and commissions owed to Seller's Broker, pursuant to a separate written agreement between Seller and Seller's Broker, and Purchaser shall be solely responsible for paying the fees and commissions owed to Purchaser's Broker, pursuant to a separate written agreement between Purchaser and Purchaser's Broker; provided, however, if Seller's Broker has agreed to offer a Cooperating Broker Fee (in which case the Cooperating Broker Fee shall have been advertised on the Website (as defined herein)), then Seller's Broker shall be responsible to pay a Cooperating Broker Fee to Purchaser's Broker in the amount set forth in this Agreement.

6.6     Property Condition.

6.6.1     Release of Claims. Purchaser releases Seller from any and all Claims (whether known or unknown, and whether contingent or liquidated) arising from or related to (a) any defects, errors or omissions in the design or construction of the Property, whether the same are a result of negligence or otherwise; or (b) other conditions (including environmental conditions) affecting the Property, whether the same are a result of negligence or otherwise. The release set forth in this Section specifically includes any Claims under any Environmental Laws, under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., or with respect to any environmental risk. "Environmental Laws" includes, but is not limited to, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. §§6901 et seq.), the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.), the Emergency Planning and Community Right to Know Act (42 U.S.C. §§11001 et seq.), the Clean Air Act (42 U.S.C. §§7401 et seq.), the Clean Water Act (33 U.S.C. §§1251 et seq.), the Toxic Substances Control Act (15 U.S.C. §§2601 et seq.), the Hazardous Materials Transportation Act ( 49 U.S.C. §§1801 et seq.), the Occupational Safety and Health Act (29 U.S.C. §§651 et seq.), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. §§136 et seq.), and the Safe Drinking Water Act (42 U.S.C. §§300f et seq.), as any of the same may be amended from time to time, and any state or local law dealing with environmental matters, and any regulations, orders, rules, procedures, guidelines and the like promulgated in connection therewith, regardless of whether the same are in existence on the date of this Agreement. **THE CONVEYED PROPERTY IS BEING CONVEYED "AS IS", "WHERE IS", AND "WITH ALL FAULTS" AS OF THE CLOSING DATE, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED, OTHER THAN AS SET FORTH IN THIS AGREEMENT.**

6.6.2     Acknowledgment of Inspection. Purchaser acknowledges and agrees that (a) Purchaser had an opportunity to inspect the Property and its operations prior to the Effective Date, (b) if this transaction is consummated, Purchaser will be purchasing the Property pursuant to Purchaser's independent examination, study, inspection and knowledge of the Property, and (c) Purchaser is relying upon its own determination of the value and condition of the Property and not on any information provided or to be provided by Seller. Purchaser is relying solely upon its own inspections, investigations, research and analyses in entering into this Agreement and is not relying in any way upon any representations or warranties (except those expressly provided in this Agreement), statements, plans, specifications, cost estimates, studies, reports, descriptions, guidelines or other information or material furnished by Seller or its representatives to Purchaser or its representatives, whether oral or written, express or implied, of any nature whatsoever regarding any such matters.

6.6.3     RELEASE. PURCHASER RELEASES SELLER AND ANY SERVICER, AGENT, REPRESENTATIVE, MANAGER, AFFILIATE, OFFICER, PARTNER, SHAREHOLDER OR EMPLOYEE OF SELLER (A "SELLER RELATED PARTY") FROM ALL CLAIMS, LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES WHICH PURCHASER OR ANY PARTY RELATED TO OR AFFILIATED WITH PURCHASER (A "PURCHASER RELATED PARTY") HAS OR MAY HAVE ARISING FROM OR RELATED TO ANY MATTER OR THING RELATED TO THE PHYSICAL CONDITION OF THE PROPERTY, ANY CONSTRUCTION DEFECTS, ANY ERRORS OR OMISSIONS IN THE DESIGN OR CONSTRUCTION OF THE PROPERTY AND ANY ENVIRONMENTAL CONDITIONS AT, IN, ON OR

6

(PSA – Vacant Improved Property)
43067416.1

UNDER THE PROPERTY, AND PURCHASER WILL NOT LOOK TO SELLER OR ANY SELLER RELATED PARTY IN CONNECTION WITH THE FOREGOING FOR ANY REDRESS OR RELIEF.

6.6.4 ASSUMPTION. EFFECTIVE AS OF THE CLOSING DATE, PURCHASER WILL ASSUME ALL OF SELLER'S LIABILITIES AND OBLIGATIONS WITH RESPECT TO PERSONAL PROPERTY AND INTANGIBLE PROPERTY ARISING AND ACCRUING FROM AND AFTER THE CLOSING DATE.

6.6.5 SURVIVAL. THE ACKNOWLEDGMENTS AND AGREEMENTS OF PURCHASER SET FORTH IN THIS SECTION WILL SURVIVE THE CLOSING.

7. CONDITIONS PRECEDENT TO CLOSING.

7.1 Purchaser's Conditions. Purchaser's obligations to Close are subject to the following conditions precedent:

7.1.1 The representations and warranties of Seller in this Agreement are true, complete and accurate in all material respects as of the Closing Date, and Seller has performed in all material respects all covenants and obligations required to be performed by Seller on or before the Closing Date.

7.1.2 The Escrow Agent is irrevocably committed to issue to Purchaser an ALTA form owner's policy of title insurance (the "Purchaser's Title Policy") in the amount of the Purchase Price, less Marketing Fee, showing fee title to the Real Property vested solely in Purchaser and subject only to the following: (a) the standard, preprinted exclusions to Purchaser's Title Policy; (b) liens to secure payment of real estate taxes and assessments not yet due and payable; (c) matters affecting the Real Property created by or consented to by Purchaser; and (d) Permitted Exceptions.

7.2 Seller's Conditions. Seller's obligations to Close are subject to the following conditions precedent:

7.2.1 Purchaser's representations and warranties contained in this Agreement shall be true, complete and accurate in all material respects as of the Closing Date.

7.2.2 Purchaser shall have performed in all material respects all covenants and obligations required to be performed by Purchaser on or before the Closing Date.

7.3 Waiver of Conditions. Either party may waive its respective closing conditions in its sole discretion. By proceeding to Closing, each party waives its respective closing conditions and irrevocably releases the other party from any liability arising from any facts known by such waiving party that would otherwise have resulted in a failure of a closing condition.

8. CLOSING COSTS AND PRORATIONS.

8.1 Pre-Closing Costs. Purchaser and Seller acknowledge that the Escrow Agent may incur certain costs while processing this transaction which must be paid prior to Closing. The Escrow Agent is authorized and instructed to release funds for payment of such costs prior to Closing from funds deposited into Escrow by Purchaser. Such funds are not refundable and the Escrow Agent is released from any liability for payment of any such funds released through the Escrow prior to the Closing. The Escrow Agent is authorized to charge the appropriate party for costs incurred, or credit the appropriate party for credits, as applicable at Closing or upon termination of this Agreement.

8.2 Closing Cost Allocation: Purchaser and Seller shall pay closing costs as described in this Section 8.2 (and the Escrow Agent is authorized to (i) pay Seller's costs from Seller's proceeds, and (ii) pay Purchaser's costs from funds deposited into Escrow by Purchaser):

7

(PSA – Vacant Improved Property)
430674161

| Closing Costs (as Applicable) | Seller Pays | Purchaser Pays | Split Seller/Purchaser |
|---|---|---|---|
| Title Search Fee | X | | |
| Owner's Title Insurance Policy (Standard Coverage) | X | | |
| Additional Title Coverage or Endorsements Requested by Purchaser | | X | |
| Lender's Title Insurance Policy | | X | |
| Closing Agent Fees | | | X |
| State and/or Local Transfer Taxes | | | X |
| Credit Reports, Loan Fees, Loan Points, Reports and Inspections Required by Purchaser's Lender, Appraisal Fees, Mortgage Notarization and Recording Fees, and All Other Costs in Connection With Purchaser's Loan | | X | |
| Seller's Loan Prepayment Fees and All Other Costs in Connection With Seller's Existing Loan | X | | |
| Recording Fees | | X | |
| Recording Documents to Remove Encumbrances | X | | |
| Real Estate Broker/Agent Commissions Due Listing Broker | X | | |
| Offered Cooperating Real Estate Broker/Agent Commissions Due Purchaser's Broker | X | | |
| Additional Real Estate Broker/Agent Commissions Due Purchaser's Broker (if Any) | | X | |
| Common Interest Development Transfer Fee | | | X |
| Common Interest Development Document Preparation Fees | | | X |
| Private Transfer Fee | | | X |
| Any Reports and Inspections Requested by Purchaser | | X | |
| Seller's Attorney Fees | X | | |
| Purchaser's Attorney Fees | | X | |
| All Other Closing Costs | Any closing costs or charges of closing this transaction not specifically mentioned shall be paid and adjusted in accordance with local custom or ordinance in the jurisdiction in which the property is located. | | |

8.3    Prorations. All revenues collected, and all expenses, including, personal property taxes, installment payments of special assessment liens, vault charges, sewer charges, utility charges, reimbursement of maintenance and repair expenses and normally prorated operating expenses billed or paid as of the Closing Date (or estimates for invoices for such operating expenses which are unbilled as of the Closing Date but shall include expenses applicable to a time period on or after the Closing Date), shall be prorated as of 11:59 p.m. on the day before the Closing Date and shall be adjusted against the Purchase Price due at Closing. Seller and Purchaser acknowledge and agree that no re-proration shall occur post-Closing for any reason, known or unknown at the time of Closing or thereafter, and all proration figures included in the Settlement Statement (as defined herein) shall be final upon execution by the parties.

8.3.1    Utility Deposits. Seller shall be entitled to any refundable deposits held for utility accounts affecting the Property.

8.4    Taxes. General real estate taxes and special assessments relating to the Property payable during the year in which Closing occurs shall be prorated with respect to the Property as of the day before the Closing Date. If Closing shall occur before the actual taxes and special assessments payable during such year are known, the apportionment of taxes shall be upon the basis of taxes for the Property payable during the immediately preceding year. If, as the result of an appeal of the assessed valuation of the Property for any real estate tax year prior to (or including) the Closing, there is issued after Closing an administrative ruling, judicial decision or settlement by which the assessed value of the Property for such tax year is reduced, and a real estate tax refund issued, Seller shall be entitled to all such refunds relating to the period prior to Closing. If Seller engaged the tax appeal agent then the tax appeal agent shall remain responsible solely to Seller for such appeal. If the appeal is successfully culminated either prior to or after the proposed sale transaction, and Purchaser would benefit from such appeal for the current or subsequent

8

(PSA – Vacant Improved Property)
43667416.1

ID: 270C0BF0-0819-8526-810C-05A95B72479F

tax year, then Purchaser shall pay a pro-rata share portion of the costs and expenses incurred by Seller in connection with the appeal.

8.5   In General. Any other costs or charges of closing this transaction not specifically mentioned in this Agreement shall be paid and adjusted in accordance with local custom or ordinance in the jurisdiction in which the Property is located.

8.6   Purpose and Intent. Except as expressly provided herein, the purpose and intent as to the provisions of prorations and apportionments set forth in this Section and elsewhere in this Agreement are that Seller shall bear all expenses of ownership and operation of the Property and shall receive all income therefrom accruing through midnight of the day preceding the Closing, and Purchaser shall bear all such expenses and receive all such income accruing thereafter.

9.   **CLOSING AND ESCROW.**

9.1   Seller's Documents. On or before the Closing Date, Seller must deliver to Escrow Agent the following original documents, signed and, if applicable, acknowledged (collectively, the "Seller's Documents"):

9.1.1   Special Warranty Deeds conveying title to Purchaser of the Real Property in the forms attached hereto as **Exhibit D-1** and **Exhibit D-2** (collectively, the "Deeds").

9.1.2   Affidavits pursuant to the Foreign Investment and Real Property Tax Act in the forms attached hereto as **Exhibit E-1** and **Exhibit E-2** (collectively, the "FIRPTA Affidavits").

9.1.3   An Assignment and Assumption Agreement and Bill of Sale in the form attached hereto as **Exhibit F** (the "Assignment and Assumption Agreement").

9.1.4   A Post Closing Agreement in the form attached hereto as **Exhibit G** (the "Post Closing Agreement").

9.1.5   A Release of Lien in the form attached hereto as **Exhibit H** (the "Release of Lien").

9.1.6   If not previously executed and recorded prior to Closing, the Mutual Release and Termination of Recreation and Use Easement contemplated in paragraph 13.27 below.

9.1.7

9.1.8   The joint settlement statement (the "Settlement Statement"), prepared by Escrow Agent.

9.1.9   Such other documents, certificates and other instruments as may be reasonably required by Title Company or Escrow Agent to consummate the transaction contemplated in this Agreement.

9.2   Purchaser's Documents. On or before the Closing Date, Purchaser must (a) deliver to Escrow Agent the Purchase Price less the Marketing Fee, plus Purchaser's share of closing costs, prorations and expenses as described in this Agreement, (b) cause the payment of the Marketing Fee to Crexi, and (c) deliver to Escrow Agent the following original documents, signed and, if applicable, acknowledged (collectively, the "Purchaser's Documents"):

9.2.1   The Assignment and Assumption Agreement;

9.2.2   The Post Closing Agreement;

9.2.3   Evidence of Purchaser's authority, and the authority of the person executing any documents at Closing on behalf of Purchaser, acceptable to Seller and Escrow Agent, to enter into the transactions contemplated by this Agreement.

9.2.4   The Settlement Statement.

9.2.5   Such other documents, certificates and instruments as may be reasonably required to consummate the transaction contemplated in this Agreement.

9

(PSA – Vacant Improved Property)
43067416.1